# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

JARRET JENKINS,        :
  Plaintiff,         :
 v.            :
MICROBILT CORPORATION,    :  Case No.: 2:25-cv-03055
  Defendant.        :
              :
              :

## LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF MICROBILT CORPORATION'S RULE 56
## MOTION FOR SUMMARY JUDGMENT

Defendant, MicroBilt Corporation, though undersigned counsel, submits the following Statement of Materials Facts pursuant to Fed.R.Civ.Pro.56 and Local Rule 56.1:

1.   Paper discovery in this matter is closed and there is no discovery or discovery related motion pending. Declaration of Bruce S. Luckman, ¶6. "Luckman Decl., ¶__".

2.   The following pleadings and exhibits are true and correct copies from the docket of the Supreme Court of the State of New York, County of Nassau, in an action captions: <u>Fox Capital Group, Inc. v. Tate LLC, DDT Consultants, Inc and Jarrett R. Jenkins</u>, Index No. 611355/2023:

   a)   Summons and Complaint, Exhibit "a" to Luckman Decl. ¶7;
   b)   Complaint Exhibit "A", Future Receivables Sale and Purchase Agreement, Exhibit "b" to Luckman Decl. ¶7; and
   c)   Judgment, Exhibit "c" to Luckman Decl, ¶7

3.   Exhibit "A" to the Fox Capital Complaint against Plaintiff and his company is the Contract underlying that lawsuit. Luckman Decl., ¶7(b). That document contains Plaintiff's authorization to Fox Capital and its agents to obtain consumer reports and credit history in connection with the agreement. See provisions: 1.12 and 1.5, 1.5.1. thereto. Id.

4.   Exhibit "c" to the Luckman Decl, ¶7, is the December 2, 2024 $62,211.18 Judgment in favor of Fox Capital and against Plaintiff and his companies.

5.      MicroBilt's consumer report reseller customers undergo a rigorous credentialing process before being onboarded as a customer with access to consumer reports. Declaration of Walter Wojciechowski, ¶¶3-4 ("Wojciehowski Decl, ¶__";

6.      Alliance Title Services ("ATS") is a credentialed MicroBilt Customer. Id. at ¶6. The application and credentialing process materials, including an onsite inspection and MicroBilt User License Agreement are attached to the Wojciechowski Decl. Id. at ¶¶6-7, with Exhibits;

7.      "Soft inquiries" are only viewed by the subject of the report and such inquiries are not used to create credit scores. Id. at ¶¶12 – 13.

8.      ATS obtained the Equifax report concerning Plaintiff in connection with collection risk analysis for Fox Capital and its lender, Wells Fargo. Id. at 14.

Date: December 17, 2025

                                    */s/ Bruce S. Luckman*
                                      Bruce S. Luckman

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JARRET JENKINS,                     : | |
|      Plaintiff,               : | |
|      v.                     : | |
| MICROBILT CORPORATION,   : | Case No.: 2:25-cv-03055 |
|      Defendant.           : | |
|                          : | |
|                          : | |

**DECLARATION OF BRUCE S. LUCKMAN, ESQUIRE
IN SUPPORT OF MICROBILT CORPORATION'S RULE 56
MOTION FOR SUMMARY JUDGMENT**

I, Bruce S. Luckman, Esquire, being over eighteen years of age, declare as follows:

1.      I am a shareholder of the firm of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., and counsel for MicroBilt Corporation ("MicroBilt"), a defendant in the above action. Based on my personal knowledge and review of the Parties discovery responses, docket, Orders, and attached pleadings, I submit this declaration in Support of MicroBilt's Rule 56 and Local Rule 56.1 Motion and Statement of Material Facts.

2.      On July 20, 2025, Magistrate Judge Tiscione entered a Civil Minute Entry in connection with the Initial Conference which contained the Ruling that "Parties shall complete paper discovery by October 28, 2025. Dkt.#11.

3.      Before the close of discovery, Plaintiff filed a letter Motion to Compel MicroBilt to produce additional information and documents and MicroBilt filed a cross – motion. Dkts.## 18 and 20.

4.      A hearing was held and on October 29, 2025, and no ruling was made on the Motions pending the parties further exchange of documents. The parties did exchange additional information, but on November 14, 12025, Plaintiff renewed his Motion to Compel. Dkt.#22.

5.    On December 10, 2025, Magistrate Judge Tiscione entered a Civil Minute Entry in connection with a Motion Hearing on Plaintiff's renewed Motion to Compel which denied the Motion. Dkt.#24

6.    At this time, paper discovery is closed and no discovery or related motions are pending.

7.    I obtained the following pleadings and exhibits from the docket of the Supreme Court of the State of New York, County of Nassau, in an action captions: Fox Capital Group, Inc. v. Tate LLC, DDT Consultants, Inc and Jarrett R. Jenkins, Index No. 611355/2023:

a) Summons and Complaint, Exhibit "a" hereto;
b) Complaint Exhibit "A", Future Receivables Sale and Purchase Agreement, Exhibit "b" hereto; and
c) Judgment, Exhibit "c" hereto;

8.    Exhibit "d" hereto is the Declaration of Walter Wojciechowski, MicroBilt's CEO.

I declare under penalty of perjury that the foregoing statements made by me are true and correct.

Date: December 17, 2025

                                        /s/ Bruce S. Luckman
                                        Bruce S. Luckman

4274854.1

# EXHIBIT A

Case 2:25-cv-03655-NCM-ST Document 23-2 Filed 07/25/26 Page 6 of 121 PageID #: 3825

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

|  |  |
|---|---|
|  | Index No.: |
| FOX CAPITAL GROUP, INC., | |
|       Plaintiff, | Venue: NASSAU |
| -against- | |
| TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS, | |
|       Defendants. | **SUMMONS** |

TO THE ABOVE-NAMED DEFENDANTS:

     **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with the summons, to serve a notice of appearance, on the plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  Nassau County, New York
       July 12, 2023

                         **LIEBERMAN AND KLESTZICK, LLP**

                         *Yonatan Klestzick*

                         Yonatan Klestzick, Esq.
                         71 S. Central Avenue, 2nd Floor
                         Valley Stream, New York 11580

                         **Mail To**:
                         PO Box 356
                         Cedarhurst, New York 11516
                         PHONE: (516) 900-6720
                         FAX: (516) 308-9383
                         YKlestzick@landklegal.com

FILED: NASSAU COUNTY CLERK 07/18/2023 03:34 PM
NYSCEF DOC. NO. 1
INDEX NO. 611355/2023
RECEIVED NYSCEF: 07/18/2023

To Defendant's Addresses:

TATE LLC
25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747
334 LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044
1225 FRANKLIN AVE, GARDEN CITY, NY, 11530

DDT CONSULTANTS, INC
25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747
334 LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044
1225 FRANKLIN AVE, GARDEN CITY, NY, 11530

JARRETT R. JENKINS
25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747
334 LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044
1225 FRANKLIN AVE, GARDEN CITY, NY, 11530

## SEE COMPLAINT ANNEXED HERETO

Case 2:25-cv-03855-NJC-ST Document 23-2 Filed 02/07/25 Page 8 of 121 PageID #: 827

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

---

**FOX CAPITAL GROUP, INC.,**

          Plaintiff,

-against-

**TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS,**

          Defendants.

Index No.:

**VERIFIED COMPLAINT**

---

Plaintiff, FOX CAPITAL GROUP, INC. ("Plaintiff"), by and through its attorneys, Lieberman and Klestzick, LLP, for its complaint herein against TATE LLC, DDT CONSULTANTS, INC ("Company Defendants"), and JARRETT R. JENKINS ("Guarantor", and together with the Company Defendants the "Defendants"), alleges as follows:

## The Parties

1.     At all relevant times, Plaintiff was and is a Corporation authorized to do business and with an office in the State of New York.

2.     Upon information and belief, at all relevant times, Company Defendants were and are companies organized and existing under the laws of the State of New York.

3.     Upon information and belief, at all relevant times, Guarantor was and is an individual residing in the state of New York.

4.     Jurisdiction and venue are proper as Defendants are located in Nassau County and transact business in New York.

## The Facts

5.     On or about December 15, 2022, Plaintiff and Defendants entered into an

Case 2:25-cv-00655-NJC-SIL   Document 23-2   Filed 02/27/25   Page 9 of 121 PageID #: 3828

agreement (The "Agreement") whereby Plaintiff agreed to purchase 11 percent of Company Defendants' future receivables having an agreed to value of $108,000.00. See the Agreement annexed hereto as **"Exhibit A"**.

6.     Pursuant to the Agreement, Company Defendants agreed to have one bank account approved by Plaintiff (the "Bank Account") from which Company Defendants authorized Plaintiff to make ACH withdrawals until $108,000.00 was paid in full to Plaintiff.

7.     In addition, Guarantor agreed to guarantee any and all amounts owed to Plaintiff from Company Defendants upon a breach in performance by Company Defendants.

8.     On or about December 19, 2022, Plaintiff remitted $80,000.00, minus the agreed to fees, "the purchase price" pursuant to the Agreement, for the future receivables to Company Defendants as Agreed. See the Funding Confirmation annexed hereto as **"Exhibit B".**

9.     Company Defendants, however, repeatedly failed to clear their payments of the purchased receivables to Plaintiff from the Bank Account without providing proper notice or an alternative form of remitting the receivables and failed to provide Plaintiffs proper financial disclosures or a written request for reconciliation, thereby breaching the agreement.

10.    Company Defendants are in breach of the Agreement as of, on or about, June 1, 2023.

11.    Company Defendants made payments totaling $58,618.80, leaving a balance due of $49,381.20. See the Pay Run annexed hereto as **"Exhibit C"**.

FILED: NASSAU COUNTY CLERK 07/18/2023 03:34 PM
INDEX NO. 611355/2023
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 07/18/2023

Case 2:25-cv-03055-NCM-ST    Document 26-2    Filed 02/20/25    Page 10 of 121 PageID
#: 389

12.     Company Defendants owe Plaintiff $49,381.20 of the Purchased Amount.

13.     By Defaulting, under the terms of the Agreement, Company Defendants owe Plaintiff an additional $5,000.00 default fee. See **Exhibit "A"** at page 2 paragraph H.

14.     Despite due demand, Company Defendants have failed to pay the amounts due and owing by Company Defendants to Plaintiff under the Agreement.

15.     Additionally, Guarantor is responsible for all amounts incurred as a result of any default of the Company Defendants.

16.     There remains a balance due and owing to Plaintiff on the Agreement in the amount of $54,381.20 plus interests, costs, disbursements and attorney's fees.

### AS AND FOR THE FIRST CAUSE OF ACTION
**(Breach of Contract)**

17.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 16 of this complaint as though fully set forth at length herein.

18.     Plaintiff gave fair consideration to Company Defendants which was tendered for the right to receive the aforementioned future receivables. Accordingly, Plaintiff fully performed under the Agreement.

19.     Upon information and belief, Company Defendants are still conducting their regular business operations and still collecting their receivables.

20.     Company Defendants have materially breached the Agreement by repeatedly failing to clear their payments of the purchased receivables to Plaintiff from the Bank Account without providing proper notice, without providing proper financial disclosures or a written request for reconciliation, and otherwise intentionally impeding and preventing Plaintiff from receiving the proceeds of the receivables purchased by them while conducting their regular business operations, thereby breaching the Agreement.

21.    By reason of the foregoing, Plaintiff has suffered damages in the amount of

$54,381.20, plus interest, costs, disbursements and attorney's fees.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Personal Guarantee)**

22.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 21 of this complaint as though fully set forth at length herein.

23.    Pursuant to the Agreement, Guarantor personally guaranteed that Company

Defendants would perform their obligations thereunder and that he would be personally

liable for any loss suffered by Plaintiff as a result of a breach by Company Defendants.

24.    Company Defendants have breached the Agreement as detailed above.

25.    By reason of the foregoing, Plaintiff is entitled to judgment against Guarantor

based on his personal guarantee in the sum of $54,381.20, plus interests, costs,

disbursements and attorney's fees.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Unjust Enrichment)**

26.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 25 of this complaint as though fully set forth at length herein.

27.    Defendants have been unjustly enriched in that they have received the

purchase price for the future receivables yet have failed to pay the sum of $49,381.20

pursuant to the Agreement.

28.    By reason of the foregoing, Plaintiff is entitled to judgment against the

Defendants for unjust enrichment in an amount to be determined by the court, plus

interest, costs, disbursements and attorney's fees.

**WHEREFORE**, plaintiff FOX CAPITAL GROUP, INC., requests judgment against

defendants TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS

as follows:

i.   On the first cause of action of the complaints, Plaintiff requests judgment against Company Defendants in the amount of $54,381.20 plus interest, costs, disbursements and attorney's fees;

ii.  On the second cause of action of the complaint, Plaintiff requests judgment against the Guarantor in the amount of $54,381.20, plus interest, costs, disbursements and attorney's fees;

iii. On the third cause of action of the complaint, Plaintiff requests judgment against Company Defendants and Guarantor in the amount of $49,381.20, plus interest, costs, disbursements and attorney's fees;

iv.  For such other and further relief as this Court deems just and proper.


Dated:  Nassau County, New York
        July 12, 2023

                              **LIEBERMAN AND KLESTZICK, LLP**

                              *Yonatan Klestzick*
                              Yonatan Klestzick, Esq.
                              71 S. Central Avenue, 2nd Floor
                              Valley Stream, New York 11580
                              **Mail To:**
                              PO Box 356, Cedarhurst, New York 11516
                              PHONE: (516) 900-6720
                              YKlestzick@landklegal.com

## VERIFICATION

STATE OF _Florida_
COUNTY OF _Broward_

Shloime Nelken, being duly sworn deposes and says:

I am a managing member of FOX CAPITAL GROUP, INC. and, as such, I am

authorized to make this affidavit on behalf of FOX CAPITAL GROUP, INC.. I have read

the foregoing Verified Complaint and know the contents thereof. The same is true to my

knowledge, except as to the matters therein stated to be alleged upon information and

belief, and as to those matters, I believe them to be true.

Shloime Nelken

Sworn to before me this
18th day of July, 2023

Notary Public

Notary Public State of Florida
Daniel Guyton
My Commission HH 038834
Expires 09/01/2024

## UNIFORM ALL PURPOSE CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF FLORIDA

COUNTY OF BROWARD

Under the penalty of perjury, I certify that on the 18th day of _Ju/y_ in the

year of 2023, before me, the undersigned, personally appeared

_Shloime Velleen_, personally known to me or proved to me on the basis of

satisfactory evidence to be the individual whose name is subscribed to the within instrument and

acknowledged to me that he executed the same in his capacity, and that by his signature on the

instrument, the individual, and the entity on behalf of which the individual acted, executed the

instrument. The manner in which same was signed was, and is, in accordance with, and

conforms to the Laws for taking oaths and acknowledgments in the State of Florida.

Notary Public

Notary Public State of Florida
Daniel Guyton
My Commission HH 038834
Expires 09/01/2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

| | |
|---|---|
| FOX CAPITAL GROUP, INC., | Index No.: |
| Plaintiff, | |
| -against- | **NOTICE OF ELECTRONIC FILING IN A MANDATORY CASE (Rule § 202.5-bb)** |
| TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS, | |
| Defendants. | |

You have received this Notice because: 1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and 2) You are a Defendant/Respondent (a party) in this case.

**If you are represented by an attorney**: Give this Notice to your attorney. Attorneys: See Information for Attorneys below.

**If you are not represented by an attorney:** You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing. If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents. The benefits of participating in e-filing include: 1) serving and filing your documents electronically; 2) free access to view and print your e-filed documents; 3) limiting your number of trips to the courthouse; 4) paying any court fees on-line (credit card needed).

To register for e-filing or for more information about how e-filing works: 1) visit: www.nycourts.gov/efile-unrepresented; or 2) contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov.

To find legal information to help you represent yourself visit www.nycourthelp.gov.

**Information for Attorneys – (E-filing is Mandatory for Attorneys)**: An attorney representing a party who is served with this notice must either: 1) immediately record his or her representation with the e-filed matter on the NYSCEF site www.nycourts.gov/efile; or 2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions form mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]. For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; email: efile@nycourts.gov).

Dated: Nassau County, New York
July 12, 2023

*Jonatan Klestzick*
Jonatan Klestzick, Esq.
71 S. Central Avenue, Second Floor
Valley Stream, New York 11580
**Mail To:**
PO Box 356, Cedarhurst, New York 11516

Case 2:25-cv-03055-NCM-ST   Document 25-2   Filed 07/07/25   Page 16 of 121 PageID #: 925

Index No.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

**FOX CAPITAL GROUP, INC.,**

                                        Plaintiff,

                   -against-

**TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS**

                                        Defendants.

---

**SUMMONS AND VERIFIED COMPLAINT**

---

**LIEBERMAN AND KLESTZICK, LLP**
71 S. Central Avenue, Second Floor
Valley Stream, New York 11580

**Mail To:**
PO Box 356
Cedarhurst, New York 11516

# EXHIBIT B

Case 2:25-cv-03055-NCM-ST    Document 25-2    Filed 07/25/26    Page 216 of 121 PageID
#: 357

# EXHIBIT A

**Fox Capital Group, Inc.**

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This Agreement ("Agreement") dated December 15, 2022, is made between Fox Capital Group, Inc. ("FCG") and the following merchant(s) (hereinafter, "Merchant"), owner(s) ("Owner") and guarantor(s) ("Guarantor"):

**Legal Name of Merchant(s):** TATE LLC and entities appearing on "**Exhibit D**"
**D/B/A:**
**Form of Entity:** LLC     **State of Organization:** NY     **EIN #:** ▮▮▮▮
**Physical Address:** 25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747
**Mailing Address:** 25 MELVILLE PARK RD , STE 229 G, MELVILLE, NY, 11747

| "Purchase Price" | "Purchased Percentage" | "Purchased Amount" | "Daily Remittance" |
|---|---|---|---|
| $80,000.00 | 11.0% | $108,000.00 | $514.20 |

**FOR TATE LLC**

By: *Jarrett R. Jenkins*     ←
Name: JARRETT R JENKINS
Title: Owner
Business Phone:

**OWNER/GUARANTOR #1**

By: *Jarrett R. Jenkins*     ←
Name: JARRETT R JENKINS
SSN: ▮▮▮▮
Email: INFO@TATECAPITALLLC.COM
Phone:
Address: 334 LOCUST ST, # 1
          WEST HEMPSTEAD, NY, 11552-3044

Subject to the Terms and Conditions below ("Terms"), Merchant hereby sells, assigns, and transfers to FCG (making FCG the absolute owner) in consideration of the Purchase Price specified above, the Purchased Percentage of all of Merchant's accounts receivable and payment rights arising out of or relating to Merchant's sale or delivery of goods and/or services due to Merchant after the date of this Agreement, whether paid directly by Merchant's customers or paid by others on Merchant's customers' behalves or as reimbursements (the "Receipts") up to the Purchased Amount, which shall be remitted to FCG in the manner set forth in this Agreement until the entire Purchased Amount has been delivered by Merchant to FCG (except in the case that Merchant ceases to receive Receipts because, for example, it goes out of business or goes bankrupt in the regular course of its business). This sale of Receipts to FCG is made without recourse against Merchant or any Guarantors, except as specifically set forth in this Agreement. In consideration of the sale by Merchant to FCG of the Receipts, FCG agrees to pay to Merchant the Purchase Price (reduced by any applicable fees), which shall be delivered to Merchant following Merchant's execution of this Agreement. FCG's payment of the Purchase Price (minus any applicable fees) shall be deemed the acceptance and performance by FCG of this Agreement.

THIS IS NOT A LOAN. Merchant is selling a portion of a future revenue stream to FCG at a discount, not borrowing money from FCG. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by FCG. In lieu of calculating the value of the Purchased Percentage of the Receipts each day, Merchant shall remit the Daily Remittance, which is a good faith approximation by FCG and Merchant of (a) the Purchased Percentage multiplied by (b) the gross revenues of Merchant during the previous calendar month divided by (c) the number of business days in the previous calendar month. The initial Daily Remittance shall be as described above. Merchant going bankrupt or going out of business, or experiencing a slowdown in business or a delay in collecting its receivables, in and of themselves, do not constitute a breach of this Agreement. Under such circumstances, the Daily Remittance shall be subject to reconciliation or adjustment as set forth in Paragraph 1.4 of the Terms and Conditions provided Merchant is not otherwise in default of this Agreement and makes a reconciliation request. FCG is entering this Agreement knowing the risks that Merchant's business may slow down or fail. FCG assumes these risks based on Merchant's, each Owner's and each Guarantor's representations, warranties, and covenants in this Agreement, which are designed to give FCG a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and each Guarantor are guaranteeing performance of the terms of this Agreement and are not guaranteeing absolute payment of the Purchased Amount. Nothing in this Agreement to the contrary, Merchant shall operate its business in good faith and do nothing to intentionally cause the diminution or diversion of its Receipts.

So long as Merchant is generating Receipts and has not requested a reconciliation, FCG will debit the Daily Remittance each business day from one depositing bank account (the "Account"), into which Merchant and Merchant's customers shall exclusively remit all Receipts (regardless of the method by which Merchant receives them), until such time as FCG receives remittance in full of the Purchased Amount (except in the case that Merchant ceases to receive Receipts because it goes out of business or goes bankrupt in the regular course of its business). Merchant hereby authorizes FCG to ACH debit the Daily Remittance from the Account on each business day (i.e., Monday through Friday but not bank holidays). Merchant understands that it is responsible for ensuring that it is responsible for notifying FCG if it has no Receipts or if there is not an amount sufficient to cover the Daily Remittance to be debited by FCG in the Account. In the event that there will be insufficient funds in the Account such that the debit of the Daily Remittance will not be honored by Merchant's bank, Merchant shall give 24 hours' advanced written notice (or other reasonable notice as necessitated by the circumstances, but no later than two days after Merchant is sent notice of a rejected debit) to FCG such that FCG may be able to cancel any pending debits, and shall promptly provide to FCG bank statements and other financial records to verify Merchant's revenues and account balances. Provided there is no other Event of Default (as defined in Section 3.1 of the Terms), Merchant will not be held in default if timely notice of insufficient funds is provided and Merchant cooperates in providing information requested, even if a Daily Remittance is rejected by Merchant's bank for insufficient funds. Merchant will be held responsible for any fees incurred by FCG resulting from a rejected ACH attempt (unless timely notice of insufficient funds is provided to FCG) or caused by another Event of Default. FCG is not responsible for any overdrafts or rejected transactions that may result from FCG's ACH debiting the Daily Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between FCG and Merchant, upon the occurrence of a default under Sections 1.11 or 3.1 of the Terms, FCG shall be entitled to immediately collect any outstanding amount of the Purchased Amount as damages.

Case 2:23-cv-05055-NCM-ST Document 25-2 Filed 02/02/26 Page 20 of 121 PageID #: 990

**Fox Capital Group, Inc.**

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

## FEE SCHEDULE

**THE FOLLOWING "FEE SCHEDULE" INCLUDES ALL FEES AND LIQUIDATED DAMAGES APPLICABLE UNDER THIS AGREEMENT (OTHER THAN ATTORNEYS' FEES AND COLLECTIONS COSTS ASSESSED IN AN EVENT OF DEFAULT):**

### CLOSING COSTS

A.    Origination Fee:        $0.00                    to cover cost of origination and ACH Setup.*

B.    Underwriting Fee:      $0.00                    to cover underwriting and related expenses.*

C.    Processing Fee:         $0.00                    to cover professional service fees.*

D.    Wire Fee: Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50 for a federal wire or $0 for a bank ACH. *

### APPLICABLE FEES

D.    Bank Change Fee: $150 when Merchant requires a change of the Account, which requires changes to FCG's records and systems.

E.    Not-Sufficient-Funds Fee (Standard): $50 (each) to cover bank charges for Not Sufficient Funds in Merchant's bank account unless Merchant provides timely notice. A default may be declared after five (5) or more occurrences.

F.    Stacking Fee: For each occurrence, $5,000.00 or 10% of the balance of the undelivered Purchased Amount at the time of breach, whichever is greater, to be charged if Merchant has sold or sells any future receipts to, or has obtained or obtains a loan or advance secured by any future receipts from any person or entity without FCG's prior written consent, due to increased risk profile.**

G.    Default Fee: $5,000, to be charged for each Event of Default under Section 3.1.**

H.    Court costs, collection agency fees, attorneys' fees, expert fees, other related collections costs and costs for indemnification, as provided in the Terms of the Agreement.

All fees and/or liquidated damage amounts (i) may be added to the balance owed to FCG under the Agreement (if not already paid out of the Purchase Price), and (ii) are in addition to FCG's rights and remedies under the Agreement, including the right to declare Merchant in default.

**Total fees of $0.00 shall be deducted from the Purchase Price prior to funding. Merchant will receive a net purchase price in the amount of $80,000.00 at the time of delivery by FCG.**

\* These fees will be paid out of the Purchase Price/funding amount.
\*\* Merchant acknowledges these fees as liquidated damages, and not as penalties, and reasonable estimates of the damages likely to be incurred by FCG in the event of Merchant's breach of the Agreement.

Initials: 

**1. TERMS OF ENROLLMENT IN PROGRAM**

1.1 **Term of Agreement.** This Agreement for the purchase and sale of future Receipts does not have a fixed duration or term, making the term potentially infinite. The term of this Agreement shall commence as of the "**Effective Date**", which shall be calculated as the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when FCG paid the Purchase Price to Merchant. This Agreement shall expire on either (a) the date ("Expiration Date") when the Purchased Amount and all other sums due to FCG are received by FCG in full, as per the terms of this Agreement, or (ii) provided Merchant is not in default under any term of this Agreement, the date of the total failure of Merchant's business and the complete cessation of all Receipts.

1.2 **ACH Authorization and Agreement with Processor.** Throughout the term of this Agreement, Merchant irrevocably authorizes FCG and/or its agent(s) to deposit the Purchase Price or any amounts owed to Merchant into the Account by electronic check or automated clearing house (ACH), and to debit by electronic check or ACH from the Account any amounts owed to FCG, including without limitation (a) the Daily Remittance or (b) the entire Purchased Amount (together with applicable fees) in the event that Merchant defaults under this Agreement. Merchant shall (a) execute an ACH authorization form in favor of FCG in the form annexed as "**Exhibit A**" to authorize FCG to obtain electronic fund transfer services to and from the Account, and (b) if applicable, execute an agreement acceptable to FCG with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account (from which FCG may debit amounts owed to it by Merchant). As of the Effective Date, the Account is as listed on Exhibit A. If Merchant needs to change the designated Account for any reason, Merchant must seek advance written approval from FCG, for which FCG shall not unreasonably withhold consent, and provide a new ACH authorization form with the updated account information. It is Merchant's exclusive responsibility to pay to its banking institution and to compensate FCG in case FCG is charged by its banking institution (in accordance with the Fee Schedule) for any fees, charges and expenses incurred by either FCG or Merchant due to rejected electronic checks or ACH debit attempts, overdrafts or rejections.

1.2.1. Throughout the term of this Agreement, Merchant irrevocably grants access to FCG to view the Account information through the bank's webpage or other electronic access for the purpose of verifying Merchant's receivables, Receipts, deposits, and withdrawals into and from the Account, and shall execute the form annexed as "**Exhibit B**", providing FCG and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for such purposes. Merchant understands that any attempt to block FCG's access to the Account or refusal to provide FCG with login credentials to the Account constitutes a default under this Agreement.

1.2.2. The authorizations in this Section 1.2 apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for its Receipts, whether pre-approved or agreed to by FCG or not. This additional authorization is not a waiver of FCG's entitlement to declare this Agreement breached by Merchant as a result of its use of an account which FCG did not first pre-approve in writing prior to Merchant's use thereof. The aforementioned authorizations shall be irrevocable without the written consent of FCG. The purported revocation of such authorizations shall constitute a breach of this Agreement.

1.2.3. In the event the Account or Processor shall become unavailable or shall cease providing services to Merchant during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Merchant shall arrange for another Account or Processor and obtain advance written approval from FCG for the same.

1.3 **Acceleration.** Merchant may at any time after receipt from FCG of the Purchase Price accelerate delivery to FCG of the then undelivered portion of the Purchased Amount (such amount, the "**Outstanding Purchased Amount**") in accordance with the following procedures:

1.3.1. Unless otherwise agreed to in writing by FCG, the Outstanding Purchased Amount can only be delivered in full and not partially

1.3.2. Merchant shall request the right to accelerate the delivery of the Outstanding Purchased Amount by notifying FCG to that effect, provided that such notice shall be in writing (by email to underwriting@foxbusinessfunding.com) and must contain information on the source(s) of the funds to be used for delivery of the Outstanding Purchased Amount and the approximate date of such delivery. FCG shall respond to Merchant's request within three business days from the date of its receipt by FCG, in which it will indicate the exact amount of the Outstanding Purchased Amount as of the date of the intended delivery by Merchant. As of the date agreed upon as between FCG and Merchant, Merchant shall deliver or cause to be delivered to FCG the full amount of the Outstanding Purchased Amount.

1.3.3. Merchant shall not suspend or modify, or cause to be suspended or modified, the delivery to FCG of the Daily Remittance prior to the delivery of the Outstanding Purchased Amount to FCG, unless there are insufficient funds in the Account and Merchant has given FCG due notice. Provided Merchant is not in default of this Agreement and no fees are due to FCG, upon delivery of the full Outstanding Purchased Amount to FCG, Merchant's obligations to FCG pursuant to this Agreement shall be fulfilled.

1.3.4. Upon FCG's receipt of the Outstanding Purchased Amount, FCG shall notify its payment processor or the bank at which the Account is located to stop transferring Daily Remittance from the Account. If FCG shall have received one or more Daily Remittances after delivery of the Outstanding Purchased Amount (due to the processor's or bank's delay in processing FCG's request or for any other reason), FCG will return the overage to Merchant. Nevertheless, Merchant acknowledges and agrees that FCG shall have the right to apply the overage toward Merchant's outstanding financial obligations to FCG under any separate agreement between Merchant and FCG (if any) in exchange for, and as an adequate and sufficient consideration for, FCG granting Merchant the right to accelerate the delivery of the Outstanding Purchased Amount.

1.4 **Reconciliation/Adjustment.**

1.4.1. Either party may give notice to the other for a reconciliation of the Daily Remittance to more accurately reflect the Purchased Percentage. In the event of such reconciliation, the Daily Remittance will either be (i) increased if the amount remitted to FCG was less than the Purchased Percentage of all revenue of Merchant since the Effective Date (ii) decreased if the amount received by FCG was more than the Purchased Percentage of all revenue of Merchant since the Effective Date. In the event Merchant requires a reconciliation to decrease the amount of the Daily Remittance, it shall be Merchant's sole responsibility to initiate the process in the manner set forth in Section 1.4.2. If a reconciliation is required, FCG shall modify the Daily Remittance such that the modified Daily Remittance amount is a good faith approximation by FCG of the (a) Purchased Percentage multiplied by (b) the gross revenues of Merchant during the prior period divided by (c) the number of business days in the prior period. Any reconciliation will extend or reduce the duration of the period over which the Purchased Amount is delivered.

1.4.2. In the event that Merchant desires a reconciliation of the Daily Remittance, Merchant shall make a formal written request for a reconciliation. Requests for reconciliation must be made by email and shall include a copy of Merchant's most recent bank statements or credit card processing statements as well as Merchant's account reports showing transactions in the month to date, or other documents or reports available to Merchant for the verification of its revenues. Email requests to FCG must be made to FCG at reconciliation@foxbusinessfunding.com, with the subject line "Request for Reconciliation." The reconciliation shall be made by FCG within two business days of notice being given and shall be effective as

of the date of the notice (such that any overpayment by Merchant after the date of the notice shall be credited to Merchant). Merchant shall not be in default if it does not have the amount of the higher Daily Remittance on account each day between making its request for reconciliation and FCG's reconciliation and adjustment of the debits through its payment processor, provided however that Merchant shall at the time of making the reconciliation request notify FCG that it has an insufficient balance and no other Event of Default has occurred. Merchant shall have the right to request a reconciliation as many times during the term of this Agreement as it deems proper, and FCG shall comply with each such request provided that: (i) each such request is made in accordance with the terms of Section 1.4; and (ii) if a request for reconciliation is made after the expiration of the term of this Agreement and, as the result of such reconciliation, the total amount actually debited by FCG will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited pursuant to this Agreement shall become equal to the Purchased Amount.

1.4.3. Nothing set forth in Section 1.4 shall be deemed to prevent Merchant from requesting a stop or reduction to the Daily Remittances in the event of a material reduction or cessation of its Receipts.

1.5 **Financial Condition**

1.5.1. Merchant, each Owner and each Guarantor authorize FCG and its agents to investigate their financial responsibility and history, and will provide to FCG any authorizations, bank or financial statements, tax returns and other financial records as FCG deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement through the Expiration Date. A photocopy of this Agreement and accompanying documents will be deemed as acceptable as an authorization for release of financial and credit information. FCG is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. In addition to the authorizations set forth in Section 1.2 of this Agreement, Merchant authorizes all of its banks, brokers and processors to provide FCG with Merchant's banking, brokerage and/or credit card or other payment processing history to determine qualifications for this merchant cash advance transaction, compliance with this Agreement and for collections purposes. Notwithstanding Merchant's provision of its bank account log-in credentials, upon written request from FCG, Merchant shall provide FCG with copies of any documents related to Merchant's credit card processing activity or financial and banking affairs within five days.

1.5.2. Merchant represents that in entering this Agreement it previously disclosed to FCG (i) any and all bank, depository or other financial accounts currently maintained by Merchant for the purposes of Merchant's business including without limitation the Account, (ii) all current sources of Merchant's Receipts, revenues and receivables (including without limitation credit and debit card processors, electronic check or ACH processors, and customers or other third parties with significant accounts payable to Merchant), and (iii) all current sources of actual or potential financing, including without limitation, other merchant cash advance funders or lenders (all together, "Merchant's Financials"), and further represents that any documentation previously provided to FCG concerning Merchant's Financials is full, complete and accurate and has not omitted any of Merchant's Financials. Merchant acknowledges that FCG has relied upon such disclosures as a material consideration in entering into this Agreement. Following the Effective Date, it shall be a material breach of this Agreement for Merchant to without prior written permission from FCG (i) open another bank or credit card or payment processing account at a financial institution other than the bank at which the Account is located or the Processor, (ii) open another account at the bank at which the Account is located or with the Processor and into which account Merchant diverts its receivables or any portion thereof, or (iii) divert Merchants' receivables or any portion thereof from the Account to another bank account under the control of Merchant or a third-party

1.6 **Indemnification.** Merchant, each Owner and each Guarantor jointly and severally indemnify and hold harmless the Processor or the Merchant's bank at which the Account is located, or either of their officers, directors and shareholders, against all losses, damages, claims, liabilities and expenses (including reasonable attorneys' fees) incurred by Processor or the bank resulting from (a) claims asserted by FCG for monies owed to FCG from Merchant and (b) actions taken by Processor or the bank in reliance upon any fraudulent, misleading, or deceptive information or instructions provided by Merchant. Processor and the bank are third-party beneficiaries of this provision. Merchant and each Guarantor waive any right to seek indemnification or contribution from FCG for such losses.

1.7 **No Liability.** In no event will FCG be liable for any claims asserted by Merchant, any Owner or any Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant, each Owner and each Guarantor. In the event that these claims are nonetheless raised, Merchant and each Guarantor will be jointly and severally liable for FCG's attorneys' fees and expenses resulting therefrom in accordance with Section 3.4. Further, the above notwithstanding, in no event will FCG's total liability to the Merchant for any claim or action exceed the amount of the Purchase Price.

1.8 **Reliance on Terms.** Sections 1.2, 1.3, 1.4, 1.5, 1.6 and 2.5 of this Agreement are agreed to for the benefits of Merchant, FCG, Processor and Merchant's bank, and, notwithstanding the fact that Processor and the bank are not parties to this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

1.9 **Sale of Receipts.**

1.9.1. Notwithstanding any other provision of this Agreement, Merchant and FCG acknowledge and agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount of Merchant's Receipts, and that such Purchase Price is not intended to be, nor shall it be construed, as a loan from FCG to Merchant. There is no interest rate or payment schedule in this Agreement. FCG has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created, and the Receipts shall be held in the Account in trust in favor of FCG, and Merchant shall have no legal or equitable interest in the Purchased Amount of Receipts, except that so long as the Merchant is not in default, Merchant shall only be required to deliver the Daily Remittance each business day until the Purchased Amount is delivered in full. Remittances made to FCG in respect of the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the remittances therefor by or on behalf of Merchant's customers. FCG is a bona fide purchaser of the Purchased Amount for fair value. Merchant agrees that the Purchase Price equals the fair market value for the risk undertaken by FCG in consideration for the Purchased Amount of Merchant's Receipts. The parties intend for the sale of Receipts and not an assignment for security.

1.9.2. FCG agrees to purchase the Receipts knowing the risks that Merchant's business may slow down, go bankrupt or fail, and FCG assumes this risk based exclusively upon the information provided to it by Merchant and Merchant's business operations prior to the date of this Agreement, and upon Merchant's representations, warranties and covenants contained in this Agreement that are designed to give FCG a reasonable and fair opportunity to receive the benefit of its bargain. This sale of Receipts is made without express or implied warranty to FCG of collectability of the Receipts and without recourse against Merchant, any Owner or any Guarantor if Receipts are not generated in the regular course of Merchant's business operations or cannot be collected, except as specifically set forth in this Agreement. Thus, the period of time over which it will take FCG to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date and will depend on low well or poorly Merchant's business performs following the Effective Date. As an extreme example, in the event Merchant's business ceases to exist after FCG's

Initials: _____

FILED: NASSAU COUNTY CLERK 07/18/2023 03:34 PM INDEX NO. 611355/2023
NYSCEF DOC. NO. 2   Case 2:23-cv-05055-NCM-ST   Document 25-2   Filed 02/02/26   Page 6 of 12 PageID #: 3981   RECEIVED NYSCEF: 07/18/2023

## Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

purchase of the Receipts and prior to the delivery of the Purchased Amount as a result of a cessation of revenues for reasons outside Merchant's control, FCG may never collect all or a substantial portion of the Purchased Amount.

1.9.3.  In no event shall the Purchased Amount, the aggregate of any amounts or any portion thereof be deemed as interest. It is the express intention of the parties that Merchant not pay or contract to pay, and that FCG not receive or contract to receive, directly or indirectly in any manner whatsoever, any amount deemed to be interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, absent a modification agreed to in writing by Merchant, the Purchased Amount can never increase above the amount set forth on the first page of this Agreement.

1.9.4.  In the event a court of competent jurisdiction finds this Agreement to be a loan or to require the payment of interest, despite the parties specifically representing that it does not require payment of interest, this Agreement shall be modified such that no sum charged or collected hereunder shall exceed the highest rate permissible by law. The rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law, and FCG shall promptly refund to Merchant any interest received by FCG in excess of the maximum lawful rate.

1.9.5.  Merchant agrees that it will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns and not as a loan. Merchant hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Merchant asserts that this transaction is anything other than a sale of future receipts.

1.9.6.  Because the parties acknowledge and rely upon the lawfulness of this transaction under the laws of the State of Florida and the fairness of its terms, Merchant knowingly and willingly waives and is estopped from asserting any claim or defense of usury in any legal action or proceeding, whether based on Florida law or the law of any other jurisdiction.

1.9.7.  FCG may request, and Merchant shall execute, a Deposit Account Control Agreement (DACA) for the Account in a form acceptable to Merchant's bank, by which Merchant shall grant non-invoked control of the Account to FCG, maintaining Merchant's access to the Account unless and until there is an Event of Default, at which FCG may invoke control of the Account.

1.9.8.  In the event Merchant notifies that it is unable or unwilling to collect all or some of the Receipts, FCG shall have the right, without waiving any of its other rights and remedies under this Agreement, to notify the Processor, any other credit card or payment processor used by Merchant, or any third party having monies owed to Merchant for its sale or deliver of goods or services (including without limitation Merchant's customers), of the sale of the Specified Percentage of the Receipts under this Agreement, and to direct such credit card, payment processor or other third party to make payment to FCG of all or any portion of the amounts received by such credit card, payment processor or third party on behalf of Merchant. If no Event of Default has occurred, FCG shall remit back to Merchant the excess above the Specified Percentage of the Receipts that it collected pursuant to this paragraph within 2 business days of payment and shall provide a reconciliation in accordance with paragraph 1.4.

1.10  **[Intentionally Omitted.]**

1.11  **Collectability Covenants.** The following covenants are intended to ensure the collectability of the portion of the Receipts purchased by FCG as they are generated and shall not be construed as modifications of the above provisions that FCG has purchased only the Specified Percentage of the Receipts as a contingent purchase of receivables:

1.11.1.  Merchant, without written *notice* to FCG, shall not: (a) take any action to discourage the use of electronic check or credit or debit card processing that is settled through Processor or the Account, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products; (b) change its arrangements with Processor or the bank at which the Account is located in any way that is adverse or unacceptable to FCG; (c) change the processor through which the Receipts are settled from Processor to another processor, or permits any event to occur that could cause diversion of any of Merchant's check, credit card, debit card or deposit transactions to another processor.

1.11.2.  Merchant without the written *consent* of FCG, shall not: (a) intentionally interrupt the operation of its business or transfer, move, sell, dispose, divert or otherwise convey its business and/or assets (including its customers or receivables) without (i) the express prior written consent of FCG, and (ii) the written agreement of any purchaser or transferee to assume all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FCG; (b) take any action, fails to take any action, or offer any incentive (economic or otherwise) the result of which will be to induce any of Merchant's customers to pay for Merchant's goods or services with any means other than payments, checks or deposits that are settled through Processor or deposited in the Account or otherwise violates Section 2.7; (c) fail to remit its receivables into the Account; (d) opens another account at a financial institution other than the bank at which the Account is located, or opens another account at the bank at which the Account is located and into which account Merchant diverts deposit of its receivables or any portion thereof; (e) close the Account, block the Account or make any other material changes to the Account that would prevent FCG from debiting the Account in the manner agreed to in Section 1.2; or (f) purport to revoke the ACH authorization agreed to in Section 1.2.

1.11.3.  Merchant shall not (a)block FCG's viewing access to the Account, including by changing its log-in credential or otherwise; (i) Merchant fails to provide financial documents or other information requested by FCG including, without limitation, copies of any documents related to Merchant's credit card or payment processing activity or Merchant's financial and banking affairs (pursuant to Sections 1.2 and 1.5) within five days after a request from FCG.

1.12  **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorize FCG to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that FCG obtains) and business conduct only to agents, affiliates, subsidiaries, funding partners and credit reporting bureaus. Merchant, each Owner and each Guarantor hereby waive to the maximum extent permitted by law any claim for damages against FCG or any of its affiliates relating to any (i) investigation undertaken by or on behalf of FCG as permitted by this Agreement, or (ii) disclosure of information as permitted by this Agreement.

1.13  **[Intentionally Omitted.]**

1.14  **Publicity.** Merchant, each Owner and each Guarantor all hereby authorize FCG to use its, his, or her name and logo in listings of clients and in advertising and marketing materials.

1.15  **D/B/A's.** Merchant hereby acknowledges and agrees that FCG may be using "doing business as" or "d/b/a" names or acting through authorized agents in connection with various matters relating to the transaction between FCG and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

1.16  **Phone Recordings and Contact Authorized.** To the maximum extent permitted by law, Merchant agrees that any call between FCG and Merchant and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with FCG, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, email address or facsimile number given to FCG by the Merchant, its agents or employees, including cellular telephones. Merchant also agrees that FCG may use any other medium not prohibited by law, including but not limited to mail, e-mail, text

message and facsimile to contact Merchant. Merchant expressly consents to conduct business by electronic means.

1.17  **Applicable Fees and Closing Costs.** Merchant acknowledges that the applicable fees and closing costs (that is, such costs as are payable at the time of the execution of this Agreement) that may be charged by FCG are set forth in the Fee Schedule in the beginning of this Agreement and were subject to arms-length negotiation between Merchant and FCG. Merchant hereby agrees to pay the closing costs in full from the Purchase Price and authorizes FCG to apply a portion of the Purchase Price due to Merchant toward satisfaction of the closing costs by deducting the amount of the closing costs from the Purchase Price prior to delivering it to Merchant. For avoidance of doubt, the deduction of the closing costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price. Additionally, to the extent that Merchant has agreed to a broker fee with a third-party broker with respect to this Agreement (which is not a party hereto), Merchant hereby requests and agrees for FCG to withhold from the Purchase Price, and pay to the third-party broker associated with this Agreement, the professional service fee in the Fee Schedule contained at the beginning of this Agreement. Other than the fees listed in this Agreement, FCG is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Merchant and if Merchant is charged by any other party for any fee not listed in this Agreement, such fee is not charged by FCG. Moreover, as since the funds delivered to merchant as part of the Purchase price must be used to ensure Merchant's continued success, Merchant warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

1.18  **Multiple Merchant Entities.** In the event the term "Merchant" (as used on page 1) is comprised of more than one entity, then the term "Merchant" as used in this Agreement shall mean all such entities, individually and collectively, each of which is an affiliate of all other such entities, that is such entity or any Owner or Guarantor controls, is under the control of, or has direct or indirect common ownership with the other entities, or any Owner or Guarantor. The representations, warranties, covenants, obligations and liabilities of each Merchant entity shall be joint and several under this Agreement. The liability of each Merchant entity under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity, including any other Merchant entity. The Specified Percentage, Receipts, Daily Remittance, and Purchased Amount shall apply to each of the Merchant entities.

1.19  **Application of Amounts received by FCG.** FCG reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to FCG from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

2.  **REPRESENTATIONS, WARRANTIES, AND COVENANTS**

Merchant, each Owner and each Guarantor represent, warrant and covenant that, as of this date and during the term of this Agreement:

2.1  **Financial Condition and Financial Information.** Merchant's, any Owner's or any Guarantor's bank and financial statements (copies of which have been furnished to FCG, and future statements which will be furnished hereafter at the request and discretion of FCG) fairly represent the financial condition of Merchant and each Guarantor at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of Merchant. Merchant and each Guarantor have a continuing, affirmative obligation to advise FCG of any material adverse change in their financial condition, operations, or ownership.

2.2  **Governmental Approvals and Compliance.** Merchant is in compliance and, during the term of this Agreement, shall comply, with all laws and has and will maintain valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter. Merchant is not in default of, and will promptly pay, all necessary federal, state and local taxes, including but not limited to income, employment, sales and use taxes, imposed upon Merchant by law, and will maintain workers compensation insurance required by applicable governmental authorities.

2.3  **Authorization.** Merchant, the person(s) signing this Agreement on behalf of Merchant, and each Guarantor have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized. All organizational and other proceedings required to be taken by Merchant or each Guarantor to authorize the execution, delivery and performance of this Agreement have been taken.

2.4  **Insurance.** Merchant will maintain general liability and business-interruption insurance.

2.5  **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement without FCG's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6  **Change of Name or Location or Sale or Closing of Business.** Merchant, and any successor in interest of Merchant, will not conduct Merchant's businesses under any name other than as disclosed to FCG, nor shall Merchant change any of its places of business without prior written consent by FCG. Merchant will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets (including without limitation the Collateral or any portion thereof) without (i) the express prior written consent of FCG, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FCG. Except as disclosed to FCG in writing, Merchant has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Merchant shall not make or send notice of any intended bulk sale or transfer. Merchant agrees that until FCG has received all of the Purchased Amount, Merchant will not voluntarily close its business for renovations, repairs or any other purposes. This provision, however, does not prohibit Merchant from closing its business (i) if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or (ii) if otherwise forced to close by circumstances not reasonably in the control of Merchant. Prior to any closure, Merchant will provide FCG written notice as required by Section 3.5. In the event of a closure, Merchant shall cooperate with FCG and provide sufficient documentation to ascertain whether all or any part of the Purchased Amount may still be recovered.

2.7  **No Diversion of Future Receivables.** Merchant shall not cause a diversion of any portion of the Receipts from the Account or Processor without FCG's written permission, which permission shall not be unreasonably withheld. This provision is to ensure collectability of the portion of the Receipts purchased by FCG.

2.8  **Daily Batch Out.** Merchant will clear and settle Merchant's receivables with the Processor on a daily basis.

2.9  **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one day's prior notice from FCG to Merchant, execute, acknowledge, and deliver to FCG and/or to any other person, firm or corporation specified by FCG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), and stating the dates which the Purchased Amount or any portion thereof has been delivered.

2.10  **No Pending or Contemplated Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code, or any other law for the relief of debtors, and there has been no involuntary petition brought

Page 4 of 12



Initials: ___

Case 2:23-cv-05055-NCM-ST   Document 26-2   Filed 02/01/24   Page 9 of 21   PageID #: 392

## Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition, and it does not anticipate that an involuntary petition will be filed against it.

2.11    **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all of Merchant's receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, FCG, except as provided in "**Exhibit C**", which contains true and correct information as to the names of all of Merchant's secured creditors and the amounts that Merchant owes of those creditors as of the Effective Date. As of the date hereof, Merchant is not engaged in negotiations either directly or through a broker for any other merchant cash advances or other transactions which would contemplate the sale or encumbrance of Merchant's receivables other than those listed in Exhibit C. To Merchant's, any Owner's or any Guarantor's knowledge, there are no litigations or other proceedings pending or judgments or awards entered against Merchant in any court or tribunal in any jurisdiction concerning Merchant's receivables and there are no outstanding executions or levies concerning Merchant's receivables. In the event Merchant, any Owner or any Guarantor learns that such a proceeding has been filed, it/they/he/she shall immediately provide notice of the proceeding to FCG, which notice shall include the title, forum and case number of the proceeding. Merchant indemnifies and holds harmless FCG for any and all damages and losses (including without limitation legal fees and expenses) incurred by FCG as the result of the representations in this paragraph being untrue, incorrect or incomplete.

2.12    **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdiction(s) in which it/they/he/she is/are organized and/or operates. Merchant hereby acknowledges that it fully understands that (i) FCG's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Merchant's continued operation of its business and successful generation of the Receipts until the Purchased Amount is delivered to FCG in full, and (ii) that in the event of decreased efficiency or total failure of Merchant's business, FCG's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based on the foregoing, Merchant is entering into this Agreement for the benefit and advancement of Merchant's business operations, and will use the Purchase Price exclusively for the benefit and advancement of Merchant's business operations and will not use any portion of the Purchase Price for any other purpose, including but not limited to consumer, personal, family or household purposes.

2.13    **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity, including without limitation any other merchant cash advance provider or any other creditor.

2.14    **Good Faith.** Merchant is receiving the Purchase Price and selling FCG the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business. Merchant is not actively working with or being instructed by any debt relief consultant or debt relief attorneys and will not use the Purchase Price to either pay the fees of such consultants or attorneys or pay down prior loans or receipt purchase transactions. Nothing herein limits Merchant's, any Owner's or any Guarantor's right to seek the advice of an independent attorney or financial consultant to advise them with respect to this Agreement.

2.15    **Stacking Prohibited.** Merchant shall not enter into any merchant cash advance, factoring or loan agreement that relates to or involves Merchant's future receivables with any party other than FCG at any time prior to the Expiration Date without (i) written consent of FCG and (ii) the written agreement of the funder or lender to either deliver the Outstanding Purchased Amount to FCG prior to providing funding to Merchant in accordance with paragraph 1.3, or to guaranty all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FCG. In the event Merchant violates this provision, in addition to any other rights or remedies under this Agreement, FCG may without prior notice to Merchant or declaring Merchant to be in default: (a) assess against Merchant the stacking fee set forth in Appendix A, and/or (b) receive the benefits granted under such subsequently entered transaction, for example in the event that the daily payment (or, if payments are not made daily, the average amount owed for each business day of the payment term) or buy rate (that is the discount rate of the purchase price from the amount of receivables purchased) under such subsequently entered transaction is higher than the Daily Remittance or buy rate hereunder, FCG may either raise the Daily Remittance to an amount that is equal to the amount of such daily payment or raise the buy rate to be equal to the buy rate by which the other funder purchased Merchant's receivables. The remedies hereunder are cumulative and in addition to other remedies available to FCG under this Agreement. Further, FCG may share information regarding this Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

2.16    **No Confessions of Judgment.** Until the Expiration Date, Merchant shall not enter into any affidavits of confession of judgment, or execute a document containing a confession of judgment, with any party without FCG's prior written consent.

2.17    **Protections.** In the event of a misrepresentation or violation of any provision of this Article 2, in addition to any other remedy under this Agreement, FCG may invoke any of the protections listed in paragraph 1.11 hereof immediately and without notice to Merchant.

3.    **EVENTS OF DEFAULT AND REMEDIES**

3.1    **Events of Default.** Without limitation of any other default provision of this Agreement, the occurrence of any of the following events shall constitute an "**Event of Default**" hereunder:

1)    Merchant violates or causes a violation of any of the covenants listed in paragraph 1.11;

2)    Merchant violates any term or covenant in this Agreement

3)    Any representation or warranty by Merchant, any Owner or any Guarantor in this Agreement was incorrect, false, or misleading in any material respect when made;

4)    The sending of notice of termination by Merchant or Merchant giving verbal notification to FCG of its intent to breach this Agreement;

5)    On five or more occasions, Merchant fails to give FCG advance notice that there will be insufficient funds in the Account such that the ACH of the Daily Amount will not be honored by Merchant's bank and does not notify FCG within two days of Merchant's bank sending notice to Merchant of the rejected debit, provided Merchant has not requested a reconciliation in accordance with paragraph 1.4 and fails to reasonably respond to FCG's communications seeking to ascertain the circumstances of the insufficient funds;

6)    Merchant fails to supply all requested financial documentation and allow for daily monitoring of its bank account;

7)    Merchant changes its Processor in violation of the terms of paragraph 2.5;

8)    Merchant transfers or sells all or substantially all of its assets without prior notice and written approval from FCG;

9)    Merchant makes or sends notice of any intended bulk sale or transfer by Merchant;

10) Merchant's bank returns a code other than Not Sufficient Funds (NSF) when declining FCG's attempts to debit Merchant's account, except if the code indicates that a debit is declined because of an act of the bank or a third-party outside of Merchant's control or through no act of Merchant or if merchant gave timely notice that the Account has or will have insufficient funds such that the ACH of the Daily Amount will not be honored by Merchant's bank and has not requested a reconciliation request in accordance with paragraph 1.4;

11) Merchant defaults under any of the terms, covenants, and conditions of any other agreement with FCG, including without limitation the below Pledge of Security and Guaranty;

12) Any person or entity files a litigation or proceeding or enters a judgment concerning or claiming ownership of Merchant's receivables in any court or tribunal in any jurisdiction (unless Merchant disclosed the same to FCG prior to entering this Agreement and it is listed on Exhibit D); or

13) Merchant applies for, or enters into an agreement for, another form of financing that effects FCG's rights under the Pledge of Security (Section 4 below) without the prior written consent of FCG.

3.2    **Guaranty.** In an Event of Default, FCG may enforce its rights against any Guarantor of this transaction in accordance with the below Guaranty.

3.3    **Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 6.4. hereof, FCG shall have the right to declare the full uncollected Purchased Amount plus any fees due under this Agreement (plus reasonable attorneys' fees and costs incurred in collection) due and payable immediately. FCG may enforce any rights and remedies under this Agreement through the following procedures: (a) FCG may enforce the provisions of the below Pledge of Security (b) FCG may enforce the provisions of the below Guaranty; (c) FCG may debit Merchant's depository accounts wherever situated by means of ACH debit for any amounts owed; (d) FCG may proceed to enforce its rights and remedies under this Agreement by lawsuit or arbitration (and in such action or proceeding will be entitled to an award of attorneys' fees and costs in accordance with Section 3.4), which may be a suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce any obligations in this Agreements (including without limitation the Pledge of Security and Guaranty), or any other legal or equitable right or remedy. All rights, powers, and remedies of FCG in connection with this Agreement may be exercised at any time by FCG after the occurrence of an Event of Default, in any order, and are cumulative and not exclusive, and shall be in addition to any other rights, powers, or remedies provided by law or equity.

3.4    **Attorneys' Fees and Costs.** Merchant and each Guarantor must pay all of FCG's reasonable attorneys' fees and costs associated with (i) any breach by Merchant or any Guarantor of the covenants of this Agreement and enforcement thereof, (ii) any Event of Default, (iii) and exercise by FCG of its rights and remedies under this Agreement, or (iv) any suit, action or proceeding between FCG and Merchant or any Guarantor, arising out of or relating to this Agreement or the transactions contemplated hereby, whether commenced by FCG or by Merchant or any Guarantor, and whether brought in court or in arbitration or in any proceeding to confirm or vacate an arbitration award. FCG shall be entitled, without limitation, to collection agency fees or attorneys' fees (which may include a contingency fee of up to thirty-three percent (33%) of the outstanding Purchased Amount as of the earlier of an Event of Default or the commencement of such proceeding), expert witness fees and costs of suit. FCG shall further be entitled to an award of costs and fees incurred by FCG on any appeal and in making an application for costs and fees (so-called "fees on fees").

3.5    **Equitable Remedies.** Without limitation of any other provision in this Agreement, in the event that Merchant or any Guarantor breach or threaten to breach any of the covenants, representations and warranties in this Agreement, Merchant and each Guarantor hereby consent and agree that FCG shall be entitled to the ex parte (without advanced notice) entry of a preliminary or permanent injunction, temporary restraining order, prejudgment attachment or other equitable relief, including without limitation to protect against such breach or threatened breach, from any court of competent jurisdiction, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting any bond or other security with respect to obtaining or continuing any injunction or temporary restraining order. Further, Merchant and each Guarantor release FCG from, and waive any claim for, damages that may result to Merchant and each Guarantor from FCG obtaining any equitable relief pursuant to this Agreement. If a bond or other security is required, Merchant and each Guarantor consent that its damages would be de minimis and that the amount of the bond or security shall be no more than $500. Merchant and each Guarantor consent to pay the amount of $15,000 as liquidated damages, and not as a penalty, for FCG's successful application for injunctive relief under this paragraph, which the parties agree is a reasonable estimate of the costs for such an application (which shall not be a limitation on the overall amount of attorneys' fees and costs FCG shall be entitled to recover in any action). The amount of liquidated damages shall be awarded to FCG upon prevailing on the initial application for injunctive relief, without the need for FCG to prevail in the ultimate judgment in the proceeding, and Merchant and each Guarantor consents to the court or tribunal including the liquidated amount in the total amounts of any assets to be stayed or attached pursuant to its order granting equitable relief. Merchant and each Guarantor agree that the aforementioned equitable relief shall not diminish any other right or remedy that FCG may have at law or in equity to enforce the provisions of this Agreement. Merchant and each Guarantor agree that any such equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief

3.6    **Required Notifications.** Without limitation of any of Merchant's other obligations under this Agreement, Merchant is required to give FCG written notice (a) within 24 hours of any filing under Title 11 of the United States Code or any other law for the protection of debtors, and (b) at a commercially reasonable (but no less than seven days' time) prior to FCG closing or slowing down its business or transferring, moving, selling, disposing, diverting or otherwise conveying its business and/or assets (including its customers or receivables).

3.7    **Waiver of Separate Entity Rule.** Merchant and each Guarantor waive, to the maximum extent permitted by law, the separate entity rule, such that any notice, demand, lien, levy, prejudgment attachment, postjudgment attachment, turnover order, restraining notice or other process served upon any branch, department or unit of Merchant's or any Guarantor's bank, third-party payor, account debtor or other garnishee shall be deemed served regardless of the branch, department or unit served anywhere in the world, and will subject to attachment or collection any and all assets or other interests held by or for the benefit of Merchant or any Guarantor, regardless of the location of the assets or other interests anywhere in the world.

4.    **PLEDGE OF SECURITY**

4.1    **Security Interest.** As security for the performance of any and all liabilities, obligations, covenants or agreements of Merchant under this Agreement (and any future amendments of this Agreement, if any), Merchant hereby pledges to FCG a security interest in and lien ("Pledge") upon: all accounts and proceeds as those terms are defined in the Uniform Commercial Code (the "Collateral"). This Pledge will secure all of FCG's rights under this Agreement and any other agreements now existing or later entered into between Merchant, FCG or an affiliate of FCG. With respect to such Pledge, FCG will have all rights afforded under the UCC, any other applicable law and in equity. Merchant will obtain from FCG written consent prior to granting a security interest of any kind in the Collateral to a third party and any such grant of a security interest without FCG's written consent shall be null and void. Merchant acknowledges and agrees that any security interest granted to FCG under any other agreement between Merchant, any Owner or any Guarantor and FCG will secure the obligations under this Agreement. Merchant agrees to execute any documents or take any action in connection with this security interest as FCG deems necessary to perfect or maintain FCG's first priority security interest in the Collateral, including the execution of any account control agreements. Merchant hereby authorizes FCG to file any financing statements deemed necessary or desirable by FCG to perfect or maintain FCG's security interest without prior notice to Merchant. FCG is authorized to execute all such instruments and documents in Merchant's and each Guarantor's name. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Merchant is prohibited from obtaining any financing that

Initials: 

## Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

impairs the value of the Receipts or FCG's right to collect same. Merchant acknowledges and agrees that FCG's rights pursuant to this Pledge of Collateral and/ or as set forth in any UCC statements filed by FCG shall survive and be incorporated into any judgment FCG may obtain against the Merchant in connection with this Agreement.

4.2   **Remedies.** Upon any Event of Default, FCG may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce or satisfy any obligations then owing to FCG against the Collateral. This Pledge may be exercised by FCG without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. FCG shall have the right to notify account debtors at any time. Pursuant to Article 9 of the UCC, as amended from time to time, FCG has control over and may direct the disposition of the Collateral without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral (unless disclosed in **Exhibit C**). Merchant and each Guarantor agree not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral, as applicable. Merchant shall be liable for, and FCG may charge and collect, all costs and expenses, including but not limited to attorneys' fees, which may be incurred by FCG in protecting, preserving and enforcing FCG's security interest and rights.

4.3   **Termination of Pledge.** Upon the full performance by Merchant of Merchant's obligations under this Agreement, the security interest in the Collateral shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Merchant. Upon any such termination, FCG will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Merchant shall reasonably request.

4.4   **Representations with Respect to Collateral.** Merchant hereby represents and warrants to FCG that the execution, delivery and performance by Merchant of this Pledge and the remedies in respect of the Collateral under this Agreement (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (a) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (b) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Merchant is a party or by which any of Merchant's assets (including, without limitation, the Collateral) are bound.

4.5   **Further Assurances.** Upon the request of FCG, Merchant, at Merchant's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as FCG may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created, and authorizes FCG to make such filings and do such other acts as it deems necessary or desirable to perfect and maintain its security interest.

4.6   **Acknowledgment.** For avoidance of doubt, this Pledge is made for the purpose of securing Merchant's performance of its obligations to FCG and shall not (i) permit FCG to collect the Purchased Amount in the event that Merchant itself is not required to remit it, such as for the reasons set forth in Section 1.9.2. of this Agreement, or (ii) otherwise affect the contingent nature of this transaction.

5.   **GUARANTY OF PERFORMANCE**

5.1   **Guaranty.** As an additional inducement for FCG to enter into this Agreement, each Guarantor hereby provides FCG with this **"Guaranty"**. Each Guarantor hereby irrevocably, absolutely and unconditionally guarantees to FCG prompt, full, faithful and complete performance of Merchant's obligations under this Agreement and each Guarantor unconditionally covenants to FCG that if an Event of Default shall at any time be made by Merchant, each Guarantor shall well and truly perform (or cause to be performed) such obligations and pay all damages and other amounts stipulated in this Agreement with respect to the non-performance of Merchant's obligations, or any of them (collectively, the **"Guaranteed Obligations"**). The Guaranteed Obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement. For avoidance of doubt, this Guaranty is made for the purpose of securing performance of Merchant's obligations to FCG and, (i) no Guarantor shall be liable to remit the Purchased Amount in the event that Merchant itself is not required to do so, such as for the reasons set forth in Section 1.9.2. of this Agreement, and (ii) this Guaranty does not otherwise affect the contingent nature of this transaction.

5.2   **No Notice.** FCG does not have to notify Guarantor of any of the following events, and Guarantor will not be released from its obligations under this Guaranty if it is not notified of: (i) Merchant's failure to timely remit any amount required under this Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) FCG's acceptance of this Guaranty; and (v) any renewal, extension, or other modification of this Agreement or Merchant's other obligations to FCG. In addition, FCG may take any of the following actions without releasing Guarantor from any of its obligations under this Guaranty: (i) renew, extend, or otherwise modify this Agreement or Merchant's other obligations to FCG; (ii) release Merchant from its obligations to FCG or settle with Merchant; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Guaranty.

5.3   **Guarantor's Obligations Severable.** In the event of a breach of this Agreement, FCG may seek recovery from each Guarantor for all of FCG's losses and damages (including without limitation any right to recover costs, attorneys' fees or other amounts as set forth in this Agreement) for the enforcement of FCG's rights under this Guaranty without first seeking to obtain payment from Merchant or any other Guarantor. Merchant and any other guarantor are not necessary parties to any litigation brought under this Guaranty.

5.4   **Guarantor Waiver of Rights.** Until the Purchased Amount and Merchant's other obligations to FCG under this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Guaranty. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Guaranty: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification or (v) contribution. Each Guarantor knowingly and willingly waive(s) any claims or affirmative defenses that might otherwise be available to Merchant, including without limitation bad faith, unjust enrichment, usury, duress, unconscionability, unfair business practices, consumer protection statutes, champerty, contract of adhesion or fraud (including fraud in the inducement of this Guaranty), except for the defense of payment.

5.5   **Multiple Guarantors.** In the event "Guarantor" (as defined on page 1 of this Agreement) is comprised of more than one individual, then: (i) the term "Guarantor" shall mean, individually and collectively, all such individuals; (ii) each Guarantor is an affiliate of all other Guarantor(s); (iii) the representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement; (iv) the liability of each Guarantor under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any

other person or entity; and (v) FCG may pursue its rights and remedies under this Agreement against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or Merchant.

5.6   **Guarantor Acknowledgement.** Each Guarantor acknowledges that he/she/it: (i) is an owner, officer or manager of Merchant and/or will benefit from Merchant and FCG entering into this Agreement; (ii) irrevocably, absolutely and unconditionally guarantees to FCG performance of all of the obligations of Merchant under this Agreement; (iii) is bound by the Jury Trial and Class Action Waiver provisions below; (iii) understands the seriousness of the provisions of this Guaranty; (iv) has had a full opportunity to consult with counsel of his/her/ its choice; and (v) has consulted with counsel or has decided not to avail himself/herself/itself of that opportunity.

6.   **MISCELLANEOUS**

6.1   **Modifications.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Merchant and FCG. The parties may enter into one or more written addendums to this Agreement (in addition to any exhibits) that modify, clarify or supplement the terms of this Agreement.

6.2   **Binding Effect; Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, FCG, and their respective successors and assigns. FCG may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Merchant. Merchant may not assign, transfer or sell its rights or obligations under this Agreement without an express written modification of this Agreement.

6.3   **Notices.** Except as otherwise provided herein, all notices, requests, consents, demands, and other communications hereunder shall be delivered (i) to FCG, by email to underwriting@foxbusinessfunding.com or fax to 866-557-0455, or (ii) to Merchant or Guarantor, by email, fax or mail at the contact information set forth in this Agreement. Merchant and each Guarantor shall promptly notify FCG of any change to its contact information. Notices to FCG shall become effective only upon receipt by FCG. Notices to Merchant and any Guarantor shall be effective when sent by email or fax, or three days after mailing.

6.4   **Waiver of Remedies.** No failure on the part of FCG to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

6.5   **Governing Law, Venue, and Jurisdiction.** This Agreement, and any dispute arising out of or relating to this Agreement or the parties' relationship, shall be governed by and construed in accordance with the laws of the State of Florida, without regard to any applicable principles of conflicts of law. Any suit, action, or proceeding arising out of or relating to this Agreement or the transaction contemplated herein or the interpretation, performance, or breach hereof, shall be instituted in any state court sitting in the State of Florida (the "Acceptable Forums"), provided that FCG may institute suit in another forum. Merchant, each Guarantor and each Owner agree that the Acceptable Forums are convenient to them, and submit to the personal jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue in the Acceptable Forums. Should a proceeding be initiated by Merchant, any Guarantor or any Owner in any other forum, Merchant, each Guarantor and each Owner waives any right to oppose any motion or application made by FCG to dismiss such proceeding, to remove and/or transfer the proceeding to an Acceptable Forum, and for an anti-suit injunction against such proceeding (which FCG may make in the Acceptable Forums). ADDITIONALLY, MERCHANT, EACH OWNER AND EACH GUARANTOR WAIVE PERSONAL SERVICE OF ANY SUMMONS AND/OR COMPLAINT OR OTHER PROCESS TO COMMENCE ANY LITIGATION AND AGREE THAT SERVICE OF SUCH DOCUMENTS SHALL BE EFFECTIVE AND COMPLETE IF SENT BY PRIORITY MAIL OR FIRST CLASS MAIL TO THE MAILING ADDRESS(ES) SET FORTH FOR MERCHANT ABOVE, AND EMAILED TO THE EMAIL ADDRESS, LISTED ON PAGE 1 OF THIS AGREEMENT OR THE UPDATED MAILING AND EMAIL ADDRESS IN ACCORDANCE WITH PARAGRAPH 6.3. SERVICE SHALL BE EFFECTIVE AND COMPLETE 5 DAYS AFTER THE MAILING. MERCHANT WILL THEN HAVE 30 CALENDAR DAYS AFTER SERVICE IS COMPLETE IN WHICH TO APPEAR IN THE ACTION OR PROCEEDING.

6.6   **Statute of Limitations.** Merchant, Owner and each Guarantor agree that notwithstanding any other statute of limitations or repose or tolling under state or federal law (including any statute permitting equitable recoupment), there shall be shall be a one (1) year statute of limitations from the date of accrual of a cause of action or defense with respect to the filing or interposing of any claim, defense suit, action or proceeding by Merchant, Owner and any Guarantors that arises out of or relates to this Agreement, the transaction contemplated herein, or the interpretation, performance of breach hereof. If such a claim is filed more than one (1) year after accrual it shall be time-barred, regardless of the nature of the cause of action. This provision does not apply to claims by FCG against Merchant, Owner or any Guarantor.

6.7   **Survival of Representations.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

6.8   **Interpretation.** This Agreement embodies the arms-length negotiation and mutual agreement between the parties and shall not be construed against any party as having been drafted by such party. As such, the parties further agree that this Agreement has been jointly drafted, so that in the event any portion, word, clause, phrase, sentence, or paragraph of this Agreement is deemed ambiguous, said ambiguity shall not be construed against any of the parties.

6.9   **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

6.10   **FCG's Consent.** Merchant agrees that in every instance in which Merchant's rights under this Agreement are contingent upon first obtaining FCG's consent, such consent may be withheld, granted or conditioned at FCG's sole and absolute discretion. For avoidance of doubt, this discretion does not apply to FCG's obligation to provide a reconciliation to Merchant under Section 1.4.1-1.4.2.

6.11   **Consultation.** Merchant represents that it is a business operated by one or more experienced business persons. The person(s) authorized to make management and financial decisions on behalf Merchant with respect to this Agreement either (i) have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Merchant entering into this Agreement, or (b) have consulted with such other persons as are capable of advising Merchant with respect to the transaction. Such person says: (i) has read and fully understands the content of this Agreement; (ii) has received all information that such persons deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (iii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and to verify any such information furnished to him or her by FCG. In the event such person(s) has not done any of the foregoing, he or she has knowingly and intentionally waived the opportunity to do so.

6.12   **Entire Agreement.** This Agreement (including any exhibits or addendums) embodies the entire agreement between Merchant, each Guarantor and each Owner and FCG and supersedes all prior agreements, understandings or oral or written representations relating to the subject matter hereof.

Initials: _____

## Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

Merchant, each Guarantor and each Owner represent that they have no inducements, representations, or promises by FCG, anyone acting on FCG's behalf, or any broker that may have solicited each Guarantor and each Owner to enter into this or any other agreement, other than as expressly set forth herein. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by FCG, anyone acting on its behalf, or any broker, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Merchant's, each Guarantor's and each Owner's obligations pursuant to this Agreement or any rights and remedies of the parties hereto.

6.11    JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION, OR PROCEEDING ON ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREIN. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

6.14    CLASS ACTION WAIVER. TO THE EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT ANY SUIT, ACTION, OR PROCEEDING ON ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED (INCLUDING WITHOUT LIMITATION ANY ARBITRATION IN ACCORDANCE WITH SECTION 6.15) MUST BE PURSUED ON AN INDIVIDUAL BASIS ONLY. THE PARTIES WAIVE ANY RIGHT TO COMMENCE OR BE A PARTY TO ANY CLASS, COLLECTIVE, REPRESENTATIVE OR MASS ACTION OR PROCEEDING OR TO BRING JOINTLY OR COLLECTIVELY ANY CLAIM. TO THE EXTENT MERCHANT IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST FCG, THE PARTIES AGREE THAT: (I) MERCHANT SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS, COLLECTIVE OR REPRESENTATIVE ACTION; AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS, COLLECTIVE OR REPRESENTATIVE ACTION.

6.15    ARBITRATION. FCG HAS THE RIGHT TO REQUEST THAT ANY DISPUTE, CONTROVERSY OR CLAIM BETWEEN FCG AND MERCHANT, ANY GUARANTOR OR ANY OWNER, WHETHER ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT OR OTHERWISE (INCLUDING WITHOUT LIMITATION CLAIMS FOR FRAUD, MISREPRESENTATION, INTENTIONAL TORT, NEGLIGENT TORT OR UNDER ANY LOCAL, STATE OR FEDERAL STATUTE OR RULE), BE SUBMITTED TO ARBITRATION BEFORE EITHER (I) THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH ITS COMMERCIAL RULES OR (II) MEDIATION AND CIVIL ARBITRATION INC. D/B/A RAPIDRULING (WWW.RAPIDRULING.COM) IN ACCORDANCE WITH ITS COMMERCIAL ARBITRATION RULES. THE ARBITRATION SHALL BE

GOVERNED BY THE FEDERAL ARBITRATION ACT. THE ARBITRATION SHALL BE DEEMED TO BE LOCATED IN BROWARD COUNTY, FLORIDA, REGARDLESS OF THE LOCATION OF THE PARTIES OR ARBITRATOR. TO THE EXTENT PERMITTED BY THE ARBITRATOR RULES, THE ARBITRATION PROCEEDINGS SHALL PROCEED VIRTUALLY OR REMOTELY AND SHALL NOT REQUIRE THE PARTIES TO APPEAR IN-PERSON. ALL QUESTIONS CONCERNING ARBITRABILITY OF ANY DISPUTE SHALL BE DECIDED BY THE ARBITRATOR. FCG MAY DEMAND THAT SUCH DISPUTE BE SUBMITTED TO ARBITRATION EITHER BY (I) SENDING A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES IN ACCORDANCE WITH THE NOTICE PROVISION IN PARAGRAPH 6.5 OF THIS AGREEMENT, OR (II) SENDING A WRITTEN NOTICE OF INTENT TO ARBITRATE TO THE ATTORNEY OF RECORD FOR MERCHANT, ANY GUARANTOR OR ANY OWNER WHO HAS BROUGHT ANY ACTION OR PROCEEDING BEFORE ANY COURT OR TRIBUNAL AGAINST FCG. INITIALLY, THE PARTIES WILL SPLIT THE ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR FEE. IF FCG PREVAILS IN ARBITRATION, THE ARBITRATOR MAY AWARD TO FCG ITS ATTORNEYS' FEES (IN ACCORDANCE WITH PARAGRAPH 4.4 OF THIS AGREEMENT) AND SHARE OF THE ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR FEE. MERCHANT, ANY GUARANTOR AND ANY OWNER MAY OPT OUT OF THIS ARBITRATION PROVISION BY SENDING FCG A NOTICE THAT HE, SHE OR IT DOES NOT WANT THIS PROVISION TO APPLY IN ACCORDANCE WITH PARAGRAPH 6.5 WITHIN 14 DAYS AFTER THE EFFECTIVE DATE OF THIS AGREEMENT.

6.16    ACKNOWLEDGEMENT. EACH OF THE PARTIES ACKNOWLEDGES THAT IT: (I) HAS READ THIS AGREEMENT AND FULLY UNDERSTANDS THE CONTENTS AND LEGAL EFFECTS THEREOF; (II) HAS BEEN GIVEN A REASONABLE AMOUNT OF TIME TO CONSIDER THIS AGREEMENT; (III) HAS BEEN ADVISED TO SEEK COUNSEL AS TO THE MEANING AND CONSEQUENCES OF THIS AGREEMENT; (IV) HAS BEEN SO ADVISED BY COUNSEL TO THE MEANING AND CONSEQUENCES OF THIS AGREEMENT OR HAS VOLUNTARILY WAIVED PROCUREMENT OF COUNSEL; (V) DESIRES TO ENTER INTO THIS AGREEMENT AND IS DOING SO KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION OR DURESS; AND (VI) HAS NOT RELIED ON ANY REPRESENTATIONS, PROMISES, OR AGREEMENTS OF ANY KIND MADE TO HIM, HER OR IT IN CONNECTION WITH HIS, HER OR ITS DECISION TO ACCEPT AND SIGN THIS AGREEMENT EXCEPT THOSE EXPRESSLY SET FORTH IN THIS DOCUMENT.

6.17    Facsimile & Digital Acceptance. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Facsimile, email, PDF or digital signatures hereon shall be deemed acceptable for all purposes. This Agreement shall be valid and in force even if it is not initialed.

In witness whereof, the parties have executed this Agreement as of the date first listed above.

FOR TATE LLC

By: *Jarrett R. Jenkins*
Name: JARRETT JR JENKINS
Title: Owner

Fox Capital Group, Inc.

By: _____
Name: _____
Title: _____

OWNER/GUARANTOR #1

By: *Jarrett R. Jenkins*
Name: JARRETT JR JENKINS

Initials: JRJ

# Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

## EXHIBIT A – AUTHORIZATION FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

### DEFINITIONS

**FCG:** Fox Capital Group, Inc.
**Merchant (Legal Name):** TATE LLC and entities appearing on Exhibit "E"
**Merchant Agreement:** Secured Merchant Agreement between FCG and Merchant, dated December 15, 2022

### Designated Checking Account:

| | | | |
|---|---|---|---|
| Bank Name: | | Branch: | |
| ABA: | | Routing: | |

Capitalized terms used in this Authorization Form without definition shall have the meanings set forth in the Merchant Agreement.

This Authorization for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes FCG to disburse the advance proceeds less the amount of any applicable fees upon advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes FCG to collect amounts due from Merchant under the Merchant Agreement by initiating ACH Debits from the Designated Checking Account. The initial authorized amount is as follows, which may be adjusted by FCG from time to time in accordance with the Merchant Agreement:**

In the amount of: **$514.20**

(Or) percentage of each Banking Deposit: **11.0%**

On the following days: **MONDAY-FRIDAY**

If any payment date falls on a weekend or holiday, Merchant understands and agrees that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that FCG may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes FCG to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** FCG is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH Debits and Credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until FCG has received written notification from Merchant at the address set forth above at least five banking days prior to its termination to afford FCG a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

FOR TATE LLC

Signature: *Jarrett R. Jenkins*  ←
Name: JARRETT R JENKINS
SSN/EIN: ███████
Title: Owner

## Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

### EXHIBIT B – BANK ACCOUNT ACCESS INFORMATION

Dear Merchant,

Thank you for accepting an offer from Fox Capital Group. We look forward to being your funding partner for as long as you need.

Please note that the way your sale of receivables is set up, we will need viewing access to your bank account each business day in order to calculate the amount of your daily payment in accordance with Section 1.2 of your agreement. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it. We will also require viewing access to your bank account, prior to funding, as part of our underwriting process. The requested access is for "look in" or viewing purposes only. We are not requesting any change or modification to your account.

Please fill out the form below with the access information for your account. Be sure to indicate capital or lower case letters.

#### Please fill out the form below with the access information for your account

Bank portal website:

Username:

Password:

Security Question/Answer 1:

Security Question/Answer 2:

Security Question/Answer 3:

### ACKNOWLEDGED AND AGREED:

Signature: *Jarrett R. Jenkins* ←
Name:
Title: Owner
Dated: 12/15/2022

Failure to timely establish our our access ability to your account is a breach of your merchant agreement for which we reserve the right to exercise all remedies under the merchant agreement. If you have any questions, please feel free to contact us at (800) 895-4424.

Case 2:23-cv-05055-NCM-ST Document 25-2 Filed 02/07/25 Page 28 of 121 PageID #: 647

## Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

### EXHIBIT C – MERCHANT'S CURRENT SECURED CREDITORS

**Secured Creditor Name**                                **Balance**

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

Initials: JRJ

Case 2:25-cv-05055-NCM-ST	Document 25-2	Filed 02/07/25	Page 29 of 121 PageID #4658

## Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

# EXHIBIT D

**List of Additional Entities Included in the Definition of the Term "Merchant"**
**That Have Sold Future Receipts and Granted FCG a Blanket Security Interest**

DDT CONSULTANTS, INC
1225 FRANKLIN AVE,
GARDEN CITY, NY 11530
EIN:

FCG may file a UCC-1 financing statement with the appropriate Secretary of State(s) reflecting a blanket security interest in the assets of the above-listed entities.of the above-listed entities.

ACKNOWLEDGED AND AGREED ON BEHALF OF THE
FOREGOING ENTITIES:

Jarrett R. Jenkins

By: JARRETT R JENKINS

DocuSign Envelope ID: BE69360D-7328-4CF9-970C-2FE84BE81091

# Fox Capital Group, Inc.

P: (800) 895-4424 | F: 866-557-0455 | underwriting@foxbusinessfunding.com

## ADDENDUM TO SECURED MERCHANT AGREEMENT FOR WEEKLY REMITTANCE

WHEREAS Fox Capital Group, Inc. ("FCG") and TATE LLC ("**Merchant**") are parties to the Secured Merchant Agreement, dated December 15, 2022 (the **"Agreement"**); and

WHEREAS, Merchant requested that for Merchant's convenience FCG make weekly debits toward the Purchased Amount instead of debits of the Daily Remittance each business day, and FCG grants Merchant's request as a courtesy to Merchant;

NOW, THEREFORE, it is agreed as follows:

1. **Definitions.** Except as otherwise defined in this Addendum, all capitalized terms have the same meaning as in the Agreement. The term **"Weekly Remittance"** means the following amount, $2,571.00, which is a good faith approximation of five times the Daily Remittance. The term **"Payment Day"** means Monday, the day of the week on which payment of the Weekly Remittance is due.

2. **Weekly Remittance.** Without modification or waiver of any term of the Agreement and as a courtesy to Merchant, rather than debiting the Daily Remittance each business day, FCG will debit the Weekly Remittance from the Account once each week on every Payment Day that is not a bank holiday until such time as FCG receives payment in full of the Purchased Amount or until FCG elects to revoke or cancel this Addendum. If any Payment Day falls on a bank holiday, FCG will debit the Weekly Remittance on the next business day following that Payment Day. If the next business day falls during the next week, FCG will debit the Weekly Remittance for both weeks during that following week and which will result in FCG debiting twice in a week. By way of example only, if the Payment Day is Friday and the next business day falls the following Monday, FCG will debit the Weekly Remittance on Monday and Friday of that following week. Nothing herein prevents an adjustment of the Daily Remittance under paragraph 1.4 of the Agreement, in which case the Weekly Remittance will be adjusted accordingly.

3. **Revocation.** FCG in its sole and absolute discretion may revoke or cancel this Addendum at any time and for any reason upon 24 hours' notice by email to the Merchant. Upon revocation or cancellation of this Addendum, FCG may resume regular debiting of the Daily Remittance in the manner set forth in the Agreement. If Merchant is aware that there will be insufficient funds in the Account such that the debit of the Daily Remittance will not be honored by Merchant's bank, Merchant shall notify FCG within 18 hours of receiving FCG's email notice.

FOR TATE LLC

Signature: *Jarrett R. Jenkins*
Name: JARRETT R. JENKINS
Title: Owner

AGREED AND ACCEPTED:

FOR FOX CAPITAL GROUP, INC.

By:
Name:
Title:

# EXHIBIT C

Case 2:25-cv-03055-NCM-ST Document 25-2 Filed 07/02/25 Page 32 of 121 PageID #: 681



**Nassau County**
**Maureen OConnell**
**County Clerk**
Mineola, NY 11501

Ref ID#: EC 23 611355

Instrument Number: 2024- 00384761
As
**JE1 - ELECT JUDG SUPREME COURT MONEY**

Recorded On:
December 03, 2024

Parties:
FOX CAPITAL GROUP INC
TO
TATE LLC

Num Of Pages: 6

Recorded By: LIEBERMAN

Comment:

** Examined and Charged as Follows: **

JE1 - ELECT JUDG SUPREME CC  0.00

Recording Charge:  0.00

** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Nassau County, NY

**File Information:**
Document Number: 2024- 00384761
Receipt Number: 3366118
Recorded Date/Time: December 03, 2024 10:49:45A
Book-Vol/Pg: Bk-K Vl-1103 Pg-202
Cashier / Station: 0 CAG / NCCL-FKSGT13

**Record and Return To:**



County Clerk Maureen O'Connell

1 of 6

Case 2:25-cv-05055-NCM-ST    Document 25-2    Filed 07/25/26    Page 739 of 1525 PageID #4092

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

P R E S E N T:
HON.  Justice Danielle M. Peterson,

_____

FOX CAPITAL GROUP, INC.

                                        Plaintiff,                    **JUDGMENT**

            - against -
                                                                **Index No.:** 611355/2023

TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS

                                        Defendant.

_____

Plaintiff, FOX CAPITAL GROUP, INC., having moved for Default Judgement pursuant to CPLR §3215, to be heard on May 13, 2024, at a motion term of this Court presided over by the Honorable Danielle M. Peterson;

UPON the agreement entered into by the parties and fully executed on December 15, 2022, and

UPON Defendants TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS failure to perform under the agreement, and

UPON Plaintiff's commencement of this action on July 18, 2023, by filing a summons and verified complaint, and

UPON Plaintiffs having served and filed a motion for default judgement dated September 1, 2023, against the defendants TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS  and

UPON the decision of Honorable Danielle M. Peterson dated September 13, 2024, granting Plaintiff's Motion, it is hereby

ORDERED, that the Plaintiff's motion for default judgement is granted, in its entirety, as against defendants TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS without opposition, it is further

ADJUDGED, that the Plaintiff, FOX CAPITAL GROUP, INC., located at 140 BROADWAY, 46TH FL, NEW YORK, NY 10005, recover jointly and severally from the Defendants TATE LLC, DDT

Case 2:25-cv-03055-NCM-ST   Document 25-2   Filed 07/02/25   Page 34 of 121 PageID #: 563

CONSULTANTS, INC located at 25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747; 334

LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044; 1225 FRANKLIN AVE, GARDEN CITY,

NY, 11530 and Defendant JARRETT R. JENKINS residing at 25 MELVILLE PARK RD, STE 229 G,

MELVILLE, NY, 11747; 334 LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044; 1225

FRANKLIN AVE, GARDEN CITY, NY, 11530, of the sum of $54,381.20 with statutory interest from

June 1, 2023, in the amount of $ _7374.98_

Together with costs and disbursements as taxed by the clerk in the amount of

$ 455.00 making the total $ 62,211.18.

The Plaintiff shall have execution therefor.

Dated: 11/26/24        ENTER

_____
Danielle M. Peterson

**ENTERED**

DEC 0 2 2024

**NASSAU COUNTY**
**COUNTY CLERK'S OFFICE**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

**FOX CAPITAL GROUP, INC.**

　　　　　　　　　　　　Plaintiff,

vs.

**TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS,**

　　　　　　　　　　　　Defendants

Index No.: 611355/2023

**BILL OF COSTS**

**DISBURSEMENTS**

Fee for Index Number.....................$210
　　CPLR §8018(a)

Costs by Statute...........................$200

Motion Fee...............................$45

**Total.......................................$455**

*ADJUSTED AT $ 455.⁰⁰*
*THIS 2nd DAY OF DEC 20 24*
*Maureen O'Connell*
*Clerk, Nassau Co.*

**ATTORNEY'S AFFIRMATION**

STATE OF NEW YORK
COUNTY OF NASSAU
　　　　The undersigned, an attorney at law of the State of New York, affirms that he is the attorney of record for the Plaintiff FOX CAPITAL GROUP, INC. herein, and states that the disbursements above specified are correct and true and have been or will necessarily be made or incurred herein and are reasonable in amount and affirms this statement to be true under the penalties of perjury.

Dated: Nassau County, New York
　　　　September 23, 2024

　　　　　　　　　　　　*Yonatan Klestzick*
　　　　　　　　　　　　Yonatan Klestzick, Esq.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

FOX CAPITAL GROUP, INC.,

                       Plaintiff,

vs.

TATE LLC, DDT CONSULTANTS, INC AND JARRETT
R. JENKINS,

                       Defendants.

Index No.: 611355/2023

**NOTICE OF JUDGMENT**

      **PLEASE TAKE NOTICE**, that upon the Honorable Danielle M. Peterson Order dated September 13, 2024, and entered on September 19, 2024, FOX CAPITAL GROUP, INC. ("Plaintiff") will request Judgment from TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS ("Defendants") on October 7, 2024, before the honorable Danielle M. Peterson at the Nassau County Supreme Court located at 100 Supreme Ct Drive, Mineola, NY 11501.

Dated: September 23, 2024
Valley Stream, New York

By: *Yonatan Klestzick*
     Yonatan Klestzick, Esq.
     Lieberman and Klestzick, LLP
     Attorneys for Plaintiff
     381 Sunrise Hwy, 3rd Floor
     Lynbrook, NY 11563
     P: 516-900-6720

TO:

TATE LLC
25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747
334 LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044
1225 FRANKLIN AVE, GARDEN CITY, NY, 11530

DDT CONSULTANTS, INC
25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747
334 LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044
1225 FRANKLIN AVE, GARDEN CITY, NY, 11530

JARRETT R. JENKINS
25 MELVILLE PARK RD, STE 229 G, MELVILLE, NY, 11747
334 LOCUST ST, # 1, WEST HEMPSTEAD, NY, 11552-3044
1225 FRANKLIN AVE, GARDEN CITY, NY, 11530

Case 2:25-cv-03055-NCM-ST   Document 25-2   Filed 07/02/26   Page 37 of 121 PageID #: 456

Index No. 611355/2023

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NASSAU

FOX CAPITAL GROUP, INC.,

Plaintiff,

-against-

## TATE LLC, DDT CONSULTANTS, INC AND JARRETT R. JENKINS

Defendants.

## JUDGMENT AND BILL OF COSTS

**Lieberman and Klestzick, LLP**
*Attorney for Plaintiff*

*Address, Telephone*
**PO BOX 356**
**CEDARHURST, NEW YORK 11516**
**PHONE: (718) 900-6720**

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

JARRET JENKINS,
    Plaintiff,
    v.
MICROBILT CORPORATION,
    Defendant.

Case No.: 2:25-cv-03055

## DECLARATION OF WALTER WOJCIECHOWSKI IN SUPPORT OF MICROBILT CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Walter Wojciechowski certifies, pursuant to 28 U.S.C. Section 1746, as follows:

1.    I am the Chief Executive Officer of MicroBilt Corporation ("MicroBilt") and have held such role since January 2007. I have been employed by the consumer reporting industry in various roles for almost forty (40) years. I have personal knowledge of MicroBilt's business practices, compliance and credentialling protocols, and procedures.

2.    This Declaration is submitted in support of MicroBilt's Motion for Summary Judgment in this case.

3.    MicroBilt is, among other things, a specialty "consumer reporting agency" ("CRA") and a "reseller of consumer reporting services" and "Consumer Reports" (a "Reseller") as such terms are defined under the Fair Credit Reporting Act, 15 U.S.C. §1681 et. seq. ("FCRA").

4.    MicroBilt provides access to consumer credit and other information, including reselling Consumer Reports via Experian and Equifax, to its authorized business customers whom must undergo a rigorous due diligence and credentialing process prior to onboarding, including a site

4259155.1

inspection of their business premises, and sign a comprehensive agreement governing terms of access, including their obligation to certify each specific "permissible purpose" as defined in the FCRA or "permitted use" under the Gramm-Leach-Bliley Act of 1999, 15 U.S.C. §6801 et. seq. ("GLBA"), for which the consumer credit or other information is requested. That credentialing process overseen by MicroBilt, is conducted by ComplyTraq, a wholly owned subsidiary of MicroBilt, which in addition to MicroBilt, provides site inspections and business credentialing solutions to many third party vendor and end user companies in the consumer reporting space.

5.      I have personal knowledge of and am familiar with the MicroBilt business, business records storage practices, products and databases, and contract, compliance and credentialing processes discussed and described below.

6.      In order to comply with the FCRA, MicroBilt credentials all business customers prior to their access to MicroBilt's FCRA governed databases. Alliance Title Services ("ATS") is a credentialed MicroBilt customer and the compliance and credentialing materials, including the ComplyTraq materials and application, site inspection and identification materials are attached hereto as Exhibit "1", Bates Nos. 56 - 117.

7.      After ATS completed the application and credentialing process, including a site inspection of its business premises, MicroBilt and ATS entered into the MicroBilt User License Agreement, dated March 9, 2018, 2013 (the "User Agreement") attached hereto as Exhibit "2" (Bates No. 51-55).  As required by the FCRA, MicroBilt's data repository vendors, and MicroBilt's compliance regimen, the User Agreement agreed to by the user, here ATS, mandates that the user will strictly comply with the FCRA and in

particular, to certify that "consumer reports" will only be requested for a "permissible purpose" or "permitted use". See User Agreement, "A" and "C".

8.    Except for Plaintiff's allegations, which are denied, MicroBilt's records do not contain a single complaint or dispute or notice of any issue regarding ATS or its access to consumer reports through MicroBilt.

9.    Further, I have reviewed MicroBilt's business records regarding this matter, and confirmed the following timeline and events regarding Plaintiff and his interactions with MicroBilt and third parties regarding this matter.

10.    Exhibit "3" attached hereto is MicroBilt's May 7, 2025 Letter to ATS, auditing the consumer inquiry regarding Plaintiff.

11.    Exhibit "4" attached hereto is ATS's May 9, 2025 "Audit Verification" response verifying that it had a permissible purpose to obtain Plaintiff's Equifax report. ATS described the permissible purpose as a "review of collections for rental" and attached a record of the Fox Capital Judgment against Plaintiff. Bates Nos. 3 – 4.

12.    Exhibit "5" hereto is an internal report regarding the inquiry on Plaintiff's Equifax report establishing it was listed under: "Inquiries That do Not Impact Credit Score/Rating", a "soft inquiry". Bates Nos. 6 – 8. Other inquiries are called "hard inquiries".

13.    The distinction between the two types of inquiries referenced above is important for two reasons. First, "hard inquiries" are visible on a consumer's report by third parties whom are furnished the consumer report; "soft inquiries" are only visible to the consumer, whom receives their report pursuant to their disclosure request. Further, "hard inquiries" are used by credit scoring algorithms to create credit scores. Because "soft inquiries" are

only seen by the consumer, they are not and cannot be used to create credit scores.

14.    On October 28, 2025, I called Tim Bender, the principal of ATS to discuss the above described audit response. At that time, Mr. Bender informed me that the reference to the Fox Capital judgment was accurate, and that the Equifax report was obtained for purposes of collection risk analysis for Fox Capital and its lender, Wells Fargo. That use is compliant with his contract with MicroBilt. He also told me that the reference to "rental" was a ministerial error he could not explain.

I certify under penalty of perjury that the foregoing is true and correct and that the statements made herein are true. I am aware that if any of the statements made herein are willfully false, I am subject to punishment.

Dated: December 8, 2025

_Walter Wojciechowski_ CEO
WALTER WOJCIECHOWSKI

# Exhibit 1

# :: ComplyTraq

## On-Site Property Observation Request Form

| Inspection Request Information | | | | |
|---|---|---|---|---|
| **Customer Company Name**<br>**Alliance Title Services** | | | | |
| **Street Address (Physical Address)**<br>**2914 E 32nd St. Ste. 120** | | City<br>**Joplin** | State<br>**MO** | Zip<br>**64804** |
| Main Contact<br>**Tim Bender** | Title<br>**owner** | | Telephone Number<br>**417-206-6000 ,** | |

| Date Requested<br>**3/12/2018** | Customer / Sales Agent<br>**MicroBilt Corporation** | Type of Business as Submitted on Application<br>**Real Estate** |
|---|---|---|
| Company/Division Name<br>**MicroBilt** | | |
| Comments / Additional Instructions | | |

### These Sections To Be Completed By Representative Doing On Site Inspection

Complete this original form and return via fax to ComplyTraq @ 408-549-8830 within 2 business days. Notify ComplyTraq of any delay and reason for delay beyond 2 business days. Please submit the completed inspection to via www.complytraq.com. Please contact ComplyTraq at 800-849-4960 with any questions.

| Date contact was made with Customer:<br><br>03/14/2018 | Scheduled appointment date with Customer:<br><br>03/15/2018 |
|---|---|

When contact was made, was it direct contact at the phone number provided? Or was contact made via a returned call after leaving a message for business to contact you? Returned call after leaving a voice mail.

Was contact and/or appointment made with the main contact provided or an alternate contact? Main contact.

If alternate, list name, title and telephone: N/A

| On Site Inspection Company Name and Representative Name<br>ComplyTraq - William Maples | Date Observation Performed<br>03/15/2018 |
|---|---|

### Building Evaluation

1.) Type of Establishment (Check all that apply)
- [ ] Exclusive Commercial Building
- [x] Store/Shopping Center/Mall/Retail
- [ ] Executive Suite with shared Receptionist*
- [ ] Virtual Office
- [ ] Home converted strictly for business use (no living quarters at all)
- [ ] Is any part of the facility being used for living quarters? ☐ Yes ☐ No

- [ ] Apartment Complex/Mgmt Office
**If Apartment Complex, is the location deemed to be (please check one):**
- [ ] Utilized as a commercial office space during normal business hours only or
- [ ] Utilized as personal living quarters by the resident manager
- [ ] Multi-Tenant Building w/ Individual Suites
Are there lockable doors between the suites
☐ Yes ☐ No

- [ ] Share office space with other businesses*
Are there lockable doors between the offices? ☐ Yes ☐ No
Do the companies share a computer network? ☐ Yes ☐ No
*If customer shares office space or is in an Executive Suite, list the names of the other companies, the nature of their business and the relationship between the companies. N/A

**Private Residence** – If yes, does the following exist?
- ☐ Yes ☐ No Is business area located in any portion of the living quarters?
- ☐ Yes ☐ No Is business located in an apartment or high-rise condominium?
- ☐ Yes ☐ No Is there a locking door separating business area from living area?
- ☐ Yes ☐ No Is the office secured from the rest of the home? **If No, please ask how others are kept out of the office space.**

☐ Yes ☐ No Is there a physical separation between the business and the living quarters (i.e. no bed or toys in room, no clothes in the closet and no items present in the room that do not relate to the daily functioning of the business)? **IF NO, PLEASE EXPLAIN.**

Is the office located in a: ☐ House ☐ Apartment ☐ Mobile Home ☐ Trailer ☐ Other? If other please explain: N/A

**CONFIDENTIAL**
MicroBilt00056 of 5    A445



14.) If a Landlord, does apartment complex have more than two units?

☐ Yes ☐ No ☒ N/A    If No, explain: N/A

15.) Do office space, furnishings and equipment conform to stated business type?

☒ Yes ☐ No    If No, explain: N/A

16.) Is there evidence that this is an active business?

☒ Yes ☐ No    If No, explain: N/A

17.) Are client files present?

☒ Yes ☐ No    If No, explain: N/A

18.) What service(s) does it appear they provide (i.e. is there presence of inventory indicative of a retailer, do they serve consumers or businesses, is there presence of equipment indicative of a leasing company, etc.). **Ask the question "What types of services and products are provided"?**

Real Estate.

Does the contact have difficulty describing the nature of the business? ☐ Yes ☒ No

Does the contact have difficulty describing the products and services? ☐ Yes ☒ No

19.) Office Equipment Observed: (check all that apply)

☒ File Cabinets        ☒ Computers        ☐ Copier

☒ Phones        ☐ Postage Meter        ☐ Fax

☐ Trade Assoc. plaques

20.) While onsite performing the physical inspection call the phone number provided on the order.  Does it ring at the location?

☒ Yes ☐ No

**If not, select the best option:**

☐ Switchboard   ☐ Electronic attendant   ☐ Answering service   ☐ Another office within the campus   ☐ Cell phone (if cell phone please ask if the business landline forwards the call to a cell phone) _____

☐ Other, explain:  N/A

21.) What security features are utilized?  Is access to the office space restricted (swipe card, punch code, door, locks, etc.)?

☒ Yes ☐ No    If No, explain: Electronic lock, security system.

22.) Is there a security system present?

☒ Yes ☐ No    If No, explain: N/A

23.) Is there a security guard?

☐ Yes ☒ No

If so, is one present 24 hours a day seven days a week?  ☐ Yes ☐ No  If not, what is the guard's hours? N/A

24.) What are the hours of operation?

| | |
|---|---|
| Sunday | Closed |
| Monday | 9 AM to 5 PM |
| Tuesday | 9 AM to 5 PM |
| Wednesday | 9 AM to 5 PM |
| Thursday | 9 AM to 5 PM |
| Friday | 9 AM to 5 PM |
| Saturday | Closed |

25.) Who is able to enter the building during and after office hours? (i.e., employees, customers, vendors, cleaning, etc.)

During: Employees and customers.    After: Owner only.

26.) Type of neighborhood surrounding the business? (check one)

☐ Residential    ☒ Commercial    ☐ Rural    ☐ Other: (explain)

27.) Status of neighborhood? (check one)

☒ Stable    ☐ Improving    ☐ Other: (explain)

**CONFIDENTIAL**        MicroBilt00057

 *On-Site Property Observation Request Form*

## Business Procedure Review

| | |
|---|---|
| 28.) Is business reselling consumer reports or providing credit reports direct to consumers? No. | |
| If Yes, explain: N/A | |

29.) Document destruction / storage.

How are the credit reports stored / secured? File cabinet.

Are there locking filing cabinets? ☒ Yes ☐ No

Is there a locked filing room? ☐ Yes ☒ No
Does Customer Destroy Confidential Documents and if so, How?

☐ No  ☒ Shredder  ☐ Destruction Service  ☐ Other

If you use a Destruction Service, what is the company name of the service company? N/A

If using shredder, are the shredder bins locked or can anyone get access? ☐ Yes ☒ No ☐ N/A

30.) Is the company server located in a secure location? A server is a computer that is serving up data or application but is not necessarily a workstation. **Please explain:**

N/A, no server.
Is it segregated and secure in an area of its own, away from other activity in the office, e.g.: front office; lunch room; janitor closet. **Please explain:  N/A, no server.**

31.) How will customer receive consumer credit reports and non-public information?

☒ Web Site     ☒ PC          ☐ DAT          ☐ Other: (explain)

If PC, what type? Dell

32.) Location of equipment used to access consumer credit reports and non-public information?
Office.

33.) Is access to equipment restricted? ☒ Yes ☐ No

If Yes, explain (separate, locked room, etc.): Locked door.

34.) If no, is the equipment secured to the desk by a PC lock?

☐ Yes ☐ No ☒ N/A

35.) Is the Server/PC password protected?

☒ Yes ☐ No

36.) Is the Server/PC viewable by non-employees?

☐ Yes ☒ No

37.) Who performs maintenance and repair on client's computer(s)? Parr Hill  417 553 2828

38.) Are computer(s) installed with current anti-virus/anti-malware?   ☒ Yes ☐ No  If yes, what application? N/A

39.) Equipment Environmental Controls:

Heating and air conditioning? ☒ Yes ☐ No

Who services the equipment? Landlord.

Is power control uninterruptible, auto shut-down or none? None.

## Final Observations

| 40.) Are there any other factors (suspicious activity) that raise doubts whether the customer should receive access to consumer or other non-public? Please note any positive or negative observation related to security of premises, workstation, files, etc. Please document any suspicious activity (suspicious activities are activities that are not related to the kind of business the end user customer identified themselves to be), if possible, with other photos: |
| --- |
| No. |

| 41.) Did discussions with receptionist, secretary, or other employees conflict with other information provided or raise suspicions? |
| --- |
| ☐ Yes ☒ No  If yes, explain: N/A |

| 42.) When scheduling the appointment, was the phone answered in a personal capacity or with another or a general name, in such as "corporate office" or vague voice mail message? |
| --- |
| Personal capacity. |

| 43.) Were there any problems in scheduling the site inspection? |
| --- |
| No. |

| 44.) Can the contact only be reached by mobile phone? |
| --- |
| ☒ Yes ☐ No |

| 45.) Did you speak with the contact person?  ☒ Yes ☐ No |
| --- |
| If No, with whom did you speak:     Name: N/A                    Title: N/A |
| What was the contact person's, or any other employees encountered, demeanor (too nice, too angry, evasive or too inquisitive, attempting to understand/influence inspection process)? |
| Cooperative. |
| Was the contact person knowledgeable of the business and use of consumer credit information? |
| Yes. |
| Was there conflicting information from one person to the next? |
| No. |

| 46.) Photos Taken?  If so, how were they delivered? |
| --- |
| ☐ Website      ☒ E-mail      ☐ Regular Mail      On (date): 03/16/2018 |

## STOP

The last page of this document includes spaces for signatures. These signatures will include yours (the inspector) and the signature of the contact person you met with during the inspection. These must be obtained in order for your inspection to be processed. Any delay in getting these signatures and returning them to ComplyTraq, LLC will result in immediate removal of your name from our database and reduction in your inspection fee. You may fax the signature form to 408-549-8830 or email an electronic scan to sitesurvey@complytraq.com. If you need assistance, please contact 800-849-4960.

**CONFIDENTIAL**

MicroBilt00059

ComplyTraq

*On-Site Property Observation Request Form*

## Inspection Request Information

| Customer Company Name | | | | | |
|---|---|---|---|---|---|
| **Alliance Title Services** | | | | | |
| Street Address (Physical Address) | | City | | State | Zip |
| **2914 E 32nd St. Ste. 120** | | **Joplin** | | **MO** | **64804** |
| Main Contact | Title | | Telephone Number | | |
| **Tim Bender** | **owner** | | **417-206-6000 ,** | | |
| Date Requested | Customer / Sales Agent | | | | |
| **3/12/2018 9:35:04 AM** | **MicroBilt Corporation** | | | | |

### Signature of Inspector

I verify that i have visited and inspected the premises described and concluded that all of the above information is correct. Photos are being forwarded expeditiously. I also acknowledge that I understand the Federal Fair Credit Reporting Act requires that any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretense may be fined under Title 18, United States Code, imprisoned for not more than 2 years, or both.

Will Maples
Inspector, Printed Name / Title

Inspector Signature

3/15/18
Date

### Signature of Contact (Present during Inspection)

I verify that an inspection of the above business and address took place and that I met physically with the inspector signing above. I also acknowledge that I understand the Federal Fair Credit Reporting Act requires that any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretense may be fined under Title 18, United States Code, imprisoned for not more than 2 years, or both.

Tim Bender / Manager
Representative Printed Name / Title

Representative Signature

3/15/18
Date

contact@alliancedeed.com
Email Address

917-206-6000
Phone Number

917-708-9811
Fax Number

**CONFIDENTIAL**     MicroBilt00060



**CONFIDENTIAL**                    MicroBilt00061



CONFIDENTIAL

MicroBilt00062

ALLIANCE TITLE SERVICES LLC



## State of Missouri
### Insurance License
### ALLIANCE TITLE SERVICES LLC

| LICENSE TYPE | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|

Business Name : ALLIANCE TITLE SERVICES LLC
Phone Number :
Location addr : 1318 E 7TH ST
Lic Nbr/Class : 1# 8002933O  INSURANCE AGENT  AGENCY, BROKER
Issue date : 3/16/17  Expiration date :

LICENSE NON-TRANSFERABLE/DISPLAY IN VIEW FOR CUSTOMERS

ALLIANCE TITLE SERVICES LLC
2401 E 32ND ST #15
JOPLIN MO 64804

CONFIDENTIAL                    MicroBilt00063



CONFIDENTIAL

MicroBilt00064



CONFIDENTIAL



# Fraud Watch Report

**Date of Search:** Mar 16, 2018

**Search Critieria:**
Alliance Title Services
2914 E 32nd St.
Ste. 120
Joplin, MO - US 64804
Tim Bender
417-206-6000

**Results:**

| | |
|---|---|
| **Company Search:** | Passed |
| **Address Search:** | Passed |
| **Contact Search:** | Passed |
| **Phone Search:** | Passed |

## :Comply Traq

### Compliance & Credentialing Checklist

**Client Name & Address:** <u>Alliance Title Services</u>

**Date Initiated:** <u>3/9/2018</u>    **Account Number:** <u>26769/US656600</u>

| Item | Initials | | Labe |
|---|---|---|---|
| **Application Information. (Principal information N/A for publicly traded companies & government entities).** | | | |
| 1.) Completed and signed User Agreement and Application for Access to Consumer Reports and FCRA Data. If contracts were signed via EchoSign, verify tracking number present on documents, audit log received, and principal signed contracts. | ☑ In File | IG | A1 |
| 2.) Verify company and Principal information is filled out completely. | | IG | |
| 3.) Verify business and bank references have been provided (only required if in business for less than one year). | ☑ Verified | IG | |
| 4.) Verify Principal signed Application and is authorized officer or owner of company. | ☑ Verified | IG | |
| 5.) If materials are received via fax, verify the fax header matches the company name and address. If not, obtain two (2) business documents that verify the company name and address (i.e., business check, business license, etc.) | ☐ Verified/In File | n/a | A2 |
| 6.) Obtain current copy of Principal's Photo ID or Drivers License (only if sole proprietorship, partnership or corporation in business less than one year; N/A as above). | ☐ In File | n/a | A3 |
| 7.) Copy of current Lease (terms, address, signature, landlord info; N/A if publicly traded). If permitted to be verified verbally, include details below: | ☐ In File | IG | A4 |
|    Person who verified: <u>Richard Duley Real Estate</u> | | | |
|    Phone No. & Date: <u>417-438-7155</u> <u>3/15/18</u> | ☑ Verified | | |
| 8.) Letter of Intent on company letterhead signed by officer, owner or manager. Must contain type of business, intended use of services, anticipated monthly volume and if use will be local, regional, national or international. | ☑ In File | IG | A5 |
| **Application Verification and Fraud Prevention. (Principal information N/A for publicly traded companies & government entities).** | | | |
| 1.) Run Principal name and address through People Search to confirm address. | ☑ Verified/In File | IG | A6 |
| 2.) Run Principal name and address through Criminal Search (if hit is received perform manual search). | ☑ Verified/In File | no hit | A7 |
| 3.) Run principal name and email address through social network site (facebook.com). | ☑ Verified/In File | IG | A8 |
| 4.) Run principal name and business name through Export.gov. | ☑ Verified/In File | IG | A9 |
| 5.) Verify principal's relationship to the business via email address, business phone number, proof of financial responsibility. | ☑ Verified/In File | IG | A10 |
| 6.) Verify the main contact is employed by the company by calling the number provided in the agreement. | ☑ Verified | IG | |
|    Date and Time: <u>3/12/18 9.31AM</u> | | | |
| 7.) Confirm company is listed with online or telephonic directory assistance. If permitted to be verified verbally, include details below: | ☑ Verified/In File | IG | A11 |
|    Person who verified: _____ | ☐ Verified | | |
|    Date and Time: _____ | | | |
| 8.) Call and verify business and bank references listed. Alternative to business & banking references: reputable industry listing or rating, such as AM Best's, Moody's Standard | ☐ Verified/In File | n/a | A12 |

**CONFIDENTIAL**

| Item | Initials | Label |
|---|---|---|
| and Poor's, FDIC or NCUA, copy of company's annual financial report and/or commercial business report that reflects same company name and location. | | |
| 9.) Pull super phone, reverse phone and/or yellow pages search on phone numbers provided in references and verify business name matches in search results and references. | ☐ Verified/In File    n/a | A13 |
| 10.) Pull Business Credit Report on business. | ☑ Verified/In File    1G | A14 |
| 11.) Search www.ftc.gov and www.cfpb.gov to determine whether or not business or principal is or has been under investigation by FTC or CFPB. Insert any copies in file. Date/Time verified: 3/12/13   9.50AM | ☑ Verified/In File    none   1G | A15 |
| 12.) Pull Consumer Credit Report on Principal (only if sole proprietorship, partnership, corporation in business less than 1 yr, or no Business Credit Report available; N/A as above). | ☐ Verified/In File    n/a | A16 |

**Bona Fide Business Verification (if business is subsidiary, do an internal desktop verification of the parent company too)**

| | | |
|---|---|---|
| 1.) Indicate and file items provided for proof of Bona Fide Business Verification: | ☑ In File    1G | A17 |

| | | |
|---|---|---|
| ☐ Copy of Business License (mandatory if required by state, city or county) | ☐ Articles of Incorporation/ Partnership | ☐ Corporation verification with state or Federal government (documentation required) |
| ☐ Sales tax records | ☐ State and/or Federal tax records | |
| ☐ State Tax ID Certificate (not application) | ☐ Federal ID No. form (not application) | ☐ Professional State Issued License |
| | ☐ Proof of status under FCRA § 621(b) (1, 2, 3) (Federal bank, CU, air/ground carries and those subject to the Packers and Stockyards Act of 1921) | ☐ Proof of 501 (c) (3) status (non-profit, charitable, religious or educational organization) |

| Item | Initials | Label |
|---|---|---|
| 2.) Verify via online search of business, that business activities are consistent with service indicated on application (to include google.com and facebook.com). | ☑ Verified/In File    1G | A18 |
| 3.) Verify website ownership via whois.domaintools.com and print/file results. | ☑ Verified/In File    1G | A19 |
| 4.) Review company website and document items below. If no company website, print screen to document attempt to verify (i.e. Google or BING) and obtain marketing materials. | ☑ Verified/In File    1G | A20 |

| | |
|---|---|
| ☑ Check company name, phone number and address | ☑ Review for any association, ties, blogs or links to or with credit repair |
| ☑ Review services provided, and information to support kind of business and permissible purpose | 1G |

| Item | Initials | Label |
|---|---|---|
| 5.) Verify past website content via www.archive.org and print /file results. | ☑ Verified/In File    1G | A21 |

**FCRA Information**

| | | |
|---|---|---|
| 1.) Ensure that Applicant has adequately described its business. | | 1G |
| 2.) Ensure that Applicant has indicated intended use of information. | | 1G |
| 3.) Ensure that Applicant affirmed a permissible purpose. | | 1G |
| 4.) Ensure that Applicant business type is NOT one which: is on the MicroBilt / vendor do not sell list (check any that apply); is not in the traditional financial services industry; does not routinely have a need for consumer reports in the ordinary course of business; or poses a question as to its ethical nature or legitimate need for consumer reports. | ☑ Verified    1G | |

| | | | |
|---|---|---|---|
| ☐ Pawn Shop * | ☐ Health / Book Club | ☐ Credit Repair | |
| ☐ Dance Studio | ☐ Process Server | ☐ Law Enforcement * | |
| ☐ Check Cashing * | ☐ Media/News/Journalist | ☐ Adult, Dating, Massage Service | |
| ☐ Spiritual / Tattoo | ☐ Diet Center | ☐ Asset Locator-not collect agncy | |
| ☐ Adoption Search | ☐ Time Share, Continuity Club | ☐ Internet People Locator | |

Key: * Exception may apply. See Compliance Manager.

**CONFIDENTIAL**

MicroBilt00068
Page 2 of 6

| Item | | Initials | Labe |
|---|---|---|---|
| 5.) | If Lawyer or Law Firm, ensure permissible purpose, and confirm product requested can be provided. | □ Verified — *n/a* | |
| 6.) | If Lawyer or Law Firm, and they are using services for the purpose of filing consumer bankruptcies, they must provide a document/sample template the consumer signs authorizing access to their information. | □ In File □ N/A | A22 |
| 7.) | Ensure Private Investigators and Repossession business is established, reputable and state licensed. Obtain relevant license(s). | □ Verified/In File | A23 |
| 8.) | If a PI, News or Law Enforcement Agency, ensure sole use is for employment purposes. | | |
| 9.) | Ensure that business is not a Credit Repair / Finance Counseling business (except for non-profit / housing counsel or registered securities broker), or reselling consumer reports, or providing credit reports direct to consumers. | | |
| **Financial Services or Lending Companies** | | | |
| 1.) | Is Applicant financial service or lending company? | ☑ Yes □ No — *1a* | |
| 2.) | If yes, verify all states they are licensed in currently. | ☑ Verified/In File — *A17* | A24 |
| 3.) | If yes, applicant must provide sample of adverse action letter. | □ In File — *n/a* | A25 |
| **Bail Bonds Companies (All are required to be state licensed)** | | | |
| 1.) | Is the Applicant a Bail Bonds Company? | □ Yes ☑ ~~No~~ — *n/a* | |
| 2.) | Ensure permissible purpose is extension of credit w/ consumer consent and/or collections. | □ Verified | |
| 3.) | Verify state license and, if applicable, any class requirements (please note class requirement may need to be met before obtaining license). | □ Verified/In File | A26 |
| 4.) | Obtain a sample bail bond contract which includes a signature line giving the agency clear and conspicuous permission to pull the consumer's credit report in connection with their application for credit with the bail bond company. | □ Verified/In File | A27 |
| 5.) | Obtain a sample Notice to Indemnitor (this may be part of the contract). | □ Verified/In File | A28 |
| 6.) | Obtain Bail recovery agent license (if applicable) or information on who is used for bail recovery and whether or not information is passed to that company or individual. Note: The end user may NOT pass information to a third party. | □ Verified/In File | A29 |
| 7.) | Is Bail Bonds Company using data for collections? If yes, obtain documented information on collection process to the location of the defendant. | □ In File □ N/A | A30 |
| 8.) | Obtain Fees Schedule (this may be part of the contract) and information explaining what the consumer is agreeing to do and pay. | □ In File | A31 |
| **Employment Screening Industry Verification** | | | |
| 9.) | Did Applicant check "Employment Screening" in the FCRA Information Section? | □ Yes ☑ ~~No~~ — *n/a* | |
| 10.) | Verify that the business has at least 2 employees and list number. No. of Employees: _____ | □ Verified | |
| **Credit Counseling / Housing Counseling Agency Industry Verification** | | | |
| 1.) | Verify agency is a non-profit organization. | □ Verified — *n/a* | |
| 2.) | Verify presence of one of the following items and indicate which one is provided.<br>❑ Member of Association of Independent & Consumer Credit Agencies (AICCA)  ❑ Member of National Foundation for Credit Counseling (NFCC) | □ Verified/In File | A32 |
| 3.) | Is Applicant a non-profit credit counseling agency? | □ Yes □ No | |

**CONFIDENTIAL**

| Item | | Initials | Labe |
|---|---|---|---|
| 4.) If yes, verify presence of one of the following items and indicate which one is provided. | ☐ Verified/In File | n/a | A33 |
|    ☐ Letter of certification from the Council on Accreditation (COA)    ☐ Certification or ISO 9001:2000 standard for Consumer Credit & Counseling Agencies | | | |
| 5.) If yes, obtain blank copies of all contracts initiated between the consumer credit counseling service and their clients, including Dual Role Disclosure. | ☐ In File | | A34 |
| 6.) Is applicant a non-profit housing counseling agency? | ☐ Yes ☐ No | | |
| 7.) If yes, obtain HUD approval certificate. Verify current standing by contacting HUD. | ☐ In File | | A35 |
|    Person who verified: _____ | ☐ Verified | | |
|    Phone No. & Date: | | | |
| 8.) Verify agency is NOT a credit repair clinic and is not affiliated, either by ownership or contract, with a credit repair clinic. | ☐ Verified | | |
| 9.) Obtain copies of fee disclosure documents. | ☐ In File | | A36 |
| 10.) Verify agency provides a range of permitted housing counseling services, which include: ☐ Homebuyer education ☐ Pre-Purchase counseling ☐ Mortgage delinquency ☐ Loss mitigation ☐ Money/debt management ☐ Post-purchase ☐ Home equity conversion mortgage ☐ Mobility/relocation assistance ☐ Renter assistance ☐ Fair housing assistance | ☐ Verified | | |
| 11.) Verify employees are trained by non-affiliated third party (trainer must be certified). Name of Trainer: _____ Certified? ☐ Yes ☐ No | ☐ Verified | | |
| 12.) Obtain copies of brochures and marketing materials. | ☐ Verified/In File | | A37 |
| 13.) Verify agency does not charge consumers fees related to credit report dispute or reinvestigation assistance. | ☐ Verified | | |

**Tenant Screening Industry Verification**

| Item | | Initials | Labe |
|---|---|---|---|
| 1.) Did Applicant check "Tenant Screening" in the FCRA Information Section? | ☐ Yes ☐ No | n/a | |
| 2.) Verify presence of 3 completed tenant rental applications. | ☐ In File | | A38 |
| 3.) Verify presence of **one** of the following items and indicate which one provided. ☐ Document Filings in Landlord / Tenant Court ☐ Sample application with consumer consent language ☐ Membership in local/regional/national Apartment Association. | ☐ In File | | A39 |
| 4.) If Property Management Company, verify presence of one of the following items and indicate which one provided. ☐ Contract between the landlord and management company (executed copy preferred) ☐ Sample contract between management company and property owner that identifies services provided by management company | ☐ In File | | A40 |
| 5.) Verify presence of complex name on Application. If Property Management company, obtain signed list of all apartment complexes and/or properties. | ☐ Verified/In File | | A41 |
| 6.) If Apartment complex, verify complex is listed with telephone directory assistance. | ☐ Yes ☐ No | | |
| 7.) Verify complex has more than 2 units. Number of Units:_____ | ☐ Verified | | |
| 8.) Is Applicant an Individual Landlord? (Note: only EX permits individual landlords) | ☐ Yes ☐ No | | |
| 9.) If yes, verify receipt of one of the following items and indicate which one: ☐ Copy of Title ☐ Copy of Property tax document ☐ Public records search ☐ Property insurance documents ☐ County Assessor's office records | ☐ In File | | A42 |

**CONFIDENTIAL**

MicroBilt00070

| Item | Initials | Labe |
|------|----------|------|
| **Operating from a Residence and Permitted by the Credit Bureau / Data Repository** | | |
| 1.) Is the business operating from a Residence? (Note: Only EQ and TU permitted). | ☐ Yes ☐ No   n/a | |
| 2.) If yes, verify receipt of one of the following items and indicate which one:<br>☐ Receipt of certificate of incorporation or formation with state or federal government.  ☐ Receipt of sole proprietorship or partnership business license from county or state government or fictitious name license. | ☐ In File | A43 |
| 3.) Verify residence is NOT a rental or apartment or operating within unrestricted location. | ☐ Verified | |
| 4.) Verify property is owned by principal, by completing property search. | ☐ In File | A44 |
| 5.) Verify business operations are separate from living quarters (separate business sign, phone & locking door, locking filing cabinets, living area and office do not share space). | ☐ Verified | |
| **Business Site Verification** | | |
| 1.) Is a Site Inspection required by Repository? (MAY be exempt for publicly traded companies, Banks, CU's or Government Agencies with addresses verified) | ☐ Yes ☐ No   1G | |
| 2.) Order Site Inspection for each business location desiring access.  Date Ordered: 3/12/18 | 1G | |
| 3.) Receipt of completed Site Inspection. | ☑ In File   1G | A45 |
| 4.) Verify sign at place of business, which conforms to stated business type. | ☑ Verified   1G | |
| 5.) Verify business license (if applicable) is displayed and location of business is safe, is not a residence and conforms to stated business type. | ☑ Verified   1G | |
| 6.) Verify office space, furnishings & equipment conforms to stated business type. | ☑ Verified   1G | |
| 7.) Verify business does not share office space and if so, with a reputable business. | ☑ Verified   1G | |
| 8.) Verify presence of employees that perform business functions. | ☑ Verified   1G | |
| 9.) Verify customer files are stored in locked cabinets & destroyed when necessary. | ☑ Verified   1G | |
| 10.) Verify office, equipment and room to access reports is protected and restricted. | ☑ Verified   1G | |
| 11.) Is the business in a shared office space? | ☐ Yes ☑ No   1G—n/a | |
| 12.) If yes, obtain completed and signed shared office space agreement (if applicable). | ☐ In File ☑ N/A   n/a | A46 |
| 13.) If Applicant is a lawyer / law firm solely in collections, consumer bankruptcies or hiring employees, obtain copy of attorney ID, bar membership card or verification from www.martindale.com. | ☐ In File   n/a | A47 |
| 14.) Is the Applicant a Collection Agency? | ☐ Yes ☑ No | |
| 15.) If yes, obtain copy of Collection Agency license, bond, and/or certificate of authority, as required by state or local government. | ☐ In File ☐ N/A | A48 |
| 16.) Is Applicant a Bank? | ☐ Yes ☑ No | |
| 17.) If yes, verify listing at http://www2.fdic.gov/sdi/main.asp and print for file. | ☐ In File | A49 |
| 18.) Is Applicant a Credit Union? | ☐ Yes ☑ No | |
| 19.) If yes, verify CU is listed at http://www.ncua.gov/ & place print screen in file. | ☐ In File | A50 |
| 20.) Is Applicant a Government Agency? | ☐ Yes ☑ No | |
| 21.) If yes, verify listing at http://www.usgov.gov/ & place print screen in file. | ☐ In File | A51 |
| 22.) Is Applicant a publicly held company? | ☐ Yes ☑ No | |
| 23.) If yes, verify listing from www.sec.gov/edgar and print for file. | ☐ In File | A52 |
| 24.) Is Applicant a Mortgage Broker? | ☐ Yes ☐ No | |

| Item | | Initials | Label |
|---|---|---|---|
| 25.) If yes, obtain mortgage broker license and government issued picture identification. | ☐ In File | n/a | A53 |
| 26.) Is Applicant a licensed insurance company? | ☐ Yes ☐ No | 1a | |
| 27.) If yes, copy Applicant's insurance license or print AM Best verification for file. | ☑ In File | 1G | A54 |
| **Consumer Reporting Repository "Do Not Sell To" Lists** | | | |
| 1.) Compare Applicant information to Experian Watch List.<br>Date and Time verified: _SO - 3/16/18 2:18pm_ | ☑ Verified | 1G | |
| 2.) Compare Applicant information to Equifax Watch List.<br>Date and Time verified: _3/16/18 2:15pm_ | ☑ Verified | 1G | |
| 3.) Compare Applicant information to LexisNexis Watch List.<br>Date and Time verified: _3/16/18 2:15pm_ | ☑ Verified | 1G | |
| 4.) Compare Applicant information to TransUnion Watch List.<br>Date and Time verified: _3/16/18 2:15pm_ | ☑ Verified | 1G | |
| **FCRA Training** | | | |
| 1.) Verify FCRA training course is turned on for all users. | ☑ Verified | (AB) | |
| **Auditing** | | | |
| 1.) | | | |
| 2.) | | | |
| **Client Specific Items** | | | |
| 1.) Provide copy of signed contracts to Applicant. Insert copies in file. | ☐ In File | mD | A55 |
| 2.) Save copy of signed contracts on secure drive. | | mD | |
| 3.) SSN Masked (Site Inspection and Full Credentialing Required): If a) a state license required Bail Bonds company; b) a state Private Investigator license required Judgment Recovery company; c) a Pawn Shop or Repossession company, ensure in each instance that the business is established, reputable and in a secure / safe location; or (d) operating out of a residence. | | n/A | |
| 4.) Verify IP Address on application, if receiving full SSN. (www.melissadata.com) | ☐ Verified | mD | |
| 5.) Mark FCRA checkbox in MB.com support site. | | mO | |
| 6.) Send welcome email to each Applicant. Insert copy in file. | ☐ In File | 1G | A56 |

Notes:

_____

**Checklist Completion Confirmation**

**Credentialing Representative**
Name:

_[signature]_    3/16/18
Signature      Date

**Manager**
Name:

_[signature]_    3/20/18
Signature      Date

**CONFIDENTIAL**



## Application for Access to Consumer Reports and FCRA Related Data

This ComplyTraq, LLC ("ComplyTraq") Application for Access to Consumer Reports and FCRA Related Data ("Application") and the information identified herein and documentation submitted by the below referenced "Client" pursuant hereto, along with the terms, conditions, obligations, requirements, guidelines, assurances and certifications that follow, is subject to the terms and conditions, including those relating to confidentiality, of the agreement for services entered into between Client and MicroBilt Corporation, ("MicroBilt") along with any exhibits, amendments and addenda thereto (the "Agreement"). MicroBilt is a "consumer reporting agency" and a "reseller of consumer reporting services" as such terms are set forth in the "FCRA" (defined below). ComplyTraq is the approved agent of MicroBilt designated pursuant to the Agreement, to perform customer onboarding due diligence, compliance certification, credentialing, background checks, FCRA training and testing, and on-site inspections of Client's business premises, to determine and review credit, history, procedures, processes, security practices, protective measures and need for accessing, using, storing and/or distributing consumer credit information, data or other reports obtained from or through MicroBilt, so as to ensure Client's initial and ongoing compliance with the Agreement.

### Application

Every field on this Application MUST be completed. If not applicable, you must write N/A. Failure to fully complete this Application in its entirety and return it along with the signed Certification (attached) will delay and/or deny your approval.

### Company Information

| Business Name (Hereinafter "Client") and Type of Company<br>Alliance Title Services, LLC | | Website Address(es) / URLs (if applicable)<br>www.alliancedeed.com | | IP Address and Range<br>159.118 17.215 | |
|---|---|---|---|---|---|
| Physical Address (No PO Boxes)<br>2914 E. 32nd St., Ste 120 | | City<br>Joplin | | State<br>MO | Zip<br>64804 |
| SSN or Federal ID Number<br>47-1449543 | State / Date Business was Established<br>MO / 6/30/14 | Hours of Operation<br>M-F 9a-5p | | Number of Employees<br>Total: 4<br>For Access: - | |
| Main Contact<br>Tim Bender | Title<br>Owner | Email<br>contact@allianced<br>eed.com | | Phone and Fax Numbers<br>Work: 417-206-6000<br>Cell: 417-850-5535<br>Fax: na | |
| Compliance Contact<br>Tim Bender | Title<br>Owner | Email<br>contact@allianced<br>eed.com | | Phone and Fax Numbers<br>Work: 417-206-6000<br>Cell: 417-850-5535<br>Fax: na | |

### Principal Information (Client Owner or Officer signing below) - N/A for publically traded companies & government entities

| Principal Name (if different)<br>Tim Bender | Title<br>Owner | Email<br>contact@allianced<br>eed.com | Phone and Fax Numbers<br>Work: 417-206-6000<br>Cell: 417-850-5535<br>Fax: na |
|---|---|---|---|
| Home Address | | | |
| City/State/Zip | | | |
| Home Phone Number<br>na | Drivers License Number | | Social Security Number |

### Parent Company Information (if a subsidiary)

| Parent Company<br>na | Website Address(es) / URLs (if applicable)<br>na | | |
|---|---|---|---|
| Physical Address (No PO Boxes)<br>na | City<br>na | State<br>na | Zip<br>na |

### FCRA Information

For the Purposes of the FCRA, please describe the nature / type of your company's business (required):

Title company and due diligence on private lender loans.

Please indicate End Users' intended use of information (check all that apply):

☑ Related to transaction involving credit extension, account review, account collection or bankruptcy filing with respect to subject consumer.

☐ Employment purpose (END USER WILL IDENTIFY TO PROVIDER EACH TIME A REPORT IS REQUESTED FOR THIS PURPOSE).

Version 4.2; October 24, 2016

Adobe Sign Transaction Number: CBJCHBCAABAA4LO9KPWWdgJFG1HHSoknviUoJygGib

**CONFIDENTIAL**        MicroBilt00073

☑ Insurance underwriting (END USER WILL IDENTIFY TO PROVIDER EACH TIME A REPORT IS REQUESTED FOR THIS PURPOSE)

☑ Tenant screening

☑ Related to a business transaction involving subject consumer. (CLIENT WILL IDENTIFY SPECIFIC BUSINESS PURPOSE EACH TIME A REQUEST IS MADE UNDER THIS CATEGORY, AND REPORT SAME TO THE PROVIDER AT POINT OF ACCESS)

## GLBA Information

For the Purposes of the GLBA, please describe the nature / type of your company's business (required).

# Title and lending underwriting

Please indicate End Users' intended appropriate use of information under GLBA (check all that apply):

| | |
|---|---|
| ☐ Child support enforcement | ☐ Credit/Collection Activity/skip tracing |
| ☐ Locating former patients | ☑ Asset Verification Search |
| ☐ Locating beneficiaries and heirs | ☐ Locating existing customers |
| ☑ Fraud Prevention | ☐ Find owners/unclaimed goods |
| ☐ Employment verification | ☐ Locate Alumni/class reunions |

## DPPA Information

For the Purposes of the DPPA, please describe the nature / type of your company's business (required).

# Title and lending underwriting

Please indicate End Users' intended appropriate use of information under DPPA (check all that apply):

| | |
|---|---|
| ☐ Government Use | ☐ Motor Vehicle or Driver Safety |
| ☑ Verify accuracy of Personal Information | ☐ Civil, Criminal, Administrative or arbitral proceeding |
| ☐ Statistical Reports | ☑ Insurer or insurance support organization |
| ☐ Licensed Private Investigative Agency or licensed security services | |

## CA Civil Code End User Compliance (Please fully read Section below and check one)

End User ■ IS or ■ IS NOT a "Retail Seller," as defined in Section 1802.3 of the California Civil Code and conducts "Point of Sale" transactions, i.e., issues credit to consumers who appear in person on the basis of applications for credit submitted in person.

## Letter of Intent

☑ On Company letterhead signed by an officer, owner or authorized manager, please provide the nature of your business, the intended use for the services, anticipated monthly volume and whether your Company anticipates its access to be primarily local, regional, national or international.

## Bona Fide Business Verification

Copy of Business License plus one of the following must be attached (indicate which by checking the appropriate boxes):

| | | |
|---|---|---|
| ☑ Copy of Business License (must be attached if required by your state, city or county and if not required, two of the other items must be chosen and attached) | ☐ Articles of Incorporation / Partnership | ☐ Corporation verification with State or Federal government |
| | ☐ State and/or Federal tax records | ☑ Professional State Issued License |
| | ☐ Federal ID No. form (not application) | |
| ☐ Sales tax records | ☐ Proof of status under FCRA § 621(b) (1, 2, 3) (Federal bank, CU, air/ground carries and those subject to the Packers and Stockyards Act of 1921) | ☐ Proof of 501 (c) (3) status (non-profit, charitable, religious or educational organization) |
| ☐ State Tax ID Certificate (not application) | | |

Each of the following must be attached

| | | |
|---|---|---|
| ☑ Advertising Material or Business Card | ☐ Copy of Business Check (only if sole proprietorship, partnership or corp. in business under 1 yr) | ☑ Copy of Principal's Photo ID / Driver's License (only if sole proprietorship, partnership or corp in business under 1 yr) |
| ☑ Copy of Current Business Phone Bill | | |

Business References and a Bank Reference are required for those in business under 1 yr., and upon request.

Do you own your office space? ■Yes ■No     If yes, indicate how long to date (        )

Do you lease your office space? ■Yes ■No     If yes, indicate how long to date (        ) and provide the following (N/A for publicly traded companies):

Copy of current Lease (must include Lease terms, the address page, the signature page and the landlord name and contact information)

## Financial Services or Lending Companies

If your company is a mortgage banker and servicer, short term lender (deferred deposit transaction), consumer or commercial finance lender and broker, please indicate accordingly and provide license for each:

| | |
|---|---|
| ☐ Mortgage Banker | ☐ Deferred Deposit Transaction |
| ☑ Commercial Finance Lender | ☐ Consumer Finance Lender |

List all states currently licensed for lending.

☐ Please provide a sample of your adverse action letter.

**CONFIDENTIAL**                    MicroBilt00074

**Employment Screening Information**

If you selected Employment Screening under FCRA you must provide the following:

☑ List Number of Employees: 4                    ☐ Private Investigator License (if applicable)

**Consumer Credit / Housing Counseling Agency Information**

Agency may not be or have an affiliation with a credit repair clinic. Agency must be non-profit and must provide the following as indicated:

☐ Proof of Membership in Association of Independent Consumer Credit Counseling Agencies (AICCA); *OR*

☐ Proof of Membership in National Foundation for Credit Counseling (NFCC).

☐ Proof of non-profit status.

☐ Letter of certification from the Council on Accreditation (COA); *OR*

☐ Certification of ISO 9001:2000 standard for Consumer Credit Counseling Agencies.

☐ Blank copies of all contracts initiated between the Consumer Credit Counseling Agency and its clients, including Dual Role Disclosure.

☐ Copy of Housing Counseling Agency's current HUD approval certificate

☐ Copies of Fee Disclosure documents.

☐ Copies of brochures and marketing material.

☐ Copy of non-affiliated third party employee trainer certification.

**Tenant Screening Attachment Information**

If you selected Tenant Screening under FCRA you must provide three completed rental applications and one of the optional items listed:

☐ Three completed rental applications

☐ Signed list of all apartment complexes or properties being managed (mandatory for property management companies; optional for all others)

☐ Document filings in Landlord/Tenant Court (optional)

☐ Verify membership in local/regional/national Apartment Association (optional)

Please provide name of complex.

Are you an individual Landlord?    ☐ Yes ■ No   If yes, you must provide the following

☐ Copy of title

☐ Copy of property tax document

☐ Public records search of property

☐ Property insurance documents

☐ County Assessor's office records

**Bail Bonds Support Information**

If your business is a Bail Bonds company, please provide the following items:

☐ State Bail Bonds License

☐ Sample Bail Bonds contract

☐ Sample Notice to Indemnitor (if not part of contract)

☐ Fee Schedule (if not part of contract)

☐ Bail Recovery Agent License (if applicable)

**Business Operating from Residence Support Information**

Is your business operating out of a residence? (NOT Unrestricted or an Apartment)          ■ Yes ■ No   If yes, provide one of the following.

☐ Corporation verification by certificate of incorporation or framework with state or federal government

☐ Sole proprietorship/partnership verification by business license from county or state government or fictitious name application

**Attorney or Law Firm Support Information**

Is Lawyer/Law Firm a) solely in collections, b) filing consumer bankruptcies or c) hiring employees?          ■ Yes ■ No   If yes, provide one of the following:

☐ Attorney State Identification Card

☐ Bar Association Membership Card

☐ Verify licensure from www.martindale.com

☐ If you will be using our services for the purpose of filing consumer bankruptcies, you must provide a document/sample template the consumer signs authorizing access to their information.

## Compliance Assurances

Client agrees, acknowledges and warrants, as either an approved end user ("End User") or as an approved third party sales agent distributor ("Sales Agent") to End Users of various credit related products and services, ("Reports") that as applicable:

1. Sales Agents may only distribute Reports to approved End Users who have a "permissible purpose" as defined in the FCRA to request such Reports and to no other third party, and may not themselves be End Users of Reports, nor have access to or use of the Reports; and

2. It shall abide by and accept responsibility for accessing and distributing (as to Sales Agents), using and storing (as to End Users) the Reports in accordance with the Fair Credit Reporting Act, 15 U.S.C. §1681 et. seq., ("FCRA") as amended by the Fair and Accurate Credit Transactions Act of 2003 ("FACT Act") and thereafter from time to time, the Gramm-Leach-Bliley Act of 1999 ("GLBA"), the Driver Privacy Protection Act ("DPPA"), the laws of the applicable state issuing Motor Vehicle Records ("MVR"), the Equal Credit Opportunity Act ("ECOA"), the Truth In Lending Act ("TILA") and all other applicable local, state and federal laws regarding the Reports, as well as the permissions and limitations of the national consumer credit reporting agencies, TransUnion, Experian, Equifax ("Credit Bureaus"), and other industry, consumer or business data providers (together with the Credit Bureaus, "Repositories" and each a "Repository"), ComplyTraq, MicroBilt, and other vendors providing access to the Reports, when Reports subject to such acts and laws is accessed, distributed, used and/or stored, and as applicable, adhere to the "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA" and the "Notice to

**CONFIDENTIAL**                    MicroBilt00075

Furnishers of Information: Obligations of Furnishers Under the FCRA," received hereunder as required by the FCRA, and be aware that access to certain Reports is subject to restrictions of the Repository providing such Report, such that End Users shall not export such Reports, related documentation or technical data, or any product incorporating such, outside of the fifty (50) states of the United States of America and its territories; and

3. End Users shall obtain in advance and retain on file appropriate application, release, consent and/or authorization forms ("Forms") from any credit applicant, job applicant or other individual on whom Reports are sought; and

4. End Users shall disclose to each such individual(s) as and when required by law, that credit and/or other Reports (including investigative credit report data, if applicable) will be sought on such individual(s); and

5. End Users shall provide consumer(s) with questions about their own credit report or when credit is denied, terminated or changed or when an application is declined, based in whole or in part on such Reports, resulting in "adverse action" as defined in the FCRA, with the relevant Repository's name, address and toll free phone number (and not that of any other Repository, vendor, partner or customer); and

6. End Users shall both advise applicants and follow procedures itself, regarding Repository mandates on inquires and complaints and retain Forms for a minimum of five (5) years in all cases where credit is extended or an application approved and in any case where credit is declined or an application declined and promptly make available such Forms to the Repositories upon reasonable notice for occasions where confirmation or audit is required by the Repositories; and

7. End Users shall take all reasonable precautions to ensure that consumer Credit Information on individuals will be held in strict confidence, disclosed only to those of its employees whose duties reasonably relate to the legitimate business purpose for which the information was requested and not disclosed to any other party in whole or in part unless required by valid subpoena, court order or applicable law; and

8. Prior to requesting each consumer report, End Users shall be identified as the end user of the consumer report, certify each "permissible purpose" as defined in the FCRA for which the consumer report will be used and that the consumer report will be used for no other purpose; and

9. Compliance and keeping up to date with new requirements or laws regarding access to or use of Reports is the responsibility of Client; and

10. End Users may secure consumer credit and other Reports on individuals solely for End Users' own internal one-time use in accordance with the permissions and restrictions promulgated by the Repositories, which may differ from one another, which may include credit, employment, insurance underwriting, collection, government licensing or written consumer consent or initiated transactions between itself and the consumer / individual to whom information refers and/or for such other "permissible purpose" related to a business transaction as is defined by the FCRA and/or as permitted and restricted by the Repositories, and may not be resold, sub-licensed or otherwise revised in any way or delivered to any third party; and

11. As necessary, in accordance with FCRA, FACTA, GLBA, DPPA, MVR, ECOA, TILA and other local, state and federal laws, as well as Credit Bureau, Repository, MicroBilt, ComplyTraq and other vendor policies, prior to Sales Agent distributing and End User accessing the particular desired consumer credit information, data or other Reports and on an annual basis and when changing business addresses and as new products and services are offered for access from time to time and new laws, Credit Bureau, Repository, MicroBilt, ComplyTraq and vendor policies are established or amended, Client agrees to undergo and pay for compliance certification, credentialing, employee FCRA training and testing, an on-site inspection at its business premises ("Site Inspection"), criminal, consumer credit and other background checks on Client's business and its principal (owner or officer), performed by ComplyTraq, to determine and review Client's credit, history, procedures, processes and Sales Agent's need for accessing and distributing and End User's need for using and storing consumer credit information, data or other Reports, security practices and other protective measures in place, so as to ensure Client's initial compliance, as well as periodically for reassurance thereafter. To ensure its End Users' compliance, Sales Agents shall enter into a "ComplyTraq Compliance Services Agreement" directly with ComplyTraq.

The electronic signature of Client's authorized representative acknowledging acceptance of the above terms and conditions is set forth at the end of the attached Certification.

## Security Requirements

As a result of entering into your Agreement for access to and distribution (as to Sales Agents) and use and storage (as to End Users) of consumer Reports or other non-public personally identifiable information, Client further agrees as applicable, to adhere to the following measures:

### Data Access Security

We must work together to protect the privacy of consumers. The following measures are designed to reduce unauthorized access of consumer credit reports and other non-public personally identifiable information.

1. You must protect your account numbers and passwords so that only key personnel know this sensitive information. Unauthorized persons should never have knowledge of your passwords. Do not post or leave such information unattended in any manner.

2. System access software, whether developed by your company or purchased from a third party vendor, must have your account numbers and passwords "hidden" or embedded and be known only by supervisory personnel. Assign each user of your systems, a unique user ID logon and password.

**CONFIDENTIAL**                    MicroBilt00076

3. Do not discuss your account numbers and passwords by telephone with any unknown caller, even if the caller claims to be an employee of a Credit Bureau or other data Repository.
4. Restrict the ability to obtain consumer credit and other information to only a few key End User personnel.
5. Point of sale End Users utilizing the drivers license scanning product must make consumers aware via posters and obtain written consent that drivers license data is being collected and such will be used for fraud prevention and transaction dispute resolution and will not be used for marketing.
6. Place all terminal devices used to obtain consumer credit and other information in a secure location within End User's facility. You should secure these devices so that unauthorized persons cannot access them.
7. After normal business hours, be sure to turn off and lock all End User devices or systems used to obtain or store consumer credit and other information.
8. Secure hard copy and electronic files of consumer credit and other information within End User's facility to prevent unauthorized access.
9. Shred or destroy all hard copy consumer credit and other information when no longer needed by End User in accordance with applicable contract, Repository regulation or law.
10. Erase or scramble End User electronic files containing consumer credit and other information when no longer needed in accordance with applicable contract, Repository regulation or law.
11. Advise all End User employees that your company can access consumer credit and other information only for the "permissible purposes" (as defined in the FCRA) indentified herein and in your Agreement and that they may not, even for testing purposes, access their own consumer credit report or that of a family member, friend, public figure or celebrity, if your company does not have permissible purpose.

**Record Retention**

It is important that End User's keep consumer credit applications and reports for a reasonable period of time. This will help to facilitate the investigative process if a consumer claims that your company inappropriately accessed their credit and or other report. (Note: Your Agreement and some Repositories and/or Credit Bureaus require five years, some require three years or even six years and the federal Equal Credit Opportunity Act maintains that a creditor must preserve all written or recorded information connected with an application for 25 months.)

*"Under Section 621 (a) (2) (A) of the Fair Credit Reporting Act, 15 U.S.C. §1681 et. seq., ("FCRA"), as amended from time to time, any person that violates any of the provisions of the FCRA may be liable for a civil penalty of not more than $3,500.00 per violation."*

**Internal Systems Security**

Internal Client systems that have access to sensitive consumer or other non-public personally identifiable information, including Sales Agents and End Users, should implement the following security measures on their systems.

1. Use of screensavers (15 minute timeout maximum) for all personnel should be mandatory.
2. Client Names and password rules must be set according to the **Client Name and Password Security** section herein.

**Application Security**

When building an application system that will request, house or display sensitive consumer or other non-public personally identifiable information, the following measures must be put in place to help ensure unauthorized access of such data.

1. Technical measures to prevent screen scraping or robotic harvesting of any consumer or other non-public personally identifiable information, including information that can be viewed prior to purchasing a product, as well as contractual prohibitions on screen scraping or robotic harvesting.
2. The system should be set up so that account velocity is automatically measured and monitored for unusual activity. The system should also have the ability to turn off an individual account's access to consumer or other non-public personally identifiable information, if the account velocity threshold is tripped, and shut down access within 15 minutes if the site velocity threshold is tripped.
3. Client Names and password rules must be set according to the **Client Name and Password Security** section herein.
4. IP address restrictions are required for all Sales Agents who will be accessing and distributing and End Users who will be using and storing sensitive consumer or other non-public personally identifiable information. The IP addresses of those with access to the systems must be known and set up in order to access and distribute (as to Sales Agents) and use and store (as to End Users) sensitive consumer or other non-public personally identifiable information. The systems must not allow Clients to access the systems from an unknown or foreign IP address.
5. All transactions, XML and Web Based Applications must be sent over an encrypted medium. Valid encryption strategies are either HTTPS (SSL) V3 or better and at least 128 bit or HTTP over an IP Secure VPN.

**Client Name and Password Security**

The following rules must be implemented when establishing Client Names and passwords:

1. Client Names must be at least Eight (8) characters in length.
2. All passwords must be at least eight (8) characters in length.
3. Client Names and passwords cannot be the same.
4. Passwords cannot contain the Client Name.
5. All passwords must contain any two (2) of the following characters: alphabetic, numeric or symbols.

**CONFIDENTIAL**    MicroBilt00077

6. All Clients must have a unique Client Name and password.
7. Passwords should not be written down anywhere and Client Names and passwords may not be shared.
8. Clients must change their passwords at a minimum of once every 90 days.
9. Clients' account and access shall be suspended after five (5) unsuccessful login attempts.
10. Security administrators should be notified immediately if the Client has any reason to believe their Client Name or password may have been compromised.
11. Inactive Clients should be suspended after 90 days.
12. All suspended Clients must change their passwords upon their next login.

## Permissible Purpose Guidelines

Section 604 of the FCRA sets forth the "permissible purposes" (as defined therein) for End User companies to obtain consumer information from a credit-reporting agency:

a. Intend to use the information in connection with a credit transaction involving the consumer on whom the information is being furnished, or
b. Intend to use the information for employment purposes, or
c. Intend to use the information in connection with the underwriting of insurance, or
d. Intend to use the information in connection with a collection, or
e. Intend to use the information in connection with a transaction initiated by the consumer, or
f. Intend to use the information in connection with the written consent of the consumer, or
g. Intend to use the information in connection with government licensing.

If your product lines are for different permissible purposes as listed above, a separate intended use must be identified each time for each type. If you intend to use a consumer report for employment purposes or in connection with a consumer bankruptcy filing, you must inform us of the intent and complete the appropriate documents to receive the proper inquiry coding required. If you are contacted by us or a consumer whose consumer information you have accessed, you *must* provide us or the consumer with the detailed transaction information.

## Exception List

Notwithstanding the above, certain Credit Bureaus and Repositories have identified certain types of companies to which certain consumer information cannot be sold. We have chosen to be even more restrictive and will not sell certain consumer information to:

- Credit or Financial Repair or Counseling (unless for non-profit, housing counseling or registered securities broker).
- Lawyers or Law Firms (unless sole practice is collections or those filing consumer bankruptcies or for employment).
- Private Investigator, Detectives or Law Enforcement (unless sole use is for employment purposes and an individual certification of "permissible purpose," as defined in the FCRA, is provided each time a report is requested).
- Media, News Agencies or Journalists (unless sole use is for employment purposes or the review of a subscriber's credit and an individual certification of "permissible purpose," as defined in the FCRA, is provided each time a report is requested).
- Bail Bonds business or Repossession company (unless business is established, reputable or state licensed).
- Pawn Shop (unless business is reputable and in a secure and safe location).
- Process Server, Skip Tracing, Internet People Locator, Adoption Search, Asset Location Service (not including Collection Agencies), Future Services (time share, Continuity Club, etc.), Check Cashing, Dance Studio, Spiritual, Tattoo, Health Club, Diet Center, Book Club, Adult, Dating, Massage Service.
- Companies: a) not in the traditional financial services industry; b) not routinely needing consumer reports in the ordinary course of business; c) providing reports direct to consumers; d) with questionable reputations or ethical natures or no legitimate need for consumer reports; e) officers or employees involved in credit fraud or other unethical business practices; or f) identified by a Credit Bureau, Repository, ComplyTraq, MicroBilt or other vendor as restricted.

## FCRA Requirements

Federal Fair Credit Reporting Act (as amended by the Consumer Credit Reporting Reform Act of 1996).

Although the FCRA primarily regulates the operations of consumer credit reporting agencies, it also affects you as an End User of information. We have included a link to the FCRA below. We suggest that you and your employees become familiar with the following sections in particular:

| § 604 | Permissible Purposes of Reports |
|-------|--------------------------------------------|
| § 607 | Compliance Procedures |
| § 615 | Requirement on users of consumer reports |
| § 616 | Civil liability for willful noncompliance |
| § 617 | Civil liability for negligent noncompliance |
| § 619 | Obtaining information under false pretenses |

**CONFIDENTIAL**

MicroBilt00078

| § 621 | Administrative Enforcement |
|-------|----------------------------|
| § 623 | Responsibility of Furnishers of Information to Consumer Reporting Agencies |

Each of these sections is of direct consequence to End Users whom obtain reports on consumers.

As directed by the law, credit reports may be issued only if they are to be used for extending credit, review or collection of an account, employment purposes, underwriting insurance or in connection with some other legitimate business transaction initiated by the subject of the report such as tenant screening, in investment, partnership, etc. It is imperative that you identify each request for a report to be used for employment purposes when such report is ordered. Additional state laws may also impact your usage of reports for employment purposes.

We strongly endorse the letter and spirit of the federal Fair Credit Reporting Act. We believe that this law and similar state laws recognize and preserve the delicate balance between the rights of the consumer and the legitimate needs of commerce.

In addition to the federal Fair Credit Reporting Act, other federal and state laws addressing such topics as computer crime and unauthorized access to protected databases have also been enacted. As a prospective End User of consumer reports, we expect that you and your staff will comply with all relevant federal and state statutes and regulations in the locale you operate.

We support legislation that will assure fair and equitable treatment for all consumers and End Users of credit information.

## Laws, Summaries & Notices

The Fair Credit Reporting Act ("FCRA") became effective on April 25, 1971. The FCRA is a group of acts contained in the federal Consumer Credit Protection act, such as the Truth in Lending Act and the Fair Debt Collection Practices Act.

Congress substantively amended the FCRA upon the passage of the Fair and Accurate Credit Transactions Act of 2003 ("FACT Act"). The FACT Act created many new responsibilities for consumer reporting agencies and users of consumer reports. It contained many new consumer disclosure requirements as well as provisions to address identity theft. In addition, it provided free annual consumer report rights for consumers and improved access to consumer report information to help increase the accuracy of data in the consumer reporting system.

The identity theft rights summary includes the identity theft rights granted to consumers by FACTA, including the right to place fraud alerts on their credit reports, to block businesses and Credit Bureaus from reporting information in their credit files that is a result of identity theft, and to obtain from businesses information about accounts or transactions in their name that result from identity theft. The identity theft rights summary will be provided by consumer reporting companies to consumers who contact the agencies because they believe they are victims of fraud or identity theft.

The general consumer rights summary includes, among other things, consumers' right to see their credit files and know when they have been used against them, to correct inaccuracies, and to opt-out of unsolicited offers. The summary also notes that, in addition to identity theft victims, active duty military personnel have additional rights under the FCRA and FACTA. This general summary of rights updates the current summary, which credit reporting companies provide to consumers with their credit reports. The furnisher and user notices explain to businesses their duties under the FCRA.

The FCRA contains significant responsibilities for business entities that are consumer reporting agencies and lesser responsibilities for those that are not. Generally, financial institutions are not consumer reporting agencies.

In addition to the requirements related to financial institutions acting as consumer reporting agencies, FCRA requirements also apply to financial institutions that operate in any of the following capacities:

- Procurers and users of information (for example, as credit grantors, purchasers of dealer paper, or when opening deposit accounts).
- Furnishers and transmitters of information (by reporting information to consumer reporting agencies, other third parties, or to affiliates).
- Marketers of credit or insurance products.
- Employers.

Financial institutions are subject to a number of different requirements under the FCRA. The statute contains some of the requirements, while others are in regulations issued jointly by the FFIEC agencies or in regulations issued by the Federal Reserve Board and/or the Federal Trade Commission.

The Dodd-Frank Act granted rulemaking authority under the FCRA (except for §615(e) (identity theft) and §628 (disposal)) to the Consumer Financial Protection Bureau ("CFPB") and, with respect to entities under its jurisdiction, granted authority to the CFPB to supervise for and enforce compliance with the provisions of the FCRA and the implementing regulations.

The CFPB structured the examination procedures as a series of modules, grouping similar requirements together. The modules contain general information about each of the requirements:

- Module 1 Obtaining Consumer Reports.
- Module 2 Obtaining Information and Sharing Among Affiliates.
- Module 3 Disclosures to Consumers and Miscellaneous Requirements.

**CONFIDENTIAL**                    MicroBilt00079

- Module 4 Financial Institutions as Furnishers of Information.
- Module 5 Consumer Alerts and Identity Theft Protections.

To view the relevant summaries, notices, laws and websites, please click below, visit www.MicroBilt.com or contact us to request copies.

FCRA: http://www.ftc.gov/os/statutes/031224fcra.pdf

Summaries of Rights and Notices of Duties Under the FCRA and FACT Act: Publication of Final Guidance on Model Disclosures: Summary of Rights and Notices of Duties Under FCRA and FACTA.pdf

CFPB: http://www.consumerfinance.gov/

CFPB Regulations: http://www.consumerfinance.gov/regulations/

CFPB and the FCRA: http://www.consumerfinance.gov/policy-compliance/guidance/supervision-examinations/

The CFPB required that the standard FCRA notices that refer to the FTC must be updated by Jan. 1, 2013 to reflect the role of the CFPB under the FCRA. Part 1022 of the Code of Federal Regulations:
https://www.federalregister.gov/articles/2011/12/21/2011-31728/fair-credit-reporting-regulation-v

Appendix I to Part 1022—Summary of Consumer Identity Theft Rights: Appendix I.pdf

Appendix K to Part 1022—Summary of Consumer Rights: Appendix K.pdf

Appendix M to Part 1022—Notice of Furnisher Responsibilities: Appendix M.pdf

Appendix N to Part 1022—Notice of User Responsibilities: Appendix N.pdf

GLBA: GLBA and How To Comply.pdf

DPPA: http://www.accessreports.com/statutes/DPPA1.htm

ADA: http://www.ada.gov/pubs/ada.htm

ECOA: http://www.fdic.gov/regulations/laws/rules/6500-200.html

TILA: https://www.fdic.gov/regulations/compliance/manual/5/V-1.1.pdf

## Employment Screening Requirements

If your End User business intends to use credit reports and information for employment screening purposes, please read carefully.

Certain Credit Bureau products (Experian's Employment Insight, Equifax's Persona Report) may be sold to members who access credit reports and information for employment purposes. These reports differ from the consumer credit profile by suppressing information that is not applicable to an employment decision or may inadvertently violate an equal opportunity law. Suppressed information includes account numbers, year of birth and spouse references. Such Credit Bureau products also notify applicants that their file was accessed if it contains derogatory public record information, such as bankruptcies, liens and judgments. Additionally, inquiries only display on the report provided to the applicant. They do not display on the report provided to a potential employer.

The Consumer Credit Reporting Reform Act of 1996 added to the FCRA a new section 604 (b), governing the use of consumer reports (and other data, including, but not limited to, motor vehicle, criminal and eviction data) for employment purposes.

By way of brief summary, section 604 (b) of the FCRA as amended, essentially mandates the following conditions on users of consumer reports for employment purposes:

1. Before pulling a consumer report, the End User must provide a "clear and conspicuous" written disclosure to the consumer in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes, and obtain a written authorization from the consumer to pull his or her report;
2. Before taking any adverse action based in whole or in part on the consumer report, the End User must **first** notify the consumer, provide the consumer a copy of the report, and a written summary of the consumer's rights as prescribed by the FCRA;
3. Once adverse action is taken based on the consumer report, the End User must provide notice to the consumer advising of the decision, and among other things, provide the name and contact information of the consumer reporting agency from which the report was obtained;
4. The End User must certify to the consumer reporting agency/reseller that in addition to complying as above, the report will not be used in violation of any applicable federal or state equal employment opportunity law or regulation; and
5. The consumer reporting agency must provide with the consumer report, a Summary of Consumers Rights.

More specifically as to Adverse Action:

The Fair Credit Reporting Act requires that employers, who make decisions regarding the hiring, promotion, suspension, or termination of an applicant or employee, in whole or in part on the basis of information contained in their consumer report, must send "adverse action" notice to such individuals.

"Adverse Action" is defined as, a denial of employment or any other decision for employment purposes based in whole or in part on a consumer report that adversely affects any current or prospective employee. *FCRA §603(k)(1)(B)(ii) and FCRA §615.*

Employers that take adverse action against an applicant or employee must follow **two** notice requirements of the FCRA. The first is a Pre-Adverse Action Notice, and the second is a final Adverse Action Notice.

The Pre-Adverse Action Notice:

Section 604 of the FCRA requires that employers provide to the consumer, **before** taking any adverse action based on a consumer report, notice to the consumer, a copy of the report, and a summary of consumer rights: "A Summary of Your Rights Under the Fair Credit Reporting Act." This is referred to as the Pre-Adverse Action Notice, since it must be sent before the adverse action is taken and a final decision is made. In other words, if an employer has a report and believes that the information contained in the report may impact the hiring, promotion or other employment decision, then at that time the employer must send the Pre-Adverse Action Notice. This informs and allows the individual a reasonable opportunity to explain or dispute the details of the adverse information contained in the consumer report.

The final Adverse Action Notice:

The second notice must be sent to the consumer **after** the employer takes adverse action. In this final Adverse Action Notice (the second notice) the employer must notify the consumer of the fact that adverse action has been taken based on a consumer report, and include in that disclosure the following: (1) the name, address, and phone number of the consumer reporting agency that furnished the report; (2) a statement that the consumer reporting agency that supplied the report did not make the adverse action decision, and is unable to provide the consumer with specific reasons for the action; (3) a notice of the consumer's rights to obtain another free copy of his or her report from the consumer reporting agency upon request within 60 days; and (4) a notice that the individual has the right to dispute the accuracy or completeness of any information in the report." *FCRA §615.*

Unfortunately, the FCRA does not provide specifics as to how much time an employer must wait after sending the Pre-Adverse Action Notice, before sending the (second) final Adverse Action Notice. However, the FTC stated in an opinion letter that employers should keep, "in mind the purpose of the provisions to allow consumers to discuss the report with employers before adverse action is taken." *FTC Opinion Letter, Lewis, June 11, 1998.* The adverse action rules go to the heart of the consumer protection goals of the FCRA, and give an individual an opportunity to clear up any potential errors on a report. Thus, employers should consider the nature of the job, how the employer does business, and other factors such as holiday and weekend time, and provide the consumer with a reasonable opportunity to review and discuss the report before taking final Adverse Action. Congress has provided that five (5) business days is a reasonable time period to wait after the Pre-Adverse Action Notice before taking final Adverse Action. *H.R.Rep.No. 103-486, at 30 (1994).* To be cautious, we recommend seven (7) business days.

Please visit www.MicroBilt.com to view samples of the Pre-Adverse Action Notice, and the final Adverse Action Notice, or contact us to request copies.

This information is not intended to provide legal advice. Please consult with your own legal counsel for verification of and more detailed information regarding this information and sample notices.

### Employment Compliance Certification

In compliance with the federal Fair Credit Reporting Act as amended by the Consumer Credit Reporting Reform Act of 1996, End User, as applicable, hereby certifies to Consumer Reporting Agency that it will comply with the following provisions:

1. End User will ensure that prior to procurement or causing the procurement of a consumer report for employment purposes:
   a) A clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and
   b) The consumer has authorized in writing the procurement of the report by End User.
2. In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, End User shall **first** provide notice to the consumer to whom the report relates and:
   a) A copy of the report; and
   b) A written summary of the consumer's rights under the FCRA, which can be downloaded from www.MicroBilt.com or supplied upon request.
3. Once adverse action is taken based on the consumer report, End User shall provide notice to the consumer, advising of the decision, and among other things, provide the name and contact information of the consumer reporting agency from which the report was obtained.
4. The information from the consumer report will not be used in violation of any applicable federal or state equal employment opportunity law or regulation.

**CONFIDENTIAL**

The requirements herein shall not apply if the report is provided to the employer in connection with suspected misconduct related to employment, or in compliance with federal, state or local laws and regulations, the rules of a self-regulatory organization (as defined in the Sarbanes-Oxley Act of 2002), it is not obtained for the determining the individual's credit worthiness and it is only provided to the employer, a federal agency, a self regulatory organization or as required by law.

The electronic signature of Client's authorized representative acknowledging acceptance of the above terms and conditions is set forth at the end of the attached Certification.

## California Civil Code Section 1785.14(a) End User Compliance Certification

Section 1785.14(a), as amended, states that a consumer credit reporting agency does not have reasonable grounds for believing that a consumer credit report will only be used for a permissible purpose unless all of the following requirements are met:

Section 1785.14(a)(1) states: "If a prospective user is a retail seller, as defined in Section 1802.3, and intends to issue credit to a consumer who appears in person on the basis of an application for credit submitted in person, the consumer credit reporting agency shall, with a reasonable degree of certainty, match at least three categories of identifying information within the file maintained by the consumer credit reporting agency on the consumer with the information provided to the consumer credit reporting agency by the retail seller. The categories of identifying information may include, but are not limited to, first and last name, month and date of birth, driver's license number, place of employment, current residence address, previous residence address, or social security number. The categories of information shall not include mother's maiden name."

Section 1785.14(a)(2) states: "If the prospective user is a retail seller, as defined in Section 1802.3, and intends to issue credit to a consumer who appears in person on the basis of an application for credit submitted in person, the retail seller must certify, in writing, to the consumer credit reporting agency that it instructs its employees and agents to inspect a photo identification of the consumer at the time the application was submitted in person. This paragraph does not apply to an application for credit submitted by mail."

Section 1785.14(a)(3) states: "If the prospective user intends to extend credit by mail pursuant to a solicitation by mail, the extension of credit shall be mailed to the same address as on the solicitation unless the prospective user verifies any address change by, among other methods, contacting the person to whom the extension of credit will be mailed."

In compliance with Section 1785.14(a) of the California Civil Code, by the electronic signature of End User's authorized representative acknowledging acceptance of the above terms and conditions set forth at the end of the attached Certification, End User hereby certifies to the Consumer Reporting Agency as indicated above, whether it is or is not a retail seller, as defined in Section 1802.3 of the California Civil Code ("Retail Seller") and issues credit to consumers who appear in person on the basis of applications for credit submitted in person ("Point of Sale").

End User also certifies that if it is a Retail Seller who conducts Point of Sale transactions, it will, beginning on or before July 1, 1998, instruct its employees and agents to inspect a photo identification of the consumer at the time an application is submitted in person.

End User also certifies that it will only use the appropriate End User code number designated by the Consumer Reporting Agency for accessing consumer reports for California Point of Sale transactions conducted by Retail Seller.

If End User is not a Retail Seller who issues credit in Point of Sale transactions, it agrees that if it, at any time hereafter, becomes a Retail Seller who extends credit in Point of Sale transactions, it shall provide written notice of such to the Consumer Reporting Agency prior to using credit reports with Point of Sale transactions as a Retail Seller, and shall comply with the requirements of a Retail Seller conducting Point of Sale transactions, as provided in this certification.

## Vermont FCRA Compliance Certification

End User certifies that if it orders information services relating to Vermont residents that are credit reports as defined by the Vermont Fair Credit Reporting Statute, 9 V.S.A. § 2480e (1999), as amended ("VFCRA"), End User will do so only after it has received prior consumer consent in accordance with VFCRA § 2480e (set forth below), as well as the Vermont Rules (set forth below), and other applicable laws and rules.

### Vermont Fair Credit Reporting Statute, 9 V.S.A. § 2480e (1999)

#### § 2480e. Consumer Consent

(a) A person shall not obtain the credit report of a consumer unless:

(1) the report is obtained in response to the order of a court having jurisdiction to issue such an order; or

(2) the person has secured the consent of the consumer, and the report is used for the purpose consented to by the consumer.

(b) Credit reporting agencies shall adopt reasonable procedures to assure maximum possible compliance with subsection (a) of this section.

(c) Nothing in this section shall be construed to affect:

(1) The ability of a person who has secured the consent of the consumer pursuant to subdivision (a)(2) of this section to include in his or her request to the consumer permission to also obtain credit reports, in connection with the same transaction or extension of credit, for the purpose of reviewing the account, increasing the credit line on the account, for the purpose of taking collection action on the account, or for other legitimate purposes associated with the account; and

**CONFIDENTIAL**                    MicroBilt00082

(2) The use of credit information for the purpose of prescreening, as defined and permitted from time to time by the Federal Trade Commission.

**Vermont Rules \*\*\* Current Through June 1999\*\*\*, Agency 06.  Office of the Attorney General, Sub-Agency 031.  Consumer Protection Division, Chapter 012.  Consumer Fraud – Fair Credit Reporting, Rule CF 112 Fair Credit Reporting, CRV 06-031-012, CF 112.03 (1999), CF 112.03 Consumer Consent**

(a) A person required to obtain consumer consent pursuant to 9 V.S.A. §§ 2480e and 2480g shall obtain said consent in writing if the consumer has made a written application or written request for credit, insurance, employment, housing or governmental benefit.  If the consumer has applied for or requested credit, insurance, employment, housing or governmental benefit in a manner other than in writing, then the Client is required to obtain consumer consent pursuant to 9 V.S.A. §§ 2480e and 2480g shall obtain said consent in writing or in the same manner in which the consumer made the application or request.  The terms of this rule apply whether the consumer or the person required to obtain consumer consent initiates the transaction.

(b) Consumer consent required pursuant to 9 V.S.A. §§ 2480e and 2480g shall be deemed to have been obtained in writing if, after a clear and adequate written disclosure of the circumstances under which a credit report or credit reports may be obtained and the purposes for which the credit report or credit reports may be obtained, the consumer indicates his or her consent by providing his or her signature.

(c) The fact that a clear and adequate written consent form is signed by the consumer after the consumer's credit report has been obtained pursuant to some other form of consent shall not affect the validity of the earlier consent.

## Certification

Client has selected to access and distribute (as to Sales Agents) and use and store (as to End Users) certain consumer products that are governed by the FCRA and Credit Bureau / Repository guidelines.  Therefore, Client must read all above sections and certify below that Client is and will remain in compliance.

In whole or in part, ComplyTraq reserves the right, in its sole discretion, at any time and for any reason, with or without prior written notice, via email, fax, or regular US mail and with no liability to Client, to modify, amend, change, alter, update, add to or delete from the terms and conditions contained in this Application and Client's Agreement for access to consumer credit and other personally identifiable information per Credit Bureau / Repository, vendor, legal, industry, MicroBilt, ComplyTraq or other mandate and audit Client's compliance therewith as well as the legal requirements applicable thereto, via on-site visits, notifications and/or document requests, with the date of receipt deemed to be the effective date of the notice.

For questions please call: PH: 1-800-849-4960.  The electronically signed Certification, along with the fully completed Application, must be electronically sent in their entirety to: ComplyTraq, Attn: Addendum Administration Dept., with a copy and backup documentation sent via Fax: 404-393-9512.

Client's electronic signature verifying compliance and submission of this Application certifies that:

- It has read and accurately and fully completed the **Application** section;
  - Complete all appropriate sections. Be sure to include principal information.
  - Include business references and a bank reference as required or requested.
  - Read each item listed in the FCRA section and initial choice of use and permissible purpose.
  - Select and attach the chosen items listed in the Bona Fide Business Verification Section.  Also attach a copy of a voided business check, a copy of photo id and advertising material or business card.
  - Tenant Screening companies must attach three completed rental applications along with one of the other items listed.  If an individual landlord, provide one of the items listed along with a photo id.
  - If operating out of a residence (other than individual landlords), provide one of the items listed.
- It has read, is and will remain in compliance with the **Compliance Assurances** section;
- It has read, is and will remain in compliance with the **Security Requirements** section;
- It has read, is and will remain in compliance with the **Permissible Purpose Guidelines** section;
- It has read, is and will remain in compliance with the **FCRA Requirements** section;
- It has read, is and will remain in compliance with the **Fact Act Summary & Notices** section;
- It has read, is and will remain in compliance with the **Employment Screening Requirements** section;
- It has read, is and will remain in compliance with the **Employment Compliance Certification** section;
- It has read, is and will remain in compliance with the **Summary of Consumers Rights** section;
- It has read, is and will remain in compliance with the **CA Civil Code End User Compliance Certification** section;
- It has read, is and will remain in compliance with the **VT FCRA Compliance Certification** section.

By its electronic submission, which shall constitute a legal, valid and binding mark, with the same force and effect as a physically signed original, Client agrees, acknowledges and consents that the terms on all pages of this Application have been read, the information is accurate and that Client agrees to all of the above terms and conditions as written on behalf of Client and the accepting representative of Client warrants that he / she is authorized and expressly agrees to electronically accept,

**CONFIDENTIAL**      MicroBilt00083

deliver and execute this document on behalf of Client, which shall be effective as of the date of Client's electronic submission thereof (the "Effective Date"), as well as all exhibits, documents, notices, updates, addenda and amendments related thereto, as well as any other documents to be provided by ComplyTraq hereafter. Client acknowledges that this Application may exist in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Client understands that it will need a valid e-mail address and access to the Internet, as well as the appropriate software and/or programs, including, but not limited to, Adobe Acrobat, in order to access this Application and subsequent documents electronically. Client further understands that it may update its information, obtain a full description of systems requirements, revoke this consent, or request one or more paper documents at any time by contacting ComplyTraq in writing.

Signature: *Tim Bender*

    **Email:** contact@alliancedeed.com

    **Title:** manager

**Company:** Alliance Title Services

Signature: *Mike Garretson*

    **Email:** contractadmin@microbilt.com

    **Title:** EVP, GM

**Company:** MicroBilt Corporation

**CONFIDENTIAL**    MicroBilt00084

# MicroBilt SR Alliance Title Services, LLC.

Adobe Sign Document History                    03/09/2018

| Created: | 03/08/2018 |
|---|---|
| By: | Sheri Reynolds (sheri_reynolds@microbilt.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4xNB5KPVhhSg2FG1XH5o8gvaOu7ygOib |

# "MicroBilt SR Alliance Title Services, LLC." History

Document created by Sheri Reynolds (sheri_reynolds@microbilt.com)
03/08/2018 - 1:49:15 PM PST- IP address: 174.214.11.245

Sheri Reynolds (sheri_reynolds@microbilt.com) set a password to protect the signed document.
03/08/2018 - 1:49:15 PM PST

Document emailed to Tim Bender (contact@alliancedeed.com) for signature
03/08/2018 - 1:57:26 PM PST

Email viewed by Tim Bender (contact@alliancedeed.com)
03/08/2018 - 2:27:59 PM PST- IP address: 159.118.17.215

Tim Bender (contact@alliancedeed.com) entered valid password.
03/08/2018 - 2:28:44 PM PST

Document e-signed by Tim Bender (contact@alliancedeed.com)
Signature Date: 03/08/2018 - 2:33:06 PM PST - Time Source: server- IP address: 159.118.17.215

Document emailed to Mike Garretson (contractadmin@microbilt.com) for signature
03/08/2018 - 2:33:07 PM PST

Email viewed by Mike Garretson (contractadmin@microbilt.com)
03/09/2018 - 5:48:44 AM PST- IP address: 209.49.147.2

Mike Garretson (contractadmin@microbilt.com) entered valid password.
03/09/2018 - 5:49:19 AM PST

Document e-signed by Mike Garretson (contractadmin@microbilt.com)
Signature Date: 03/09/2018 - 5:49:57 AM PST - Time Source: server- IP address: 209.49.147.2

 

Signed document emailed to Sheri Reynolds (sheri_reynolds@microbilt.com), Mike Garretson (contractadmin@microbilt.com) and Tim Bender (contact@alliancedeed.com)

03/09/2018 - 5:49:57 AM PST

MICROBILT

Adobe Sign

**CONFIDENTIAL**     MicroBilt00086



**ALLIANCE**
—— TITLE SERVICES ——

**Company Name:**    Alliance Title Services LLC

2914 E 32nd St, Suite 120
Joplin MO 64804      Ph 417-206-6000

**We intend to use the data for insurance underwriting and lending purposes.**

**Our average monthly use will be about $100.00**

**Does your company anticipate Data usage to be local, regional, national or international?** (Please circle all that apply.)

I hereby certify that the above statements are accurate.  The products and services accessed by my company through MicroBilt will only be used for the purposes stated above.  If the above stated purposes change or are no longer accurate or additional purposes are required, I shall provide a revised or additional statement with such corrected, updated or additional purposes.

\_\_Alliance Title Services LLC_____
Company Name

Signature of Owner or Officer

\_\_Tim Bender_____
Name Typed or Printed
Manager

Title

\_\_3/9/18_____
Date

2914 E 32nd St #120, Joplin, MO 64804    Tel: (888) 571-5252  Fax: (417) 708-9811
www.alliancedeed.com

A5

**CONFIDENTIAL**        MicroBilt00087

🗋 **35248.0 BENDER, TIMOTHY**

[ Merge ] [ E-Mail ] [ Print ]

## Enhanced People Search

### Applicant Information

TIMOTHY D BENDER

Not Deceased

Reported: 11-15-2017

| Address Recent | Vacant |
|---|---|
| YES | |

**Overview**

| | |
|---|---|
| Reported Matches | 8 |
| Verified Matches | 8 |
| Vacant Matches | 0 |
| High Risk Matches | 0 |
| Street Address Matches | 5 |
| Post Office Box Matches | 2 |
| Business Matches | 0 |
| Reported Phone Numbers | 0 |

| Phone | Type |
|---|---|
| | |

**Street View**



**Address Details**

| | |
|---|---|
| Address Type | RESIDENTIAL |
| Address Verified | Yes |
| High Risk Address | No |
| Deliverable | |
| Mail Drop | |
| Latitude | |
| Longitude | |
| Time Zone | |

### Social Security Number Status

## VALID SOCIAL SECURITY NUMBER

- This is a valid Social Security Number
- Issued, Beginning and End Date Provided
- The AREA number is valid for the state or province of Missouri
- Social Security Number flagged not Deceased

### People Search History

**1**    **No Phone Number**

VERIFIED RESIDENTIAL ADDRESS

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
USPS BARCODE 648048610076

TIME ZONE   CENTRAL

Seasonal Information
| ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

Orig: 11-05-2009   Filed: 11-15-2017
Deliverable
Mail Drop
GEO: 37.0054 , 94.5210

[ ] Business   [✓] Residential Address   [ ] Post Box   [ ] High-Rise   [ ] Rural Route      [ ] High Risk Address

| ROUTE | R004 | CENSUS | BLOCK 2119 |
|---|---|---|---|

**2**    **No Phone Number**

VERIFIED POST OFFICE BOX ADDRESS

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

TIME ZONE   CENTRAL

Seasonal Information
| ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

Orig: 10-19-2003   Filed: 03-14-2017
Deliverable

**CONFIDENTIAL**

MicroBilt00088

USPS BARCODE 648034827

Mail Drop
GEO: 37.0890 , 94.5130

| | | | |
|---|---|---|---|
| ☐ Business ☐ Residential Address ☑ Post Box ☐ High-Rise ☐ Rural Route | | | ☐ High Risk Address |

| ROUTE | B027 | CENSUS | BLOCK 1014 |
|---|---|---|---|

---

**3**    **No Phone Number**

VERIFIED RESIDENTIAL ADDRESS

USPS BARCODE 648012043183

TIME ZONE   CENTRAL

Seasonal Information
✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓

Orig: 08-05-2014   Filed: 08-05-2014
Deliverable
Mail Drop
GEO: 37.0836 , 94.4988

| | | | |
|---|---|---|---|
| ☐ Business ☑ Residential Address ☐ Post Box ☐ High-Rise ☐ Rural Route | | | ☐ High Risk Address |

| ROUTE | C018 | CENSUS | BLOCK 2004 |
|---|---|---|---|

---

**4**    **No Phone Number**

VERIFIED RESIDENTIAL ADDRESS

USPS BARCODE 648044063113

TIME ZONE   CENTRAL

Seasonal Information
✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓

Orig: 07-17-2001   Filed: 07-17-2001
Deliverable
Mail Drop
GEO: 37.0523 , 94.4986

| | | | |
|---|---|---|---|
| ☐ Business ☑ Residential Address ☐ Post Box ☐ High-Rise ☐ Rural Route | | | ☐ High Risk Address |

| ROUTE | C039 | CENSUS | BLOCK 3000 |
|---|---|---|---|

---

**5**    **No Phone Number**

VERIFIED RESIDENTIAL ADDRESS

USPS BARCODE 648011710200

TIME ZONE   CENTRAL

Seasonal Information
✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓ ✓

Orig: 10-22-1997   Filed: 04-26-1999
Deliverable
Mail Drop
GEO: 37.0924 , 94.4891

| Business | ☑ Residential Address | Post Box | High-Rise | Rural Route | | High Risk Address |

| ROUTE | C004 | CENSUS | BLOCK 3044 |

---

TIME ZONE

Seasonal Information
| ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

**6**    **No Phone Number**

VERIFIED ADDRESS

Orig: 07-13-1995   Filed: 08-14-1997
Deliverable
Mail Drop
GEO: ,

| High Risk Address

| ROUTE | | CENSUS | |

---

TIME ZONE   CENTRAL

Seasonal Information
| ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

**7**    **No Phone Number**

VERIFIED POST OFFICE BOX ADDRESS

USPS BARCODE 648700571714

Orig: 11-09-1995   Filed: 07-02-1997
Deliverable
Mail Drop
GEO: 37.1521 , 94.4708

| Business | Residential Address | ☑ Post Box | High-Rise | Rural Route | | High Risk Address |

| ROUTE | B003 | CENSUS | BLOCK 1073 |

---

TIME ZONE   CENTRAL

Seasonal Information
| ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

**8**    **No Phone Number**

VERIFIED RESIDENTIAL ADDRESS

USPS BARCODE 648042543347

Orig: 12-22-1995   Filed: 12-22-1995
Deliverable
Mail Drop
GEO: 37.0576 , 94.5204

| Business | ☑ Residential Address | Post Box | High-Rise | Rural Route | | High Risk Address |

**CONFIDENTIAL**     MicroBilt00090

| ROUTE | C022 | CENSUS | BLOCK 1012 |

**CONFIDENTIAL**

MicroBilt00091

35248.1  BENDER, TIMOTHY

Merge | E-Mail | Print

## Rapsheets Criminal Database Search

### Request Information

| | |
|---|---|
| **Control #:** 0 | **Customer Ref. Acct.:** |
| **Customer Transaction ID:** | **Search Date:** 03/12/2018 |
| Services: | |
| - Criminal Search | |
| **Name:** TIMOTHY BENDER | |
| **DOB:** | |
| **SSN:** | |

### Criminal Search Results

**Search Result Count:** 0

NO HIT

**Disclaimer**
Information contained herein is derived solely from public records, which may not be 100 percent accurate or complete. Users should consult state and federal laws, including the Fair Credit Reporting Act, before using this information in making business decisions based on the results. Neither we nor our vendors or suppliers are liable for claims or damages arising from the use of this data, beyond the cost of the search(es) performed by users. Because mis-identifications may occur when trying to identify a particular person, based solely upon name and other identifiers, extreme care must be exercised in the review and use of the information available through this site. This information should not be used in legal proceedings. It is recommended that users of this database obtain the original document from the jurisdiction for the purpose of legal proceedings.

**CONFIDENTIAL**

MicroBilt00092

Case 2:25-cv-03055-NCM-ST    Document 25-2  Filed 10/27/25  Page 81 of 121 PageID #460

Google          Timothy Bender Joplin MO                                    🔍                    Sign in

All     Images     News     Shopping     Maps     More              Settings     Tools

About 91,200 results (0.27 seconds)

**Timothy D Bender -** ███████████ **- Family Tree Now**

**Timothy Bender in Missouri (MO) | Whitepages**

**Tim Bender in Missouri (MO) | Whitepages**

**Tim Bender | Professional Profile - LinkedIn**
https://www.linkedin.com/in/timbender1 ▾
View **Tim Bender's** profile on LinkedIn, the world's largest professional community. Tim has 2 jobs listed
on their profile. See the complete profile on LinkedIn and discover Tim's connections and jobs at similar
companies.

**Timothy Bender** ███████████████ **MyLife.com™ Background ...**

**State attorney general looking at purported theme-park ... -** ███████

**alliancedeed.com**
www.alliancedeed.com/ ▾
Alliance Services. At Alliance Services, Our Financial customers know we cater to preserving their
capital. We are committed to ensuring the success of every transaction in **Missouri**, Arkansas, Nevada
and Texas with your property holdings, acquisitions and foreclosures. In addition, our strong
relationships with state and ...

[DOC] ████████████████████████
www.joplinmo.org/agendacenter/viewfile/agenda/12132013-546 ▾

**Atlas Risk Management LLC in** ███████████████ **- Profile**

**Timothy Bender** ███████████

CONFIDENTIAL                    MicroBilt00093

A8

1   2   3   4   5   6   7   8   9   10     Next

Kennesaw, Georgia - From your Internet address - Use precise location - Learn more

Help     Send feedback     Privacy     Terms

**CONFIDENTIAL**      MicroBilt00094

# Search the Consolidated Screening List

Search the screening lists (http://export.gov/ecr/eg_main_023148.asp) at one time by filling in the search boxes below. If you get too many results, try including more information to the additional fields. If you get too few results, try searching one field at a time.

### Keyword
Search for words in the name, alternative names (aliases), title of the entity, and additional remarks regarding the entity.

### Name
Search for an entity's name or one of its alternative names.

Timothy Bender

### Fuzzy Name
When set to off, the spelling of the Name you search for must be correct to get results. When set to on, the spelling for the Name you search for may be slightly off. Check the score for each result to determine how close a match it is to the entity's name or its alternative names. A score of 100 is an exact match. Results are returned with the highest scores first.

On                                                                                          × ▾

### Address
Search for the street address, city, province, and postal code of an entity.

### Sources
Choose which of the screening lists that you want to search.

Select...                                                                                        ▾

### Countries
Choose which countries that you want to search. Note, the Nonproliferation Sanctions and ITAR Debarred lists do not include the country with an entity. If you choose to search for entities by country then you will not be searching these two lists.

Select...                                                                                        ▾

SEARCH

No result.

## How to Export (/How-to-Export)

eCommerce (/eCommerce)
Export Education (/Export-Education)
Finding Foreign Markets (/Finding-Foreign-Markets)
Legal Considerations (/Legal-Considerations)
Logistics (/Logistics-10)
Financial Considerations (/Financial-Considerations)
Product Preparation (/Product-Preparation)
Trade Agreement Guides (/Trade-Agreement-Guides)

## Customized Services (/services)

Services for U.S. Exporters (/services)
Plan and Assess (/Plan-and-Assess)
Promote and Expand (/Promote-and-Expand)
Locations (/locations)

Market Intelligence (/Market-Intelligence)

**CONFIDENTIAL**

MicroBilt00095

Find Market Intelligence (/Market-Intelligence)
Export Guides (/Export-Guides)
Industry Information (/Industries)
Trade Leads (/Trade-Leads)
Trade Data & Analysis (/Trade-Data-and-Analysis)

## Events (/Events)

Events and Trade Missions (/Events)
Webinars (/webinars)

## Trade Problems (/Help-with-Trade-Problems)

Get Help with Trade Problems (/Help-with-Trade-Problems)
Report a Foreign Trade Barrier (/Report-a-Trade-Barrier)
Foreign Trade Remedies (/Foreign-Trade-Remedies)
Foreign Safeguard Activity Involving U.S. Exports (/Foreign-Safeguard-Actions)
U.S. Products Subject to AD/CVD Measures (/Foreign-Anti-Dumping-Actions)

## FAQs (/Export-FAQs)

## Boards (/Boards)

## About Us (/About-Us)

International Trade Administration (/ITA)
Federal Trade Partners (/Federal-Partners)
Programs for Trade Promotion Partners (/Programs-for-Trade-Promotion-Partners)
Trade Initiatives (/Trade-Initiatives)
Contact Us (/Contact-Us)
Social Media (/Social-Media)

 (http://twitter.com/ExportGov)      (http://facebook.com/ExportGov)     

(http://linkedin.com/groups/4231713/profile)      (http://public.govdelivery.com/accounts/USITATRADE/subscriber/new)

 (http://youtube.com/user/TradeGov)

**CONFIDENTIAL**

MicroBilt00096



INTERNATIONAL

# T R A D E

ADMINISTRATION

Website Feedback (/assistance) | Privacy Policy (/Website-Privacy-Policy) | Disclaimer (/Website-Disclaimer) | FOIA (/FOIA) | No Fear Act (/No-Fear-Act) | USA.gov (http://USA.gov)

The International Trade Administration (http://www.trade.gov) (ITA), U.S. Department of Commerce (http://www.commerce.gov) manages Export.gov to assist U.S. businesses plan their international sales strategies and succeed in today's global marketplace. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein. This site contains PDF documents. A PDF Reader (https://get.adobe.com/reader/) is available from Adobe Systems Incorporated.

# Search the Consolidated Screening List

Search the screening lists (http://export.gov/ecr/eg_main_023148.asp) at one time by filling in the search boxes below. If you get too many results, try including more information to the additional fields. If you get too few results, try searching one field at a time.

**Keyword**
Search for words in the name, alternative names (aliases), title of the entity, and additional remarks regarding the entity.

**Name**
Search for an entity's name or one of its alternative names.

> Alliance Title Services

**Fuzzy Name**
When set to off, the spelling of the Name you search for must be correct to get results. When set to on, the spelling for the Name you search for may be slightly off. Check the score for each result to determine how close a match it is to the entity's name or its alternative names. A score of 100 is an exact match. Results are returned with the highest scores first.

> On                                                                                                      × ▼

**Address**
Search for the street address, city, province, and postal code of an entity.

**Sources**
Choose which of the screening lists that you want to search.

> Select...                                                                                                ▼

**Countries**
Choose which countries that you want to search. Note, the Nonproliferation Sanctions and ITAR Debarred lists do not include the country with an entity. If you choose to search for entities by country then you will not be searching these two lists.

> Select...                                                                                                ▼

SEARCH

No result.

How to Export (/How-to-Export)

eCommerce (/eCommerce)
Export Education (/Export-Education)
Finding Foreign Markets (/Finding-Foreign-Markets)
Legal Considerations (/Legal-Considerations)
Logistics (/Logistics-10)
Financial Considerations (/Financial-Considerations)
Product Preparation (/Product-Preparation)
Trade Agreement Guides (/Trade-Agreement-Guides)

Customized Services (/services)

Services for U.S. Exporters (/services)
Plan and Assess (/Plan-and-Assess)
Promote and Expand (/Promote-and-Expand)
Locations (/locations)

Market Intelligence (/Market-Intelligence)

**CONFIDENTIAL**                    MicroBilt00098

Find Market Intelligence (/Market-Intelligence)
Export Guides (/Export-Guides)
Industry Information (/industries)
Trade Leads (/Trade-Leads)
Trade Data & Analysis (/Trade-Data-and-Analysis)

## Events (/Events)

Events and Trade Missions (/Events)
Webinars (/webinars)

## Trade Problems (/Help-with-Trade-Problems)

Get Help with Trade Problems (/Help-with-Trade-Problems)
Report a Foreign Trade Barrier (/Report-a-Trade-Barrier)
Foreign Trade Remedies (/Foreign-Trade-Remedies)
Foreign Safeguard Activity Involving U.S. Exports (/Foreign-Safeguard-Actions)
U.S. Products Subject to AD/CVD Measures (/Foreign-Anti-Dumping-Actions)

## FAQs (/Export-FAQs)

## Boards (/Boards)

## About Us (/About-Us)

International Trade Administration (/ITA)
Federal Trade Partners (/Federal-Partners)
Programs for Trade Promotion Partners (/Programs-for-Trade-Promotion-Partners)
Trade Initiatives (/Trade-Initiatives)
Contact Us (/Contact-Us)
Social Media (/Social-Media)

 (http://twitter.com/ExportGov)      (http://facebook.com/ExportGov)     

(http://linkedin.com/groups/4231713/profile)      (http://public.govdelivery.com/accounts/USITATRADE/subscriber/new)

 (http://youtube.com/user/TradeGov)

**CONFIDENTIAL**          MicroBilt00099



# INTERNATIONAL
# **TRADE**
# ADMINISTRATION

Website Feedback (/assistance) | Privacy Policy (/Website-Privacy-Policy) | Disclaimer (/Website-Disclaimer) | FOIA (/FOIA) | No Fear Act (/No-Fear-Act) | USA.gov (http://USA.gov)

The International Trade Administration (http://www.trade.gov) (ITA), U.S. Department of Commerce (http://www.commerce.gov) manages Export.gov to assist U.S. businesses plan their international sales strategies and succeed in today's global marketplace. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein. This site contains PDF documents. A PDF Reader (https://get.adobe.com/reader/) is available from Adobe Systems Incorporated.

**CONFIDENTIAL**  MicroBilt00100

License No: 8307291

## State of Missouri

## Insurance License

### *TIMOTHY BENDER*

NPN: 17119235

Is hereby authorized to transact business in accordance with the license description below:

| LICENSE TYPE | LINES OF AUTHORITY | EFFECTIVE DATE | LICENSE EXPIRATION DATE |
|---|---|---|---|
| Producer | Life | 12/06/2013 | 11/19/2017 |
| | Accident and Health | 12/06/2013 | |
| | Property | 11/19/2013 | |
| | Casualty | 11/19/2013 | |
| | Title | 12/04/2014 | |

This insurance license shall remain in effect until the expiration date unless suspended, revoked or forfeited. The individual must complete continuing education, if applicable, renew the license, and pay fees as required by Missouri Statutes prior to the expiration date.

For questions regarding a license, contact:
MO DIFP - Insurance 573-751-3518
or E-mail: licensing@insurance.mo.gov
http://www.insurance.mo.gov



CITY OF
JOPLIN
MISSOURI

```
Business name  . :  ALLIANCE TITLE SERVICES LLC
Phone number   . :  (417) 206-6000
Location addr  . :  1318 E 7TH ST                    Ctl nbr  . :    20538
Lic Nbr/Class  . :  18 00028330  INSURANCE AGENT, AGENCY, BROKER      JASP
Issue date     . :  3/28/17  Expiration date . :   4/14/18
```

LICENSE NON-TRANSFERABLE/DISPLAY IN VIEW FOR CUSTOMERS

```
ALLIANCE TITLE SERVICES LLC
2401 E 32ND ST #10
JOPLIN MO 64804
```

**CONFIDENTIAL**     MicroBilt00101

A10

Google

Alliance Title Services Joplin MO phone number    🔍     Sign in

All    Maps    Shopping    News    Videos    More      Settings    Tools

About 158,000 results (0.65 seconds)

## (417) 206-6000
Alliance Title Services, Phone

*Feedback*

**Alliance Title Services 2914 E 32nd St Joplin, MO Title Companies ...**
https://www.mapquest.com/us/missouri/alliance-title-services-365237306 ▾
Get directions, reviews and information for Alliance Title Services in Joplin, MO.

**Alliance Title Services - Real Estate Services - 2914 E 32nd St, Joplin ...**
https://www.yelp.com › Home Services › Real Estate › Real Estate Services ▾
Alliance Title Services in Joplin, reviews by real people. Yelp is a fun and easy way to find, recommend and talk about what's great and not so great in Joplin and beyond.

**alliancedeed.com**
www.alliancedeed.com/ ▾
Alliance Services. At Alliance Services, Our Financial customers know we cater to preserving their capital. We are committed to ensuring the success of every transaction in Missouri, Arkansas, Nevada and Texas with your property holdings, acquisitions and foreclosures. In addition, our strong relationships with state and ...

**Alliance Title Services in Joplin - Yahoo Search**
https://local.yahoo.com/info-206494359-alliance-title-services-joplin ▾
Find Alliance Title Services in Joplin with Address, Phone number from Yahoo US Local. Includes Alliance Title ... 2914 E 32nd St, Joplin, MO 64804Cross Streets: Between S Arizona Ave and S Range Line Rd/S Rangeline Rd; (417) 206-6000, alliancedeed.com, Today : Closed Opens tomorrow at 9:00 AM
See all hours ...

**Alliance Title Company, LLC**
alliancetitlenow.com/ ▾
Alliance Title Company, LLC. When purchasing a new home or refinancing an existing mortgage, do you know what transpires from the time of application to the day of settlement? At Alliance Title Company, LLC, we realize your home is your most valuable asset. We understand the stress associated with purchasing or ...
Missing: joplin

Images for Alliance Title Services Joplin MO phone ...

    

→ More images for Alliance Title Services Joplin MO phone number     Report images

**Self Storage Facilities for Sale in Joplin, MO: 7th St. Storage**
https://www.selfstorages.com/self-storages/878714-7th-st-storage-for-sale-in-joplin-mo ▾
Nov 15, 2017 - 64 Unit self storage business for sale. 93% occupied after 3 months in business. Cap rate currently at 7%, can go to 10-12% cap rate with rate increases. Great road frontage on 2nd most busy street in city. Area population of over 100000. Close to college and shopping. All paved and fenced with electronic ...

[PDF] **companies_name address csz phone 1st denver title 8480 e orchard ...**
https://spmwholesale.sierrapacificmortgage.com/.../ACTIVE_CLOSING_AGENT_050... ▾
203-261-1333. AAA TITLE PROFESSIONALS INC. 340 WILSHIRE BLVD. CASSELBERRY, FL 32707. 407-834-5130. ABACUS SETTLEMENT COMPANY. 1100 WASHINGTON AVE SUITE 103 CARNEGIE, PA 15106. 412-276-8745. ABBEY TITLE COMPANY. 2902 ARIZONE AVENUE. JOPLIN, MO 64804. 417-623-1910.

**Republic Services: Waste Disposal and Trash Pickup Service**
https://www.republicservices.com/ ▾
Get reliable, responsible waste disposal services. Republic Services offers residential, municipal, commercial and industrial garbage pickup and recycling.

[PDF] **PRESIDENT'S MESSAGE pg. 3 JOPLIN MAKERS TOOL DRIVE pg. 11 ...**
https://www.joplincc.com/wp-content/uploads/2017/07/July-Business-Outlook-1.pdf ▾
Joplin Area Chamber of Commerce. 320 E. 4th Street, Joplin, MO 64801. (P) 417.624.4150. (F) 417.624.4303. FIND US AT: www.joplincc.com. /joplinchamber ... numbers to accommodate the rapid



See photos

## Alliance Title Services
5.0    1 Google review
Title company in Joplin, Missouri     Website    Dire

**Address:** 2914 E 32nd St, Joplin, MO 64804
**Hours:** Closed · Opens 9AM ▾
**Phone:** (417) 206-6000

Suggest an edit

**Questions & answers**
Be the first to ask a question      Ask a qu

**Reviews**     Write a review    Add a
1 Google review

**People also search for**     View 10

   

Allstate Insurance Agent: Lo...   First Missouri Insurance...   State Farm Insurance   Winnett Insurance Inc   Kare Rutle State
Insurance Agency   Insurance Agency   Insurance Agency   Insurance Agency   Insura Agenc

CONFIDENTIAL     MicroBilt00102

All

Case 2:25-cv-03055-NCM-ST   Document 25-2   Filed 02/27/25   Page 91 of 121 PageID #4670

growth of telephone service. By 1967, the ... touch-tone keypad teleph... ... in Joplin. EaglePicher, one of Joplin's ...

Searches related to Alliance Title Services Joplin MO phone number

alliance title **blue springs missouri**

title **company kansas city**

**kansas city** title **companies**

alliance title **company pocatello idaho**

1  2  3        Next

Kennesaw, Georgia - From your Internet address · Use precise location · Learn more

Help     Send feedback     Privacy     Terms

CONFIDENTIAL                    MicroBilt00103

35247.0   **ALLIANCE TITLE SERVICES**

          | Merge | E-Mail | Print |

**Experian Business Profile Summary**
**ALLIANCE TITLE SERVICES LLC**

Subcode: 370050              **Ordered:** 03/12/2018 08:20:19
Search inquiry: *File Number:* 409874306

## Company Information

| ALLIANCE TITLE SERVICES LLC | Experian File #: | 409874306 |
| 100 S 4TH ST | Experian File Established: | PRIOR TO FEBRUARY 2016 |
| SAINT LOUIS, MO 63102 | Date of Incorporation: | 07/01/2014 |
| | SIC code: | - |

## Business Summary

| | |
|---|---|
| **Risk Category:** C | **# of Trade Lines:** 0 |
| **Judgment Flag:** N | **Tax Lien Flag:** N |
| **Bankruptcy Flag:** N | **UCC Filings Flag:** N |
| **Collection Flag:** N | **Bank Flag:** N |
| **Corporate Filing Status:** 1 | **Date of Incorporation:** 07/01/2014 |
| **Key Personnel 3:** | **# of Employees:** 0 |
| **Transaction Number:** Q031136799 | **Business Days Beyound Terms (DBT):** 0 |
| **Predicted DBT:** 0 | **Predicted DBT Date:** |
| **Balance Modifier:** | **Lowest Total Account Balance:** $0 |
| **Balance Modifier:** | **Highest Total Account Balance:** $0 |
| **Balance Modifier:** | **Current Total Account Balance:** $0 |
| **Single High Credit Amount:** $0 | **Median Credit Amount:** $0 |

**Note:** If the graphs do not print out as desired, please try the following: In Internet Explorer, Go To Tools, Internet Options, Advanced, Printing, and check the option for "Print background colors and images", click apply and then click OK.



**FEDERAL TRADE COMMISSION**

PROTECTING AMERICA'S CONSUMERS

///////////////////

# Cases and Proceedings

Your search yielded no results.

ftc.gov

A15

**CONFIDENTIAL**                MicroBilt00105

## JOHN R. ASHCROFT
MISSOURI SECRETARY OF STATE

## MISSOURI ONLINE BUSINESS FILING

 **?** Online Help

### Limited Liability Company Details as of 3/12/2018

Business Entity Fees & Forms

Business Entity FAQ

Business Entity Home Page

Business Entity Online Filing

Business Outreach Office

Business Entity Contact Us

UCC Online Filing

Secretary of State Home Page

**\*** Required Field

File Documents - select the filing from the "Filing Type" drop-down list, then click FILE ONLINE.

File Registration Reports - click FILE REGISTRATION REPORT.

Copies or Certificates - click FILE COPIES/CERTIFICATES.

| RETURN TO SEARCH RESULTS | Select filing from the list. | FILE ONLINE |
|---|---|---|
| | Filing Type    Amendment to Articles of Organization | |

ORDER COPIES/
CERTIFICATES

General Information    Filings    Address    Contact(s)

| Name(s) Alliance Title Services LLC | Address |
|---|---|
| Type Limited Liability Company | Charter No. LC001411195 |
| Domesticity Domestic | |
| Registered Agent Alliance Agent Services Inc<br>100 South 4th St.<br>St. Louis, MO 63102 | Status Active |
| | Date Formed 7/1/2014 |

Duration Perpetual

Managed by Member

The information contained on this page is provided as a public service, and may change at any time. The State, its employees, contractors, subcontractors or their employees do not make any warranty, expressed or implied, or assume any legal liability for the accuracy, completeness or usefulness of any information, apparatus, product or process disclosed or represent that its use would not infringe on privately-owned rights.

Google   Alliance Title Services Joplin MO

All   Maps   News   Shopping   Videos   More        Settings   Tools

Sign in

About 184,000 results (0.66 seconds)

**alliancedeed.com**
www.alliancedeed.com/ ▾
Alliance Services. At Alliance Services, Our Financial customers know we cater to preserving their capital. We are committed to ensuring the success of every transaction in Missouri, Arkansas, Nevada and Texas with your property holdings, acquisitions and foreclosures. In addition, our strong relationships with state and ...

**Alliance Title Services 2914 E 32nd St Joplin, MO Title Companies ...**
https://www.mapquest.com/us/missouri/alliance-title-services-365237306 ▾
Get directions, reviews and information for Alliance Title Services in Joplin, MO.

**Alliance Title Services - Real Estate Services - 2914 E 32nd St, Joplin ...**
https://www.yelp.com › Home Services › Real Estate › Real Estate Services ▾
Alliance Title Services in Joplin, reviews by real people. Yelp is a fun and easy way to find, recommend and talk about what's great and not so great in Joplin and beyond.

**Alliance Title Services in Joplin - Yahoo Search**
https://local.yahoo.com/info-206494359-alliance-title-services-joplin ▾
Includes Alliance Title Services Reviews, maps & directions to Alliance Title Services in Joplin and more from Yahoo US Local. ... 2914 E 32nd St, Joplin, MO 64804Cross Streets: Between S Arizona Ave and S Range Line Rd/S Rangeline Rd; (417) 206-6000; alliancedeed.com; Today : Closed Opens tomorrow at 9:00 AM

**Alliance Title Company, LLC**
alliancetitlenow.com/ ▾
Alliance Title Company, LLC. When purchasing a new home or refinancing an existing mortgage, do you know what transpires from the time of application to the day of settlement? At Alliance Title Company, LLC, we realize your home is your most valuable asset. We understand the stress associated with purchasing or ...
Missing: joplin

**Eagle - Locations and Teams | Alliance Title & Escrow Corp.**
https://www.alliancetitle.com/locations/type/Office/val/21 ▾
Contact your local Alliance Title professional for escrow services, title insurance, home closings, and property information services.
Missing: joplin mo

**Alliance Title Services - in Joplin, Missouri - Firms WeList**
https://www.welistfirm.com/f/alliance-title-services-4141627 ▾
Get all informations about Alliance Title Services (417) 206-6000. Road direction, weather forecast and time infos for 1318 E 7th St Joplin, Missouri.

**Contact — Foreclosure and Title Services**
www.alliancedeed.net/contact/ ▾
Nevada and Texas Properties. 400 South 4th Street. Suite 600. Las Vegas, NV 89101. Missouri and Arkansas Properties. 2914 E 32nd St. Suite 120. Joplin MO 64804. Phone 888-571-5252. General Email contact@alliancedeed.com. Back to Top. New Gallery. Alliance Title Services. 1318 E 7th St, Joplin, MO, 64801, ...

Images for Alliance Title Services Joplin MO

    

→ More images for Alliance Title Services Joplin MO          Report images

**Self Storage Facilities for Sale in Joplin, MO: 7th St. Storage**
https://www.selfstorages.com/self-storages/878714-7th-st-storage-for-sale-in-joplin-mo ▾
Nov 15, 2017 - 64 Unit self storage business for sale. 93% occupied after 3 months in business. Cap rate currently at 7%, can go to 10-12% cap rate with rate increases. Great road frontage on 2nd most busy street in city. Area population of over 100000. Close to college and shopping. All paved and fenced with electronic ...

Searches related to Alliance Title Services Joplin MO



See photos                                                                      See i

# Alliance Title Services

5.0         1 Google review                          Website      Dire
Title company in Joplin, Missouri

**Address:** 2914 E 32nd St, Joplin, MO 64804

**Hours:** Closed · Opens 9AM ▾

**Phone:** (417) 206-6000

Suggest an edit

**Questions & answers**                                               Ask a qu
Be the first to ask a question

**Reviews**                                          Write a review   Add a
1 Google review

**People also search for**                                             View 10

    

Allstate     First      State Farm   Winnett   Karer
Insurance    Missouri   Insurance    Insurance Rutle
Agent: Lo... Insurance...Insurance   Inc       State
Insurance    Insurance  Agency       Insurance Insura
Agency       Agency                  Agency    Agenc

**CONFIDENTIAL**                         MicroBilt00107

A18

Case 2:25-cv-03055-NCM-ST    Document 25-2    Filed 03/04/26    Page 96 of 125 PageID #: 673

alliance title **blue springs missouri**

title **company kansas city**

**kansas city** title **companies**

alliance title **company pocatello idaho**

alliance title **and escrow**

alliance title **escrow**

alliance title **office**

1 2 3 4 5 6      Next

Kennesaw, Georgia - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms

**CONFIDENTIAL**          MicroBilt00108

Home > Whois Lookup > AllianceDeed.com

## Whois Record for AllianceDeed.com

Find out more about Project Whois and DomainTools for Windows.

**DOMAINTOOLS** for Windows **Download Now**

Access domain ownership records from your desktop

### Related Domains For Sale or At Auction

| 1 | 2 | 3 |
More >

SovereignDeed.com ($1,499)          SecureDeeds.com ($1,688)
NobleDeeds.com ($2,195)             MightyDeeds.com ($1,695)

### — Domain Profile

| | |
|---|---|
| Registrant | tim bender |
| Registrant Org | tim bender |
| Registrant Country | US |
| Registrar | https://www.101domain.com/ <br> IANA ID: 1011 <br> URL: https://www.101domain.com/ <br> Whois Server: whois.101domain.com <br><br> abuse@101domain.com <br> (p) 17604448674 |
| Registrar Status | clientTransferProhibited |
| Dates | 1,271 days old <br> Created on 2014-09-18 <br> Expires on 2018-09-18 <br> Updated on 2017-12-08 |
| Name Server(s) | NS1.101DOMAIN.COM (has 156,336 domains) <br> NS2.101DOMAIN.COM (has 156,336 domains) <br> NS5.101DOMAIN.COM (has 156,336 domains) |
| Tech Contact | tim bender <br> po box 482 <br> joplin, MO, 64803, US <br> timb100@gmail.com <br> (p) 14172066000 |
| IP Address | 199.73.55.35 - 34,274 other sites hosted on this server |
| IP Location | - California - San Diego - Scalematrix |
| ASN | AS33695 SCALEMATRIX - ScaleMatrix, US (registered Mar 24, 2011) |

A19

**CONFIDENTIAL**          MicroBilt00109          1/3

| Domain Status | Registered And Active Website | |
|---|---|---|
| Whois History | 17 records have been archived since 2014-09-18 | ➦ |
| IP History | 2 changes on 3 unique IP addresses over 4 years | ➦ |
| Registrar History | 1 registrar | ➦ |
| Hosting History | 2 changes on 3 unique name servers over 4 years | ➦ |

**— Website**

| Website Title |  Foreclosure and Title Services | ➦ |
|---|---|---|
| Response Code | 200 | |
| SEO Score | 100% | |
| Terms | 244 (Unique: 153, Linked: 37) | |
| Images | 0 (Alt tags missing: 0) | |
| Links | 23 (Internal: 21, Outbound: 0) | |

Whois Record ( last updated on 2018-03-12 )

---

# 🅰 Validation Required

DomainTools is committed to preventing the abuse of Whois data so we now require a CAPTCHA to view the full raw domain name record.

Existing user? Please log in.

I'm not a robot    reCAPTCHA
Privacy - Terms



**DomainTools Iris**
More data. Better context.
Faster response.

Learn More

**Tools**

| Whois History | |
|---|---|
| Hosting History | |
| Monitor Domain Properties | ▾ |
| Reverse IP Address Lookup | ▾ |
| Network Tools | ▾ |
| Buy This Domain ▾ | |
| Visit Website | |

**CONFIDENTIAL**     MicroBilt00110

⬇ Preview the Full Domain Report

No Screenshot Available



View Screenshot History

**Available TLDs**

**General TLDs**   Country TLDs

The following domains are available through our preferred partners. Select domains below for more information. (3rd party site)

☐ Taken domain.
☐ Available domain.
☐ Deleted previously owned domain.

| AllianceDeed.com | View Whois |
| AllianceDeed.net | View Whois |
| AllianceDeed.org | Buy Domain |
| AllianceDeed.info | Buy Domain |
| AllianceDeed.biz | Buy Domain |
| AllianceDeed.us | Buy Domain |

*Domain names with FREE...*
**EMAIL** ▶

🔗 📘 🐦 8⁺

Sitemap   Blog   Terms of Service   Privacy Policy   Contact Us   Domain News   © 2018 DomainTools

**CONFIDENTIAL**   MicroBilt00111

# FORECLOSURE AND TITLE SERVICES (/)

HOME (/)
CONTACT
CONTACT (/CONTACT/)
NEW PAGE (/NEW-PAGE/)
NEW PRODUCTS (/NEW-PRODUCTS/)
SERVICES (/SERVICES/)
BIDDING PAGE (/BIDDING-PAGE/)
GIVING BACK (/GIVING-BACK/)

UTILITY COMMISSION (/PSC/)

# ALLIANCE SERVICES

*At Alliance Services, Our Financial customers know we cater to preserving their capital. We are committed to ensuring the success of every transaction in Missouri, Arkansas, Nevada and Texas with your property holdings, acquisitions and foreclosures. In addition, our strong relationships with state and county*

**CONFIDENTIAL**     MicroBilt00112

A20

1/1

Case 2:22-cv-00535-ACC-MSS Document 2-52 Filed 02/01/226 Page 105 of 121 PageID #: 620



Home - NetSuite (Micro × | alliancedeed.com ×

C ① alliancedeed.com

Apps G Google NetSuite - Custome G Google iHeartRadio | Real Secretary of State C: Secure Access SSL Business Search - B Whois Lookup & C OFAC Search Home | NAFSA OSCCCA Learning NPR

Contact

CONTACT

Nevada and Texas Properties

400 South 4th Street

Suite 600

Las Vegas, NV 89101

Missouri and Arkansas Properties

2914 E. 32nd St.

Suite 120

Joplin MO 64804

Phone 888-571-5252

General Email    contact@alliancedeed.com

**CONFIDENTIAL**

MicroBilt00113

Tuesday, March 20, 2018 8:47:43 AM -



CONFIDENTIAL      MicroBilt00114



## Title Foreclosure Services and More...

Alliance specializes in both residential and commercial foreclosure services in the states of Missouri, Arkansas, Nevada, and Texas. As an outsource vendor for foreclosures in these states, Alliance provides a single point of contact for title services, reports and coordination, trustee services, and property management.

**Non-Judicial Foreclosures** - Alliance serves as a single point of contact coordinator for processing foreclosures with legal counsel, trustee services and property preservation services. We can complete all steps of the process on conventional, first and second trust deeds, all-inclusive trust deeds, lien contracts and land sale contracts. Initial requests to start a foreclosure can be faxed or e-mailed, and Alliance can also accept document images. All email or FTP transmissions to/from Alliance can be done via secure (encrypted) methods.

**Foreclosure Sales & Bidding** - Alliance's sister company, Capital Equity LLC, provides bidding at senior sales in Missouri, Arkansas, Nevada and Texas. Capital Equity will bid at sales for you and comply with your specific instructions. Individual solutions can be tailored to your requirements.

**Bankruptcy and Unlawful Detainer** - Alliance coordinates with designated counsel for bankruptcy relief and eviction services. Alliance can provide monthly status reports in a number of hard-copy and electronic formats. We can provide status updates of property conditions and occupancy with photographs and reports.

**Post-Sale** - Alliance can complete after-sale procedures at your request. We advise you of any liens that would affect the marketable title, needed assignments, delinquent property taxes, bankruptcies, delinquencies of prior deeds of trust, Federal and State tax liens, and any other encumbrances, title defects or similar clouds on the title. We also coordinate with local renovation companies and real estate professionals to find the best exit strategy for your asset.

**Loss Mitigation** - Alliance offers a menu of services associated with the loss mitigation process including forbearance agreements and deeds-in-lieu. We can provide status reporting in a number of formats and intervals and can accept or transmit electronic data associated with these files.

**CONFIDENTIAL**

MicroBilt00115



Explore more than 324 billion <u>web pages</u> saved over time

http://alliancedeed.com/

## Hrm.

Wayback Machine doesn't have that page archived.
Want to search for all archived pages under <u>http://alliancedeed.com/</u>?

## This page is available on the web!

Help make the Wayback Machine more complete!
**Save this url in the Wayback Machine**

<u>FAQ</u> | <u>Contact Us</u> | <u>Beta Site Feedback</u> | <u>Terms of Service (Dec 31, 2014)</u>

The Wayback Machine is an initiative of the <u>Internet Archive</u>, a 501(c)(3) non-profit,
building a digital library of Internet sites and other cultural artifacts in digital form.
Other <u>projects</u> include <u>Open Library</u> & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's <u>Terms of Use</u>.

A21

**CONFIDENTIAL**        MicroBilt00116

1/1

Case 22225-cv-00355-NCMSST   Document 2282 Filed 02/04/26   Page 105 of 121 PageID #: 684



# License Services



DIFP
Department of Insurance
Financial Institutions &
Professional Registration

National Association Insurance Commissioners  Missouri Department of Insurance, Financial Institutions & Professional Registration

# Missouri Department of Insurance, Financial Institutions & Professional Registration
## Active Affiliations List for Licensee

Agent Information

| | |
|---|---|
| **Licensee Name:** | ALLIANCE TITLE SERVICES LLC |
| **License Number:** | 8341963 |
| **NPN:** | 17500783 |
| **Report Date:** | 03/09/2018 |

Active Designated Responsible Licensee Affiliations

| List of License Number | License Name | License Number | NPN | Effective Date |
|---|---|---|---|---|
| Business Entity Producer-8341963 | BENDER, TIMOTHY | 8307291 | 17119235 | 02/10/2015 |

Active Affiliations

| List of License Number | License Name | License Number | License Type | Effective Date |
|---|---|---|---|---|
| Business Entity Producer-8341963 | BENDER, TIMOTHY | 8307291 | Insurance Producer | 02/10/2015 |
| Business Entity Producer-8341963 | HAYES, AARON | 8131785 | Insurance Producer | 11/01/2017 |

Close



A54

# Exhibit 2

## MicroBilt User Agreement



**THIS USER AGREEMENT** ("Agreement") is entered into as of the "Effective Date" (defined below) by and between MicroBilt Corporation, ("MicroBilt") a Delaware corporation located at 1640 Airport Rd., Suite 115, Kennesaw, GA 30144 and the undersigned entity, ("User").

**WHEREAS,** MicroBilt developed, is the owner of and has the right to control and permit access to use, among other things, its proprietary ID Scanner equipment ("Equipment"), its proprietary software programs known as the Systems Integration Toolkit ("SDK"), its proprietary XML Interface Technology ("XML"), and its proprietary database information products and services website offering located at www.MicroBilt.com ("Website"), which provides the ability via the Internet through the Website and/or through SDK or XML, to securely access and interpret certain consumer credit and other information ("Credit Information") from its databases and one or more of the national consumer credit reporting agencies, TransUnion, Experian, Equifax ("Credit Bureaus") and/or other consumer or business data ("Data") and/or industry information ("Industry Information") and together with Credit Information and Data, "Information") from various Data or Information providers (together with the Credit Bureaus, "Repositories" and each a "Repository") and User desires to utilize such in accordance with the terms and conditions herein and MicroBilt is willing to and does permit User limited, nonexclusive, and nontransferable access to use MicroBilt's products and services through the Internet and otherwise, in accordance with the terms and conditions herein.

**NOW THEREFORE,** in consideration of MicroBilt's provision to User of the products and services specified in the application and fee schedule attached hereto as Exhibit A and incorporated herein by reference as if fully set forth, ("Fee Schedule") and User's payment of "Fees" (defined below) to MicroBilt therefore, of the mutual covenants and promises contained herein and of other good and valuable consideration, the extent and sufficiency of which is acknowledged between MicroBilt and User (each a "party" and together the "parties"), the parties hereto agree as follows:

### A. User Agrees to:

1. Abide as applicable, and as a third party sales agent / distributor, if applicable, cause its customers ("Customers") to abide by the Fair Credit Reporting Act, 15 U.S.C. § 1681 et. seq. ("FCRA"), as amended by the Fair and Accurate Credit Transactions Act of 2003 ("FACTA") and thereafter from time to time, the Americans with Disabilities Act ("ADA") and other applicable equal opportunity laws, the Gramm-Leach-Bliley Act of 1999, 15 U.S.C. § 6801 et. seq. ("GLBA"), the Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721(b)(3) ("DPPA"), the laws of the applicable state issuing Motor Vehicle Records ("MVR"), the Equal Credit Opportunity Act ("ECOA"), the Truth In Lending Act ("TILA") and all other applicable local, state and federal laws regarding Information, as well as the permissions and limitations of MicroBilt and the Repositories, when Information subject to such acts and laws is requested, accessed, used, stored and/or distributed.

2. Obtain and maintain as valid throughout the "Term" (defined below) of this Agreement, all applicable rights, title, permits, licenses, insurance, authorities and approvals necessary regarding its business, this Agreement and the receipt and use of the products and services provided hereunder, and comply, along with its officers, directors, shareholders, managers, employees, agents and representatives, with all laws and regulations applicable to its business.

3. As applicable, obtain all required Repository subcodes ("Subcodes") and access Information both directly from and through MicroBilt, a Repository or, with MicroBilt's prior written consent, a MicroBilt designated and/or approved vendor.

4. Be aware per the FCRA, those who knowingly and willfully obtain Information on a consumer from a consumer reporting agency under false pretenses shall be fined under Title 18 or imprisoned not more than two years or both.

5. Be aware that some states (CA, CO, MN, VT, WA, etc.) have stricter consumer, ADA and DMV based statutes, compliance with which is the responsibility of User.

6. Be aware that access to certain Information is subject to restrictions of the Repositories, such that User shall not export such Information, related documentation or technical data, or any product incorporating such, outside of the fifty (50) states of the United States of America and its territories.

7. Acknowledge that: Public Record Information provided to User from or through MicroBilt (including, but not limited to, criminal information (including, but not limited to, information relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments), civil suits and civil judgments, liens, evictions, bankruptcies), is provided solely for verification purposes, and shall not be requested, obtained, or used in whole or in part, as a factor in establishing an individual's creditworthiness or eligibility for (i) credit or insurance, or (ii) employment purposes, application in hiring, promotion, suspension, denial or termination of a prospective or current employee, nor for any other purposes under the FCRA. User shall not take any "adverse action" as defined under the FCRA, which is based in whole or in part on verification services, against any individual. Verification

services may be used to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability as described in the GLBA. All potential discrepancies or inaccuracies identified by such verification services, shall be re-verified by User through an additional, independent source.

8. Acknowledge that: Public Record Information provided to User from or through MicroBilt is derived solely from public records, which may not be 100 percent (100%) accurate or complete. User should consult state and federal laws, including the FCRA, before using Public Record Information in making business decisions based on the results. Neither we, nor the data Repositories, or our other vendors or suppliers, are liable for claims or damages arising from the use of Public Record Information, beyond the cost of the particular search performed and report obtained by User. Because misidentifications may occur when trying to identify a particular person, based solely upon name and other identifiers, extreme care must be exercised in the review and use of the Public Record Information contained herein. Public Record Information contained herein should not be used in legal proceedings; rather, it is recommended that User obtain the original public record document from the relevant jurisdiction for the purpose of legal proceedings.

9. Assure that if User chooses to use driver's license data, that it will use such in compliance with the DPPA, and that motor vehicle department data will be used solely for authentication purposes only.

10. Assure that if User chooses to use data from the United States Treasury Department Office of Foreign Assets Control ("OFAC") of specially designated nationals and blocked persons, that the matching of data to the OFAC list is based on very limited identification information, that a match does not necessarily indicate that the individual or entity about whom User inquired is the same individual or entity referenced by OFAC, and that any adverse action taken by User against an individual or entity must be taken based on User's complete investigation of the individual or entity and not based solely on the OFAC information.

11. Assure that except as expressly permitted by the FCRA, User shall not use any medical information contained in a consumer report in connection with any determination of the consumer's eligibility, or continued eligibility for credit, or for any purpose other than for use: (i) in connection with an insurance transaction with the affirmative consent of the consumer who is the subject of the report; (ii) in connection with a credit transaction involving the extension of credit to, or the review or collection of an account of the consumer, where the medical information to be furnished is relevant to process or effect the transaction, and the consumer has provided specific written consent for the furnishing of the report that describes in clear and conspicuous language, the use for which the medical information will be furnished; (iii) for employment purposes, where the medical information to be furnished is relevant to process or effect the transaction, and the consumer has provided specific written consent for the furnishing of the report that describes in clear and conspicuous language, the use for which the medical information will be furnished; or (iv) with the consumer's consent.

12. Be aware that some commercial Repository Data may contain consumer credit information, but that such shall nevertheless solely be used in connection with a present or prospective commercial (i.e., not for personal, family or household purposes) credit or financial transaction involving the business inquired upon or the individual on whom such Information is sought and only if such individual is the proprietor of an unincorporated business, is a general partner in a partnership, is a guarantor of the business' obligation and has provided a copy of a written guaranty, or has given written instruction for the provision of such Information, and not used as a factor in establishing an individual's eligibility for credit, insurance for personal, family or household purposes, or employment.

13. Acknowledge that every inquiry made on an individual will appear on such individual's consumer credit report, listed as either a consumer or business inquiry, when using the corresponding report, and will include, if and as applicable, User's business name and address.

14. Acknowledge that for products and services accessed which contain information from the Death Master File ("DMF") as issued by the Social Security Administration ("SSA"), User certifies pursuant to § 203 of the Bipartisan Budget Act of 2013 and 15 C.F.R. § 1110.2 and § 1110.102 that: User meets the qualifications of a "Certified Person" and that its access to the DMF is appropriate; that consistent with its applicable FCRA or GLBA use of Information, User's use of deceased flags or other indicia within such Information is restricted to legitimate fraud prevention or business purposes in compliance with applicable laws, governmental rules, regulations or fiduciary duty, as such business purposes are interpreted under 15 C.F.R. § 1110.102(a)(1) and that User shall specify the basis for so certifying; that User has systems, facilities and procedures in place to safeguard the accessed DMF information, experience in maintaining the confidentiality, security and appropriate use of the accessed DMF information pursuant to requirements similar to the requirements of § 6103(p)(4) of the Internal

**CONFIDENTIAL**     MicroBilt00051

Revenue Code of 1986, and that User agrees to satisfy the requirements of § 6103(p)(4) as if such applies to User; that User shall not disclose information derived from the DMF to the consumer or any third party, unless clearly required by applicable law; that User acknowledges that failure to comply with the provisions above may subject it to penalties under 15 C.F.R. § 1110.200 of $1,000 for each disclosure or use, up to a maximum of $250,000 in penalties per calendar year; and that User will not take any adverse action against any consumer without further investigation to verify the information from the deceased flags or other indicia.

15. Acknowledge that: The Military Lending Act, 10 U.S.C. § 987 ("MLA") protects Department of Defense ("DOD") "Covered Borrower(s)", (as defined in 32 C.F.R. § 232.3(g)(1)), including "Service Members" and certain "dependents", from certain high-cost "consumer credit" products (as such are defined in the MLA). The DOD Covered Borrower data provided to User from or through MicroBilt comes from the Defense Manpower Data Center ("DMDC") directly from the DOD, or from a DOD approved Repository. MLA data and reports obtained from or through MicroBilt shall be used by User with a "permissible purpose" in accordance with the FCRA, only for its own internal one-time use, and not in connection with, in whole or in part, underwriting of insurance, initiating preapproved offers of credit, to establish profiles, reports or any other documentation on individuals, for marketing, or any purpose other than to make a determination of consumer status as a Covered Borrower as required of "creditors" for credit "transactions" subject to and as defined in the MLA. Without using a Social Security Number in the query, neither the DMDC, the Repositories, nor MicroBilt, can authoritatively assert that the individual identified in the data and report is the same individual that your query refers to; name and data of birth alone, do not uniquely identify an individual. Refer to the MLA and consult with your attorney for more details prior to use.

16. Be aware that Information is obtained and managed by fallible sources and that for the Fee charged, MicroBilt does not guarantee or insure the accuracy, completeness, timeliness, depth or continuation of Information.

17. Assume responsibility for the final verification of the consumer's identity.

18. Be aware that MicroBilt employees are not allowed to render any opinions regarding Information contained in a consumer report. All actions or decisions must be based on User policies and procedures.

**B. MicroBilt Agrees to:**

1. Comply with all applicable Repository rules and procedures, as well as local, state and federal laws and regulations, including but not limited to the FCRA, UCC, business verification and public records, in the preparation, transmission, storage and usage of Information and all types of reports.

2. When, if and as applicable, comply with the rules set forth by the Payment Card Industry ("PCI") Data Security Standards ("DSS") for the appropriate level using an Approved PCI Compliance Scanning Vendor ("ASV").

3. Maintain copies of Information accessed by User along with transaction details, for a minimum of five (5) years. During a consumer inquiry, the subject of the report has the right to learn that User ordered Information on such subject.

4. Re-verify Information at no cost on User requests by telephone or consumer requests in writing. MicroBilt shall respond in writing and timely.

5. Follow reasonable quality assurance procedures and maintain confidentiality of Information acquisition and verification methods.

6. MicroBilt hereby certifies that it is a "consumer reporting agency" and a "reseller of consumer reporting services" as currently defined in the FCRA.

**C. Terms and Conditions:**

1. User shall, and if and as applicable cause its Customers to: identify the end user ("End User") of each consumer credit or other Information prior to requesting such; certify each specific "permissible purpose" as defined in the FCRA or "permitted use" under the GLBA for which the consumer credit or other Information is requested and certify that such will be used for no other purpose or use, (tendering this "permissible purpose" or "permitted use" in such form or manner as requested by MicroBilt); secure consumer credit and other Information on individuals solely for its own internal one-time use in accordance with the permissions and restrictions of the Repositories, which may differ from one another, and which may include credit, employment, insurance underwriting, collection, government licensing or written consumer consent or initiated transactions between itself and the consumer to whom Information refers and/or for such other "permissible purpose" related to a business transaction as is defined by the FCRA or "permitted use" under the GLBA and/or as permitted or restricted by the Repositories; notify MicroBilt immediately if the reason or need for the Information becomes different than originally claimed, for which a signed written addendum to this Agreement is required, provided that the new use consists of a "permissible purpose" as defined in the FCRA or a "permitted use" under the GLBA; and except as otherwise expressly permitted herein, agree it is the End User and will not resell, distribute, sublicense, compile or revise Information obtained through MicroBilt.

2. User and Customers are prohibited from creating derivative works of all or any portion of the "MicroBilt Products" (hereinafter defined), from reverse engineering, decompiling, disassembling, or otherwise attempting to

*MicroBilt User Agreement (con't)*

discover source code of the MicroBilt Products, or from copying, disclosing, or using the MicroBilt Products, except as otherwise provided herein.

3. User acknowledges it has received and shall provide its Customers, if applicable, with the "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA" as required by the FCRA, which can be viewed and printed at the Website.

4. User agrees that it will, and if applicable cause its Customers to, obtain in advance and retain on file appropriate application, release, consent and/or authorization forms ("Forms") from any credit applicant, job applicant or other individual on whom Information in Repositories accessed through MicroBilt is sought; that it will disclose to such individual(s) as and when required by law that credit and/or other Information (including investigative credit report Information, if applicable) will be sought on such individual(s); and that it will provide consumer(s) with answers about their own credit report or when credit is denied, terminated or changed or when an application is declined, based in whole or in part on Information secured through Repositories availed by MicroBilt, resulting in "adverse action" as defined in FCRA, with MicroBilt's name, address and toll free phone number (and not that of any MicroBilt vendor, partner or other customer, unless required otherwise per applicable law); and both advise applicants and follow procedures itself, regarding Repository mandates on consumer inquiries or complaints.

5. User agrees that it will retain Forms for five (5) years in all cases where credit is extended or an application approved and in any case where credit is declined or an application declined; and that it will make available such Forms to MicroBilt and/or Repositories upon reasonable notice for occasions where confirmation or audit is required, either by consumers, the Repositories or by MicroBilt.

6. User agrees to take all reasonable precautions to ensure that Information on individuals (including scores) will be disclosed internally only to those of its employees whose duties reasonably relate to the legitimate business purpose for which the Information was requested.

7. User shall, and if applicable, cause its Customers, at no cost on a monthly or sooner basis, to contribute current and updated consumer history, payment, credit, fraud and other transaction experience data on established and new accounts ("Contribution Data") to MicroBilt in the form, format and manner prescribed by MicroBilt in accordance with MicroBilt's then current data contribution policy, security procedures and data contribution specifications (as amended by MicroBilt from time to time upon reasonable prior written mail, fax, email or Website posting notice to User). Contribution Data shall be as complete and accurate as possible in accordance with then current industry standards and User shall adhere to all applicable local, state and federal laws regarding same. MicroBilt shall have no obligation or responsibility to return Contribution Data or the media containing same to User or act upon any instructions from User regarding the Contribution Data not expressly set forth hereunder or required by applicable law. At MicroBilt's prior written request and within a reasonable period, User shall promptly verify the accuracy of the Contribution Data provided to MicroBilt. User acknowledges it has received and shall provide its Customers, if applicable, with the "Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA" as required by the FCRA, which can be viewed and printed at the Website. User further acknowledges that the manner in which it collects, generates and reports Contribution Data, other than the mutually agreeable format for reporting Contribution Data to MicroBilt, is solely within User's discretion. User warrants that it has the full legal right, permission and authority to provide Contribution Data and that User's processes for collecting, generating and reporting Contribution Data did, does and will not infringe any patent, copyright or trademark right of any third party. Where applicable, User agrees to report Contribution Data as "paid collection" transactions when they are paid, which information shall not be deleted prior to submission, unless required by law. At its option and expense, Contribution Data may be incorporated into the consumer reporting systems of MicroBilt and/or its subsidiaries. Once Contribution Data is incorporated into a credit reporting system, such will become its exclusive property. Nothing in the preceding sentence, however, will affect User's independent full ownership rights in its customer account information from which the Contribution Data was derived. Contribution Data is intended to be added to a computer database for inclusion in consumer reports, accessible pursuant to the FCRA by both authorized subscribers and the subject consumers of such Contribution Data, and therefore it is expressly understood by User that Contribution Data will not be kept confidential in such regard. Once Contribution Data is submitted and incorporated into a credit reporting system, such may be used and disclosed for any purpose consistent with applicable laws, rules and regulations, including but not limited to those purposes set forth in the FCRA and in Section 502(e) of the GLBA and Reg. P promulgated pursuant thereto (16 CFR 313.15); provided, however, that no list shall be released of consumers' names and addresses that specifically identifies individuals as User's customers, or identifies User's customers on any third party's list, or primarily consists of User's customers. Nevertheless, mailing lists,

**CONFIDENTIAL**     MicroBilt00052

customer lists, marketing lists or lists classified as to credit performance, locality or economic indicators using the information contained within a computer database, including without limitation, the Contribution Data submitted hereunder, may be provided or furnished to any authorized party which is under contract for credit furnishing or reporting services, list extract, editing or other services; provided, however, that in no event shall any selection criteria used specifically seek a list of User's current or previous customers, and further provided that the FCRA, GLBA and the implementing regulations issued thereunder shall be fully complied with.

8. User acknowledges that services hereunder may be suspended and/or this Agreement terminated with or without notice to User, should User fail to timely undergo and successfully complete compliance, credentialing and a "Site Inspection" as set forth below.

9. Without right of setoff, User agrees to pay MicroBilt directly for all applicable "Set-Up Fees," "Access Fees," "Site Inspection" and/or "Training, Testing, Credentialing or Certification Fees," "Monthly Minimum Fees," "Monthly Service Fees," "Annual Fees," fees for "Transactions," "Bureau Products," "Repository Data," "Data," "Reports," "Information," "Products," "Searches," "Additional Data," "Additional Products," "Modules," "Equipment" and any other then current, amended or additional fees, plus taxes (collectively "Fees"), due for services rendered by MicroBilt to User under this Agreement and related to the products, services and associated prices identified in the attached Fee Schedule. User agrees and acknowledges that payment to MicroBilt of all Fees due under this Agreement shall be made in one of the two following manners and by initial in the Fee Schedule by the authorized account holder, User explicitly agrees to such method and to provide all necessary information and documentation to facilitate prompt payment: (1) MicroBilt accepts payments via ACH (Automated Clearing House) and requires User's company bank name, address, phone number, account name, account #, ABA # and a voided copy of a company check; **or** (2) MicroBilt accepts payments via Visa, MasterCard, AMEX and Discover. During the first week subsequent to the end of each previous month, MicroBilt will make invoices for all Fees due and transaction detail supporting same, available to User's assigned account or designated representative. Should User have a reasonable dispute with regard to an invoice, User must notify MicroBilt of such within five (5) business days after invoice date and send all detail or documentation via email to CustomerAccounts@MicroBilt.com or fax to 770-234-3881 Attn: Accounting Dept., or any such dispute shall be deemed waived. MicroBilt will respond to User's dispute within five (5) business days after receipt. Invoices are due upon receipt and MicroBilt will either automatically charge User's Credit Card or ACH User's account, all undisputed amounts due. All Fees for services rendered during or otherwise owed for the length of the Term of this Agreement shall be immediately due and payable upon any termination of this Agreement.

10. During the Term of this Agreement, User shall be afforded access to current and available historical invoices and product / Customer transaction detail, Information and/or reports, provided User is not currently and has not been on two (2) or more prior occasions during the Term of this Agreement, whether or not notified or timely resolved, i) in breach of any term or condition herein, or ii) delinquent or in default as to any payment due.

11. MicroBilt may, upon reasonable prior written mail, fax, email or Website posting notice to User, add, remove, increase or decrease any Fee then in effect to reflect a change in any: cost to MicroBilt by a Repository or other vendor; local, state or federal cost or surcharge; or new or enhanced services, tools or compliance cost.

12. User will hold its MicroBilt designated and issued User ID, Password and Subcodes in strict confidence, and will report to MicroBilt immediately any loss, theft, disclosure or unauthorized use of same. Until MicroBilt is so notified and acknowledges de-activation of the User ID, Password and/or Subcodes, User shall be liable for any and all Fees, and for any and all effects and/or consequences of any misuse.

13. By its signature hereto, User agrees that: Information secured will be for exclusive use in its own legitimate business decisions; all Information will be held in strict confidence; use of Information for unfair or deceptive practices is strictly prohibited; Information on current or prospective employees will only be secured by designated authorized representative(s); User employees are forbidden to obtain any Information on themselves, associates or any others save in the performance of their official duties; Information to be used for valuation purposes will be used only to perform a guideline valuation and will not be construed as a replacement for a complete, comprehensive valuation conducted by a qualified professional; Information will not be disclosed to the subject of the Information, except that it may be disclosed if adverse action or consumer dispute is taken; and subject(s) disputing or requesting a copy of their Information will be referred, upon need or legitimate inquiry, only to MicroBilt and not to the Repository identified on the Information, except if User has its own Subcodes, or as required by applicable law.

14. User specifically acknowledges that MicroBilt considers the Equipment, SDK, XML, Website and all software, source code, object code, technology

and documentation related thereto to include confidential information and trade secrets and to be proprietary to MicroBilt. Nothing in this Agreement shall be construed to convey to User any right, title, ownership, interest or intellectual property rights in such, as all vest solely in MicroBilt, whether or not in the nature of copyright, trade secret, trademark, service mark, trade name, patent or otherwise.

15. The MicroBilt and/or Repository products, services, names and marks and those of their vendors ("Marks") identified under this Agreement and Fee Schedule or otherwise, are protected by applicable copyright laws, with all ownership rights retained by the applicable party and/or its vendor. Except as specifically authorized in this Agreement or with prior written consent of the applicable party, which, with regard to MicroBilt, shall not be unreasonably withheld or delayed, the direct or indirect reference, listing, marketing, press release, communication, publication, use, sale, duplication or distribution of any such Mark contrary to the terms and conditions herein, is strictly prohibited. User agrees not to infringe any copyright or other proprietary interest of MicroBilt, any Repository or their vendors. MicroBilt may at any time, after reasonable prior written notice to User via mail, fax, email or Website posting, restrict, remove, add to or modify any such Mark, which shall be promptly adhered to by User.

16. Information and Marks obtained by User hereunder shall be held in strict confidence and except as otherwise set forth herein, are never to be reproduced, disclosed, revealed or made accessible in whole or in part to any third party unless required by applicable law, valid subpoena, court order or government inquiry. User agrees to hold MicroBilt, the Repositories and their respective officers, employees, agents and vendors harmless from any expense, damage or liability, including any special, incidental, exemplary or consequential damages of any nature, arising from the publishing or disclosure of Information or Marks by User contrary to the conditions herein, whether such is disclosed by design or in error.

17. User acknowledges, unless otherwise permitted by a Repository, MicroBilt or applicable law, that its business does not sell Information direct to consumers, and it is not a credit repair, process server, dance studio, spiritual, tattoo, health or book club, adult, dating or massage business.

18. User agrees to place all devices used to obtain Information and all electronic and hard copy Information and applications with transaction detail, which shall be maintained and kept confidential for a minimum of five (5) years, in a secure location within its facility, so that unauthorized persons cannot access them, and to password protect and lock such devices and locations after normal business hours.

19. This Agreement shall commence as of the Effective Date and shall remain in effect for a minimum initial period of three (3) years (the "Initial Term") after which it shall automatically and continuously renew for additional minimum one (1) year periods, (the "Renewal Term(s)" and with the Initial Term, each a "Term") until terminated by either party on sixty (60) days written notice to the other, prior to the end of the then existing Term, or upon termination as otherwise set forth herein. Obligations for the payment of Fees for services rendered during or otherwise owed for the length of the Term of this Agreement, the continuation of confidentiality and maintenance of records, however, shall survive termination.

20. User acknowledges, consents and agrees that MicroBilt does not guaranty the continuation and shall not be held liable to User and/or its Customers for the discontinuation of any one or more specific products or services offered hereunder as amended from time to time as set forth herein and that such shall not be a valid "Claim" (defined below), cause for breach or termination of this Agreement.

21. EXCEPT AS SET FORTH IN THE FOLLOWING PARAGRAPH, NEITHER MICROBILT NOR THE REPOSITORIES MAKE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, WITH REGARD TO THE SERVICES, PRODUCTS OR INFORMATION PROVIDED UNDER THIS AGREEMENT, (SUCH INFORMATION IS PROVIDED BY THE REPOSITORIES "AS IS") INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. FURTHER, NEITHER MICROBILT NOR THE REPOSITORIES IN ANY WAY WARRANT OR ASSUME ANY LIABILITY FOR A "CLAIM" FOR BREACH REGARDING THE TIMELINESS, CURRENCY, CONTINUATION, VALIDITY, ACCURACY, ADEQUACY OR COMPLETENESS OF ANY INFORMATION ACCESSED. USER ACKNOWLEDGES THAT ENTERING INTO THIS AGREEMENT IS ITS BUSINESS DECISION, IS NOT BASED ON THE PROVISION OF ANY ONE OR MORE SPECIFIC PRODUCTS OR SERVICES AND THAT EVERY BUSINESS DECISION INVOLVES THE ASSUMPTION OF A RISK, WHICH NEITHER MICROBILT NOR THE REPOSITORIES DO OR WILL UNDERWRITE IN ANY MANNER.

22. MicroBilt agrees that throughout the Term of this Agreement: (i) it shall perform its services hereunder in a competent and workman-like manner in accordance with the then current standards of the industry; (ii) it has and will continue to maintain all necessary ownership rights, title, licenses, insurance, authorities and approvals necessary regarding its business and the products and services provided hereunder, the Equipment, Website,

**CONFIDENTIAL**

SDK, XML and any software, source code, object code and documentation thereto (together the "MicroBilt Products"), free of all liens, claims, encumbrances and other restrictions; (iii) the MicroBilt Products do not and will not infringe upon copyrights, trademarks, patents or any other proprietary rights of any third party; (iv) it will permit access to the MicroBilt Products completely and accurately per the terms as set forth herein; (v) the MicroBilt Products shall be free from any defects in design, materials and workmanship, shall be free of any "worm," "virus," "lock out" or "self destruct" devices, as such terms are understood in the computer industry and shall perform in accordance with the terms herein; (vi) any documentation provided by MicroBilt hereunder will accurately describe the MicroBilt Products; (vii) the MicroBilt Products, MicroBilt and its officers, employees, agents and representatives shall comply with all applicable laws and regulations and obtain and maintain in effect such permits, licenses and other forms of authorization required to comply with such laws and regulations; and (viii) it will keep the MicroBilt Products validly registered and current in concert with any relevant changing industry and market conditions so that such will continue to perform all intended functions.

23. MICROBILT AND THE REPOSITORIES SHALL BE HELD HARMLESS FROM AND NOT BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF THE USE OR INABILITY TO USE ANY SERVICE OR PRODUCT PROVIDED HEREUNDER OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSS OF ANY REAL OR ANTICIPATED PROFITS, EVEN IF MICROBILT AND/OR A REPOSITORY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. ANY LIABILITY OF MICROBILT AND/OR A REPOSITORY OF ANY NATURE HEREUNDER SHALL BE LIMITED TO A REFUND OF THE PAYMENTS MADE BY USER UNDER THIS AGREEMENT. A "CLAIM" INCLUDES ANY CLAIM, DEMAND, ACTION, PROCEEDING, LOSS, COST, EXPENSE (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES), DAMAGE, LIABILITY OR PENALTY. NO CLAIM MAY BE COMMENCED MORE THAN TWO (2) YEARS AFTER THE OCCURRENCE WHICH HAS GIVEN RISE TO SUCH.

24. Each party shall defend, indemnify and hold the other party harmless from Claims arising out of the indemnifying party's breach of any representation, warranty or other term contained herein. In connection with any Claim that is indemnifiable hereunder, the indemnified party shall, if and when legally permissible: (a) give the indemnifying party prompt written notice of the Claim for which indemnification is sought; (b) give the indemnifying party the opportunity to take over and/or settle any third party Claim through counsel of the indemnifying party's choice, at its sole direction and expense; and (c) cooperate fully with the indemnifying party as to the Claim.

25. Except as stated to the contrary in this Agreement, as to "Non-public Personal Information" or "Personally Identifiable Financial Information" of consumers as defined by applicable state or federal law, including, but not limited to Title V of the GLBA (Non-public Personal Information and Personally Identifiable Financial Information, collectively, "Consumer Information") delivered or made available from one party to the other pursuant to this Agreement, each party agrees that: (i) it shall use Consumer Information solely for purposes of carrying out its obligations under this Agreement and for no other purposes; (ii) in compliance with the "Safeguards Rule" under the GLBA, it shall implement appropriate technical and organizational procedures and controls to safeguard and protect Consumer Information against accidental, unauthorized or unlawful access, disclosure, destruction, loss or alteration, and provide the other party with information regarding such measures upon reasonable prior written request; (iii) it shall conduct periodic employee training and other management oversight activities in order to assure that its employees understand the requirements contained in this Agreement and are cognizant of the need to strictly comply with all such measures; (iv) it may allow the other party, once each calendar year during the Term, at the requesting party's expense, to conduct an on-site visit, audit and review of the other party's documentation and facilities, on thirty (30) days prior written notice, at mutually convenient times and during regular business hours, to substantiate and ensure the procedures and controls are in place and adequate; (v) to the extent not restricted by subpoena, court order, government investigation or applicable law, it shall notify the providing party orally within one (1) business day of any unauthorized access to or disclosure of the providing party's Consumer Information within the receiving party's custody or control (a "Security Event") and in writing within five (5) business days after such an event, including the extent and scope of the Security Event and the names of specific consumers impacted by the Security Event, or as soon as such information is available; (vi) to the extent not restricted by subpoena, court order, government investigation or applicable law, it shall cooperate with the providing party as to legal obligations and to resolve the Security Event and notify all affected consumers in the parties joint determination as to notice, costs and expenses related thereto; (vii) any intentional, grossly negligent or continuous violation of the GLBA by a party (as determined in the other party's reasonable discretion supported by documentary evidence) may

result in the immediate suspension of the provision or use of products and services under and/or termination of this Agreement, with or without prior written notice; and (viii) the notifying party may suspend the provision or use of products and services under and/or terminate this Agreement, on fifteen (15) days prior written notice to the other party, in the event that the other party's use of any Information governed by the GLBA is either the subject of material adverse consumer reaction, which manifested in substantial negative media coverage, or the subject of material litigation or action by any governmental agency.

26. Except with regard to Contribution Data and inquiry or other submitted data, "Confidential Information" means all information furnished in any manner by one party to the other under this Agreement and all information derived therefrom, including, but not limited to, this Agreement and any exhibits, products, services and pricing, source code, object code, software, business, employee, vendor, customer and Consumer Information. The term "Confidential Information" does not include information, proven by documentation which: (i) becomes generally available to the public other than as a result of a disclosure by the information receiver; (ii) was available to the information receiver on a non-confidential basis prior to its disclosure by the information provider; (iii) becomes available to the information receiver on a non-confidential basis from a source other than the information provider, provided that such source is not known by the information receiver, after due inquiry, to be bound by any duty to the information provider or another entity, to keep such information confidential; or (iv) is independently developed by the information receiver, without use of the information provider's Confidential Information. Each party agrees that the Confidential Information disclosed to it by the other party shall not be disclosed to any third party and shall be used only for the purposes herein. Each party agrees to treat all Confidential Information of the other in the same manner in which it treats its own confidential and proprietary information, including prohibition of and sanction against the use of such by any third party, employee, agent or associate of a party so revealing and/or using such information for direct or indirect gain.

27. Either party may terminate this Agreement, should the other party breach any material term or condition herein, provided that the non-breaching party has given written notice of the breach to the breaching party and afforded the breaching party a thirty (30) day opportunity to cure and the breaching party failed to so cure. In whole or in part, MicroBilt may cease or suspend its provision of one or more products or services hereunder and/or terminate this Agreement, at any time, with or without notice, with no liability to User, if: (i) MicroBilt reasonably determines that the provision of services hereunder violates any credit reporting or other law; (ii) MicroBilt is required to do so by any Repository; (iii) MicroBilt or a Repository eliminates, modifies or restricts a product or service; (iv) User violates or upon reasonable belief is suspected of violating a consumer protection regulation, Repository guideline, the FCRA or any applicable local, state or federal law; (v) User exhibits rude, untruthful, illegal or immoral actions or omissions or there is a general breakdown in the relationship between the parties; or (vi) User fails to timely pay all undisputed amounts due, for which MicroBilt may immediately suspend services and/or User fails to resolve payment delinquencies within thirty (30) days of written notice, for which MicroBilt may terminate this Agreement and/or User's payments have been delinquent on two (2) or more occasions during the Term of this Agreement, whether or not notified or timely resolved, for which MicroBilt may immediately terminate this Agreement.

28. General Provisions

a. Notices. Except as specifically maintained otherwise herein, any and all notices shall be given in writing and sent Registered or Certified mail, return receipt requested or via overnight courier or by hand delivery to the other party at the street address listed above or in the Fee Schedule or as modified by proper notice to a party. The date of receipt shall be the effective date of the notice.

b. Waivers. A party's failure or delay to enforce or waive any provision of this Agreement shall not affect its validity or enforceability or constitute a waiver of future enforcement of that or any other provision of this Agreement.

c. Amendments. Except as otherwise set forth herein, this Agreement may be modified or amended only by the written consent of both parties.

d. Headings. All headings used in this Agreement are for the convenience of the parties and are for reference purposes only.

e. Injunctive Relief. Each party shall have, in addition to any other relief at law or equity, the right to seek injunctive relief to redress a party's breach of this Agreement.

f. Severability. Any term or condition of this Agreement deemed legally invalid or unenforceable, shall in no way affect any other remaining term or condition.

g. Assignment. Except as otherwise expressly permitted herein, neither party may distribute, rent, sublicense, lease, sell or assign this Agreement or the services or products provided herein without the prior written consent of the other, provided that either party may assign this Agreement to any of its affiliated companies without consent or may assign this Agreement in the

MicroBilt Confidential

**CONFIDENTIAL**

MicroBilt00054

event of a sale by such party of all or substantially all its assets to an assignee or to an entity with or into which it is merged or consolidated, provided that the assignee assents in writing to all terms and conditions hereof and further provided that the scope, level, volume and nature of the services to be provided to or by the assignee are not materially changed.

h. Exclusivity. This Agreement is not exclusive and either party may enter into similar agreements with others.

i. Independent Contractor. MicroBilt shall be considered an independent contractor and not an employee of User. Except as otherwise expressly provided herein, neither party shall in any way represent itself as an agent, employee, joint-venturer or representative of the other party.

j. Third Party Beneficiaries. This Agreement is intended for the benefit of, is binding upon and may be enforced solely by the parties hereto, their successors and permitted assigns and except as expressly provided herein otherwise, no third party shall have any rights herein.

k. Restriction on Employment. User may not solicit (other than via job fairs or advertisements to the general public) or hire any present or former MicroBilt employee, contractor or consultant without MicroBilt's prior written consent.

l. Non-Solicitation. User may not solicit (other than via trade shows or marketing to the general public) or entice any existing or potential vendor or customer to terminate its existing or potential relationship with MicroBilt.

m. Communications / Marketing. User agrees that MicroBilt, its vendors, partners and sponsors may market products and services to User and/or Customers from time to time, including commercial advertisement, sales promotions, additions, deletions, upgrades, updates, customer service, technical, legal and compliance notifications, via mail, fax, email, Website posting or phone and may monitor / record such for the purposes of training, improvement to sales, customer service and compliance.

n. Force Majeure. Performance by MicroBilt may be subject to interruption and delay due to causes beyond its reasonable control such as acts of God, government, weather, fire, power or telecommunications failure, inability to obtain supplies or Information, breakdown of equipment or interruption in Repository services or communications. Neither party shall be liable to the other for any delay or failure to perform which results from causes outside its reasonable control.

o. Choice of Law and Venue. THE PARTIES IRREVOCABLY AGREE THAT: i) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SOLE AND EXCLUSIVE LAW, PERSONAL JURISDICTION AND VENUE OF THE STATE AND FEDERAL COURTS OF THE STATE OF NEW JERSEY, COUNTY OF MERCER, WITHOUT REGARD TO ITS CONFLICTS OF LAW PRINCIPLES; ii) ANY ACTION RELATING TO THIS AGREEMENT SHALL BE FILED IN SUCH COURTS; AND iii) ANY CLAIM OR DEFENSE THAT A PARTY LACKS MINIMUM CONTACTS WITH THE FORUM OR THAT SUCH COURTS LACK PERSONAL JURISDICTION OR THAT VENUE IS IMPROPER OR INCONVENIENT, SHALL BE WAIVED.

p. Collection and Attorneys' Fees. Without limiting MicroBilt's remedies for non-payment or late payment of invoices, User shall be liable to MicroBilt for any and all interest, late fees, costs of collection, court costs and reasonable attorneys' fees as to any collection effort regarding invoices for services rendered pursuant to this Agreement and remaining unpaid after the due date.

q. Taxes. User shall pay all applicable federal, state and/or local sales, service, use or other taxes designated or imposed due to any action or transaction under this Agreement, other than taxes imposed on MicroBilt's net income. This Agreement provides an information service for purposes of state sales and use tax. Nothing contrary in this Agreement is intended to or in fact changes the nature of services provided hereunder.

r. Audits. MicroBilt may track, review, compile, store and use any Contribution Data and submitted inquiry or other data. During the Term and

continuing after termination of this Agreement as required or necessary as set forth below, after reasonable prior written notice to User via mail, fax, email or Website posting and at mutually convenient times during normal business hours, MicroBilt may audit User's compliance with the terms of this Agreement and all applicable legal requirements and laws, including, but not limited to, the FCRA and the GLBA, at User's expense per a MicroBilt, Repository, consumer, legal, government or court ordered rule, mandate, subpoena, inquiry or request, via non-invasive database queries, statistical financial and/or document reviews or requests, (or on-site visits at MicroBilt's expense no more than once each calendar year), each of which shall promptly and fully be responded to by User within a reasonable time after notification, to avoid the suspension of access to one or more products or services hereunder and/or termination of this Agreement.

s. Continuation of Confidentiality. Notwithstanding anything herein to the contrary, the duty of confidentiality to which the parties hereto are bound, shall continue in full force and effect for three (3) years after any termination of this Agreement.

t. Compliance Certification, Training, Testing, Credentialing & Site Inspection. As necessary, in accordance with FCRA, FACTA, GLBA, DPPA, MVR, ECOA, TILA and other local, state and federal laws, as well as Credit Bureau, Data Repository and MicroBilt policies, prior to accessing consumer Credit Information or other Data and on an annual basis and when changing business premises or ownership and as new MicroBilt products and services are offered or accessed from time to time and new laws, Credit Bureau, Data Repository and MicroBilt policies are established or amended, User agrees to undergo and pay the Fees set forth in Exhibit A for compliance certification, credentialing, employee FCRA training and testing, an on-site inspection at its business premises ("Site Inspection"), criminal, consumer credit and other background checks on User's business and principal (owner or officer), performed by ComplyTraq, LLC, to determine and review credit, history, procedures, processes and need for accessing, using, storing and/or distributing Information, security practices and other protective measures in place, so as to ensure initial compliance with the terms hereof, as well as periodically for reassurance thereafter. If applicable, to ensure its Customers' compliance, User shall enter into a "ComplyTraq Compliance Services Agreement" directly with ComplyTraq to ensure similar compliance and credentialing. Further, MicroBilt may, at any time after reasonable prior written notice to User via mail, fax, email or Website posting, add to, delete or modify any MicroBilt, Repository or Credit Bureau contractual or legal compliance / security procedure, which shall be incorporated herein by reference and promptly and fully be adhered to within a reasonable time after notification, to avoid the suspension of one or more products or services hereunder and/or termination of this Agreement.

u. Document Approval. MicroBilt and User certify that the terms on all pages have been read and that the undersigned agree to the terms of this Agreement and Fee Schedule as written on behalf of his / her business and represents that he / she is authorized to execute such documents on behalf of the party so indicated. The parties acknowledge that this Agreement and Fee Schedule may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument, with facsimile signatures construed as legal, valid and binding marks. This Agreement with Recitals, Fee Schedule and/or other exhibits attached hereto, if any, incorporated herein by reference, constitutes the entire agreement between MicroBilt and User with regard to the subject matter contained herein and therein and supersedes all other existing or contemporaneous agreements, writings, communications or understandings between the parties concerning such subject matter, written or oral. There are no warranties, representations or agreements of the parties with respect to the subject matter of this Agreement and Fee Schedule, other than those herein and therein.

IN WITNESS WHEREOF, the parties have caused this Agreement and Fee Schedule to be executed as of the 8th day of March , 20 18 ("Effective Date"), by the undersigned duly authorized.

User: Alliance Title Services LLC

*tim bender*

Signature of Owner or Officer

Tim Bender- Managing Member

Name Typed or Printed

Managing Meber for Alliance Title Services LLC

Title

3/8/2018

Date

MicroBilt Corporation

Signature of Officer

*Chris Atkins*

Name Typed or Printed

Title

3/9/18

Date

**CONFIDENTIAL**     MicroBilt00055

# Exhibit 3



May 7, 2025

Alliance Title Services
2914 E 32nd St. Ste 120
Joplin, MO 64804

To Whom It May Concern:

As part of your contractual responsibility with MicroBilt and your legal responsibility to comply with the Fair Credit Reporting Act, ("FCRA"), the Gramm-Leach-Bliley Act of 1999 ("GLBA"), and other applicable laws and contractual requirements regarding data usage, searches through MicroBilt's systems are randomly audited by MicroBilt, its data repositories, and bureau vendors to assure of the appropriateness and legitimacy of such searches, and that various privacy rights and regulations are adhered to.

Accordingly, the transactions on the following page have been selected for audit verification. Kindly review the attached search activity and complete the enclosed Audit Verification Statement.

If these searches were conducted during the normal course of your business, **please attach appropriate documentation evidencing your specific authority to conduct these specific transactions as required under your Agreement with MicroBilt and the FCRA, and complete, sign and return the enclosed Audit Verification Statement**. In the event that the searches selected were not conducted for purposes relating to your business, please identify the steps your organization is implementing to ensure that these potentially inappropriate searches are not conducted again.

Please attach all required documentation and return the signed form via fax to 270-596-2381 or email to Melissa_Dennis@microbilt.com no later than **May 14, 2025**. Failure to respond in a timely manner may result in the suspension of services or termination of your account.

Thank you for your prompt attention to this matter. Should you have any questions or if your response will exceed five (5) business days, please contact the MicroBilt Compliance Department at PH: 800-849-4960, ext. 4422.

Sincerely,

Compliance Department

**CONFIDENTIAL**  MicroBilt00001



## AUDIT VERIFICATION STATEMENT
### MicroBilt Account: 26769

This form must be signed and returned. You must return all pages of the Audit Verification Statement, along with appropriate documentation evidencing your specific authority to conduct each of the specific transactions questioned. The documents may be faxed to 270-496-2381 or emailed to Melissa_Dennis@microbilt.com.

If you have any questions about this audit procedure, or there are any transactions that you cannot verify, please feel free to contact MicroBilt Compliance at PH: 800-849-4960.

## VERIFICATION

- I hereby affirm that the attached referenced searches have been conducted in the normal course of our business in accordance with the industry-specific permissible purpose under the FCRA for use of the MicroBilt database set forth in our Agreement with MicroBilt, and that the data obtained from the attached referenced searches has been used one time by our business solely for legally permissible purposes.

*Alliance Title Services LLC*
Company Name:

*[signature]*
Signature

*Tim Bson Sr.*
Print Name

*Manager*
Title

*5-9-2025*
Date

1640 Airport Road, Suite 115, Kennesaw, GA 30144

**CONFIDENTIAL**     MicroBilt00002

# Exhibit 4



## AUDIT VERIFICATION STATEMENT
### MicroBilt Account: 26769

| Location ID | Search Criteria | Timestamp (GMT) | Permissible Purpose (please identify for each transaction) |
|---|---|---|---|
| 26769 | Jarrett Jenkins SSN: ▮▮▮▮ | 12/11/2024 | review of collections for rental. Attached |

**CONFIDENTIAL**          MicroBilt00003

Civil Judgment  $54,381.00     12/03/2024    6113552023     New York

Debtor 1

   Jenkins, Jarrett R

   25 Melville Park Rd Ste 229G

   Melville, NY 11747-3262

   SSN: █████████

Debtor 2

   Ddt Consultants Inc

   25 Melville Park Rd Ste 229G

   Melville, NY 11747-3262

Debtor 3

   Tate LLC

   25 Melville Park Rd Ste 229G

   Melville, NY 11747-3262

Creditor 1

   Fox Capital Group Inc

Filing 1

   Landlord/Tenant Dispute

   Type: Civil Judgment

   Agency: Nassau Supreme Court - Mineola

   Agency City: Mineola

   Agency State: NY

   Agency County: Nassau

   Number: 6113552023

**CONFIDENTIAL**          MicroBilt00004

# Exhibit 5

| CR | Inquiries with this prefix indicate you may have applied for credit or services. |

# INQUIRIES THAT DO NOT IMPACT CREDIT SCORE/RATING



**EQUIFAX | Total inquiries: 1**

**EQUIFAX | Total inquiries: 1**

**BUSINESS CARD MC/CITIBANK NA | Total inquiries: 34**

**CITIBANK NA | Total inquiries: 94**

**PENTAGON FEDERAL CREDIT UNION | Total inquiries: 1**

**ANDREWS FCU | Total inquiries: 1**

**KEY BANK, NA | Total inquiries: 6**

CONFIDENTIAL

MicroBilt00006

**CREDIT KARMA, INC | Total inquiries: 1**

⌄

**CREDIT KARMA, INC | Total inquiries: 58**

⌄

**EQUIFAX | Total inquiries: 1**

⌄

**EQUIFAX INC (0100) | Total inquiries: 1**

⌄

**CREDIT KARMA, INC. | Total inquiries: 1**

⌄

**FUNDING METRICS LLC | Total inquiries: 1**

⌄

**FUNDING METRICS LLC | Total inquiries: 1**

⌄

**MICROBILT CORPORATION | Total inquiries: 1**

⌃

Inquiry Type Prefix
**ND**

**CONFIDENTIAL**

MicroBilt00007

Address
**MICROBILT CORPORATION**
**1640 Airport Rd NW Ste 115**
**Kennesaw GA 3014-47038**
**(888)222-7621**

Dates of Inquiry
**12/11/2024**

**NASA FCU | Total inquiries: 1**      ⌄⌄

⌄

**KUBER FINANCIAL, LLC | Total inquiries: 1**      ⌄⌄

⌄

| Prefix | Definition |
|---|---|
| AM OR AR | Inquiries with these prefixes indicate a periodic review of your credit history by one of your creditors. |
| CAR RENT | Inquiries with this prefix are from rental car companies regarding debit card payment acceptance. |
| COLLECT | Inquiries with this prefix are for collection purposes and may be from the lender, a party collecting on the lender's behalf, or a company that purchased your debt. |
| CONS RPT | Inquiries with this prefix are from your requests for your own report or requests you have authorized as part of a service or product. |
| DDA | Inquiries with this prefix relate to a review of your consumer report for the opening of a deposit account. |

**CONFIDENTIAL**                                    MicroBilt00008